UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK HIGBEE,

     Plaintiff,

V

EASTERN MICHIGAN UNIVERSITY, THE
BOARD OF REGENTS OF EASTERN MICHIGAN
UNIVERSITY, JAMES SMITH, JAMES CARROLL,
WADE TORNQUIST, JOLINE DAVIS, DAVID TURNER,
DAVID WOIKE, RHONDA LONGWORTH, MICHELLE
CRUMM, MARY TREDER LANG, DENNIS BEAGEN,
MICHAEL HAWKS, EUNICE JEFFRIES, MICHAEL
MORRIS, JAMES WEBB AND ALEXANDER SIMPSON,

     Defendants.

CASE NO. 2:18-cv-13761

JUDGE SEAN F. COX
MAG. JUDGE ANTHONY P. PATTI

---

| | |
|---|---|
| Law Office of Glen N. Lenhoff<br>By:  Glen N. Lenhoff (P32610)<br>     Robert Kent-Bryant (P40806)<br>Attorneys for Plaintiff<br>10683 South Saginaw Street, Suite D<br>Grand Blanc, Michigan  48439<br>(810)235-5660<br>lenhofflaw@usol.com | Dykema Gossett, PLLC<br>By:  James Hermon (P53765)<br>     Ryan VanOver (P82007)<br>Attorneys for Defendants<br>2723 South State Street, Suite 400<br>Ann Arbor, Michigan 48104<br>(734)214-7629<br>jhermon@dykema.com<br>rvanover@dykema.com |

---

## **PLAINTIFF MARK HIGBEE'S ANSWER TO INDIVIDUAL DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6)**

For the reasons set forth in the attached Brief in Support of Plaintiff's Answer to Individual Defendants' Motion to Dismiss Pursuant to Fed. R. Civ, P. 12(B)(6), Plaintiff respectfully requests this Honorable court deny the aforestated motion.

Respectfully submitted,

/s/Glen N. Lenhoff
GLEN N. LENHOFF  (P32610)
Law Office of Glen N. Lenhoff
Attorney for Plaintiff
Dated:  03/01/19

/s/Robert D. Kent-Bryant
ROBERT KENT-BRYANT(P40806)
Law Office of Glen N. Lenhoff
Attorney for Plaintiff
Dated:  03/01/19

G:/CLIENTS/Higbee/ans to mtn to dismiss - ind

2

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MARK HIGBEE,                          CASE NO. 2:18-cv-13761

    Plaintiff,                        JUDGE SEAN F. COX
                                      MAG. JUDGE ANTHONY P. PATTI
V

EASTERN MICHIGAN UNIVERSITY, THE
BOARD OF REGENTS OF EASTERN MICHIGAN
UNIVERSITY, JAMES SMITH, JAMES CARROLL,
WADE TORNQUIST, JOLINE DAVIS, DAVID TURNER,
DAVID WOIKE, RHONDA LONGWORTH, MICHELLE
CRUMM, MARY TREDER LANG, DENNIS BEAGEN,
MICHAEL HAWKS, EUNICE JEFFRIES, MICHAEL
MORRIS, JAMES WEBB AND ALEXANDER SIMPSON,

    Defendants.

---

| | |
|---|---|
| Law Office of Glen N. Lenhoff | Dykema Gossett, PLLC |
| By:  Glen N. Lenhoff (P32610) | By:    James Hermon (P53765) |
|     Robert Kent-Bryant (P40806) |     Ryan VanOver (P82007) |
| Attorneys for Plaintiff | Attorneys for Defendants |
| 10683 South Saginaw Street, Suite D | 2723 South State Street, Suite 400 |
| Grand Blanc, Michigan  48439 | Ann Arbor, Michigan 48104 |
| (810)235-5660 | (734)214-7629 |
| lenhofflaw@usol.com | jhermon@dykema.com |
| | rvanover@dykema.com |

---

## PLAINTIFF'S RESPONSE TO INDIVIDUAL DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12 (B)(6)

## **TABLE OF CONTENTS**

**PAGE(S)**

TABLE OF AUTHORITIES...................................................................ii-iii

MOST RELEVANT AUTHORITY.........................................................iv

QUESTIONS PRESENTED..................................................................v

INTRODUCTION...................................................................................1

APPLICABLE LEGAL STANDARDS....................................................3

FACTS..................................................................................................5

LEGAL ARGUMENT...........................................................................11

A.   THE DEFENDANTS ARE NOT ENTITLED TO DISMISSAL
     OF PLAINTIFF'S 42 USC §1983 CLAIM BECAUSE PLAINTIFF
     ENGAGED IN PROTECTED SPEECH UNDER THE FIRST
     AMENDMENT OF THE UNITED STATES CONSTITUTION..........11
     1.   Plaintiff Spoke on a Matter of Public Concern......................12
     2.   Plaintiff Was Speaking as a Private Citizen When He
          Criticized the Response of the EMU Administration to
          Campus Racism on the Facebook Site, EMUTalk...............14
     3.   Plaintiff's Speech Satisfies the *Pickering* Balancing Test
          Because His Speech Involved Critical Issues of Public
          Concern But Was Not Unduly Burdensome to Defendant
          University......................................................................16

B.   DEFENDANTS' ARGUMENT THAT THEY ARE ENTITLED
     TO QUALIFIED IMMUNITY IS WITHOUT MERIT BECAUSE
     THE LAW WAS WELL-ESTABLISHED AT THE TIME OF
     PLAINTIFF'S DISCIPLINE THAT A PUBLIC EMPLOYEE
     COULD NOT BE DISCIPLINED FOR SPEAKING OR
     WRITING IN A PUBLIC FORUM SUCH AS EMUTALK ON
     MATTERS OF PUBLIC CONCERN, INCLUDING RACISM...........20

CONCLUSION....................................................................................23

i

## **TABLE OF AUTHORITIES**

**PAGE(S)**

## **CASES**

*Anderson v. Creighton,*
   483 U.S. 635, 640 (1987)…………………………………………......……21

*Bauer v Sampson,*
   261 F.3d 775, 785 (9th Cir. 2001)…………………………………….....18

*Becton v Detroit Terminal of Consol. Freightways,*
   687 F.2d 140, 142 (1982)………………………………....……………3, 4

*Brandenburg v Housing Authority of Irvine,*
   253 F.3d 891, 899 (6th Cir. 2001)……………………………………..18

*Brooks v. Seiter,*
   779 F.2d 1177, 1180 (6th Cir.1985)……………..………….…………3

*Chappel v. Montgomery County Fire Protection District No. 1,*
   131 F.3d 564, 576 (6th Cir. 1997)…………………………………..…13

*City of San Diego v Roe,*
   543 U.S. 77, 83-84 (2004)……………………………………………13

*Cockrel v. Shelby County School District,*
   270 F.3d 1036, 1052 (6th Cir. 2001)……………..……………13, 17

*Connick v. Myers,*
   461 U.S. 138 (1983)……………………………………………13, 14, 23

*Dambrot v. Central Michigan University,*
   55 F.3d 1177, 1188 (6th Cir. 1995)……………………………………14

*Dominque v Telb,*
   831 F2d 673, 677 (6th Cir. 1987)…………………………………….21

*Garcetti v. Ceballos,*
   547 U.S. 410 (2006)……………………………………12, 15, 17, 22

*Garvive v. Jackson,*
   845 F2d 647, 649 (6th Cir. 1988)……………………………….....21

*Guilloty Perez v Peirlusi*,
    339 F.3d 43, 53 (1st Cir. 2003)..................................................18

*Hishon v King and Spalding*,
    467 U.S. 69, 73 (1984)...........................................................3

*Lane v. Franks*,
    573 U.S. 228 (2014)............................................................22

*Leary v. Daeschner*,
    349 F.3d 888, 900 (6th Cir. 2003)............................................17

*Mayhew v. Town of Smyrna*,
    856 F.3d 456, 462 (6th Cir. 2012)........................................15, 16

*McCloud v Testa*,
    97 F.3d 1536, 1556 (6th Cir. 1996)......................................21, 24

*Nair v. Oakland County Community Mental Health Authority*,
    443 F.3d 469, 478 (6th Cir. 2006)............................................12

*Perry v. McGinnis*,
    209 F.3d 597, 608 (6th Cir. 2000)....................................3, 14, 18

*Pickering v. Bd. Of Ed. Of Township High Sch. Dist.*,
    391 U.S. 563 (1968)..................................12, 17, 18, 20-24

*Rogers v. Banks*,
    344 F.3d 587, 597 (6th Cir. 2003)........................................13, 14

*See v. Elyria*,
    502 F3d 484, 491 (6th Cir 2007)..............................................21

*Sistrunk v. City of Strongsville*,
    99 F.3d 194, 197 (6th Cir.1996).................................................3

*Victor v McElveen*,
    150 F.3d 451, 458 (5th Cir. 1998)............................................18

*Weisbarth v. Geauga Park District*,
    499 F.3d 538, 542 (6th Cir. 2007)............................................12

*White v Pauly*,
    580 U.S. __, 196 L.Ed2d 463 (S. Ct.2017)..................................21

# MOST RELEVANT AUTHORITY

**PAGE(S)**

**CASES**

*Connick v. Myers,* (Exhibit 5)
　　461 U.S. 138 (1983)……………………………………………..13, 14, 23

*Garcetti v. Ceballos,* (Exhibit 6)
　　547 U.S. 410 (2006)……………………………………….…12, 15, 17, 22

*Mayhew v. Town of Smyrna,* (Exhibit 7)
　　856 F.3d 456 (6th Cir. 2012)…………………………………...…15, 16

*Perry v. McGinnis,* (Exhibit 1)
　　209 F.3d 597 (6th Cir. 2000)………………….………………......3, 14, 18

*Pickering v. Bd. Of Ed. Of Township High Sch. Dist.,* (Exhibit 4)
　　391 U.S. 563 (1968)…………………………………….12, 17, 18, 20-24

## QUESTIONS PRESENTED

1.   Was Plaintiff's post, which concerned Defendant University's response to issues of racism on campus, speech protected by the First Amendment of the United States Constitution?

2.   Are individual Defendants entitled to qualified immunity where the law has been well-established since at least 1983 that a public employee could not be disciplined for speaking or writing in a public forum, such as EMUTalk, on matters of public concern, including racism?

## I.   INTRODUCTION

This matter arises out of Plaintiff's exercise of his free speech rights under the First Amendment of the United States Constitution while employed with Defendant Eastern Michigan University.   Prior to the speech in question, Defendant University had been the scene of racist graffiti directed at African-Americans. After students protested the university administration's response to the racist graffiti, some of the students received discipline from the university. Plaintiff, a professor of American History, and a civil rights activist, took to EMUTalk, a Facebook page not officially affiliated with the University. In a lengthy post, Plaintiff registered his criticism of Defendant University's response to the racist acts, and defended the students who were disciplined. In his post, Plaintiff referred to some of the University administrators as "HN in C," which stood for "Head Negros in Charge."   As a result of Plaintiff's Facebook post, Defendant University, through the individual defendants named in this lawsuit, suspended Plaintiff without pay for one semester, required him to attend and complete a one-on-one training session with a professional consultant, banned Plaintiff from campus and barred him from Defendant University's email system.   It is undisputed in this lawsuit that the reason Plaintiff was disciplined was his Facebook post.

As a result of the foregoing, Plaintiff brought this lawsuit. The claims Plaintiff asserted in this lawsuit are (1) actions under 42 USC §1983 against all individual defendants for violation of the First Amendment; and (2) retaliation claims against Defendants Eastern Michigan University and the Board of Regents of Eastern Michigan University, pursuant to Michigan's Elliott-Larsen's Civil Rights Act (ELCRA). Defendants have now brought two motions to dismiss pursuant to FRCP 12(b)(6), in which Defendants argue Plaintiff has failed to state a claim upon which relief can be granted. One motion pertains to Plaintiff's 42 USC §1983 claims against the individual defendants, and one pertains to Plaintiff's ELCRA claims against Defendants Eastern Michigan University and the Board of Regents of Eastern Michigan University.

This brief is in response to Defendants' motion to dismiss Plaintiff's 42 USC §1983 claims. In that Motion, Defendants claim the First Amendment did not protect Plaintiff's publically facing Facebook post and, even if it did, the individual defendants are shielded from liability by qualified immunity because Plaintiff's First Amendment rights were not "clearly established" at the time he exercised them. Based on the long-standing law the Supreme Court has articulated for over 50 years, Defendants' motion is without merit and should be denied.

## II. APPLICABLE LEGAL STANDARDS

An FRCP 12(b)(6) motion to dismiss for failure to state a claim may only be granted if it is clear beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  See, *Hishon v King and Spalding*, 467 U.S. 69, 73 (1984). In deciding the motion, the court must accept all of the plaintiff's factual allegations as true and must construe the complaint in the light most favorable to the plaintiff. *See Sistrunk v. City of Strongsville,* 99 F.3d 194, 197 (6th Cir.1996). Further, "this court will scrutinize with special care any dismissal of a complaint filed under a civil rights statute." *Brooks v. Seiter,* 779 F.2d 1177, 1180 (6th Cir.1985).  In many cases, due to inadequate factual development, a public employee/First Amendment case cannot be decided on a 12(B)(6) motion.  *Perry v. McGinnis,* 209 F.3d 597, 608 (6th Cir. 2000).

In considering what set of facts a Plaintiff will produce in the litigation, the Court may consider the findings of an Arbitrator. In *Becton v Detroit Terminal of Consol. Freightways*, 687 F.2d 140, 142 (1982), the 6th Circuit ruled:

> "We do not hold that the arbitration decision is without significance.  Certainly the court may consider the arbitration decision as persuasive evidence that the grounds found by the arbitrator to be just cause for discharge under the collective bargaining agreement are sufficient to amount to just cause.  The court should defer to the arbitrator's construction of

3

the contract.    Moreover, an arbitration decision in favor of the employer is sufficient to carry the employer's burden of articulating "some legitimate, nondiscriminatory reason for the employee's rejection."

Finally, to support its motion, Defendants have essentially asked this Court to take judicial notice that "HN in C" means "Head N-word in Charge."  Not only is this improper at this stage of the proceedings where all facts must be taken in the light most favorable to Plaintiff, it is untrue.  After he was suspended, Plaintiff grieved the suspension through his union.  The grievance went to arbitration.  The arbitration took place before Barry Goldman on April 11 and May 14, 2018.  On July 23, 2018, Arbitrator Goldman issued an opinion and order sustaining Plaintiff's grievance.[1]  In so doing, the arbitration found as a matter of fact that Plaintiff meant "Head Negro in Charge".  The arbitrator noted that the Plaintiff testified he had *never* used the N-word, and was in fact a champion for civil rights.  In his attached affidavit, Plaintiff testified:

> "When I made my October 24, 2017 post to EMUTalk, I used the term "HN in C functionaries" as short hand for "Head Negro in Charge functionaries."  It was not meant as a racial slur.  In fact, approximately one week after my original post, I explicitly clarified on EMUTalk that "HN in C" was short for "head negro in charge."  I never use the n word.
>
> The term "Head Negro in Charge" has wide usage among scholars of the African-American experience, of which I am one.

---

[1] Exhibit 2, Arbitration Opinion and Order.

I learned the term in 1980 while taking a class taught by Harold Cruse (who in the late 1960s had been the founding director of the University of Michigan's Black Studies program). In 1994 Harold Cruse was a Visiting Professor at EMU during my first year on the EMU faculty and I had many conversations with him that year.

Cornel West, the noted philosopher, activist and author, now at Harvard, used the term "Head Negro in Charge", in his bestselling book **Race Matters,** published in 1993. An essay published in 2018, Dr. West used the term "HNIC (Head Negro in Charge)" to analyze an aspect of Martin Luther King, Jr.'s career. In neither book was Cornel West using a racist racial slur, against Dr. King or anyone. When I was a student in Professor West's class at Columbia University in the 1980s, "HNIC" was defined and used in its full historical and political context. It was not a slur. Around the year 2000, Cornel West was a guest speaker at Eastern Michigan University and spoke to an overflowing crowd.

Scores of other scholars of African-American History and race relations have likewise used the terms "HNIC" and "Head Negro in Charge", never as a slur."[2]

Thus, for the purposes of this motion, the Court must take as fact that Plaintiff meant "HN in C" as a shorthand for "head negro in charge", and did not mean it as a slur.

## III. FACTS

At all times pertinent hereto, Plaintiff was employed with Defendant University and held the position of Professor of American History. Plaintiff has testified by way of affidavit that his job duties as a university professor

---

[2] Exhibit 3, Plaintiff's Affidavit, paragraphs 4-8.

include classroom teaching, scholarly research and participation on university committees. It does not included posting comments on Facebook.[3]

> Arbitrator Goldman described the underlying incident as follows:

> "In the fall of 2016, someone spray-painted "KKK", "leave niggers," and "niggers out" on buildings at Eastern Michigan University. Students, along with some of the faculty and staff, protested, marched to the president's house, and occupied the student center overnight. The administration initiated disciplinary proceedings against some of the demonstrators.

> A year later, prosecutors filed charges against an African-American former student for spray-painting racist graffiti. There was considerable press coverage of these events."[4]

Plaintiff was a critic of Defendants' response to the racist graffiti on campus and the student protests that followed. Specifically, on October 24, 2017, Plaintiff wrote a comment on "EMUTALK" group Facebook page. The EMUTalk Facebook page is open to the public and not officially connected with the university.[5] The Plaintiff wrote:

> "Clearly, the racist vandalism was racist; the hateful words alone show that, W.E.B. Du Bois, among others, wrote about Black self-hatred. This person's vandalism may well involve that, and possibly mental health issues too. It was a racist act of vandalism, on King Hall and later on the art building.

> What added fuel to the spark that was the racist vandalism was the inept, initial University response to it; public communications, the president's office, all official comments deplored such an

---

[3] Exhibit 3, Plaintiff's affidavit, paragraph 2.
[4] Exhibit 2, Arbitration Opinion and Order, pg. 1.
[5] Exhibit 2, Arbitration Opinion and Order, pg. 1.

attack on the "EMU Community" without acknowledging that it was a racist attack, and implicit a threat, against Black students. This rightly made countless Black students, including many first semester students, feel unprotected and unrecognized by University officials.

Then, when students protested against racism at EMU, EMU management threw the book at them! Confounding the belief of students that EMU administrators were racist.

EMU administrators, a small group of well paid white guys in suits (plus one woman and a few lower level "HN in C" functionaries), lacked the insight to imagine that they could ever, possibly, be remotely seen as responsible for institutional racist practices. And so they continued to act as the aggrieved party, needlessly alienating students who objected to racism. Why EMU officials, earning six figures or more, took this stance can only be explained by a combination of 1. ignorance about what racism is, 2. overconfidence that they are the good guys, 3. a lack of knowledge of EMU specifically and of higher education generally." [6]

On a day-to-day basis, Plaintiff rarely, if ever, worked with the administrators he criticized.[7]

After Plaintiff's post, another commenter on EMUTalk, Lucas Langdon, asked Plaintiff to clarify what he meant by "HN in C". Approximately a week after his original post, and well before Defendants' decision to discipline him, Plaintiff explained "HN in C" was shorthand for "head negro in charge":

"I haven't looked at EMUTalk since Oct. 24 and did not know my comment on that day inspired the questions from Lucas Langdon. So sorry to be slow. Lucas, Kyle is right: by "HN in C"

---

[6] Exhibit 2, Arbitration Opinion and Order, pg. 2.
[7] Exhibit 3, Plaintiff's affidavit, paragraph 3.

> I meant head Negro in charge…The term Head Negro in Charge has been widely used in African American vernacular English for over a century…"[8]

Defendant therefore knew even before Plaintiff was disciplined that he meant "head negro in charge" when he used the acronym "HN in C."

Nonetheless, on December 13, 2017 Eastern Michigan University, through David Woike, PhD, Assistant Vice President of Academic Affairs, suspended Plaintiff without pay for one semester, required him to attend and complete a one-on-one training session with a professional consultant, banned Plaintiff from campus and barred him from Defendant University's email system.

Plaintiff, as a member of Eastern Michigan University Chapter of American Association of University Professors, grieved the discipline. The grievance went to arbitration, which was held on March 14, 2018 and April 11, 2018.

On July 23, 2018, arbitrator Barry Goldman reversed the decision to suspend and discipline Plaintiff. In order to rule on whether the discipline plaintiff received was grounded in just cause, Arbitrator Goldman had to rule on whether Plaintiff's First Amendment rights were violated. He ruled they were.

---

[8] Exhibit 2, Arbitration Opinion and Order, pg. 3.

As a foundation for his opinion,[9] Arbitrator Goldman noted the collective bargaining agreement stated:

> "Faculty Members, while not conducting their Faculty responsibilities, shall have the same rights to participate in political activities as other citizens. This statement shall not be construed to constitute an infringement upon the academic freedom of any Faculty Member."[10]

As a consequence, the arbitrator concluded:

> "That provision does not name the First Amendment, but any fair reading of the language "the same rights to participate in political activities as other citizens" must include the rights to freedom of speech, of the press and the right to petition the government for redress of grievances. I find that the CBA implicitly incorporates First Amendment rights." [11]

The arbitrator then held Plaintiff's statements were a matter of public concern:

> "That said, what is the statement about? It is about University governance. It is criticism of a public University's handling of widely publicized, racial incident. It is, as Higbee acknowledged, also "a pointed jab at one particular EMU official," but it was a political statement in a more important sense than it was a personal one. The point was to criticize the administration."[12]

The arbitrator then found the term HN in C was ambiguous, but, in context, the better reading was that it meant "head negro in charge."

---

[9] Exhibit 2, Arbitration Opinion and Order, pgs. 7-10.
[10] Exhibit 2, Arbitration Opinion and Order, pg. 7.
[11] Exhibit 2, Arbitration Opinion and Order, pg. 7.
[12] Exhibit 2, Arbitration Opinion and Order, pg. 8.

> "In this context, it is important to acknowledge that we do not know exactly what the N stands for in HN in C. We know what members of the administration believed it stood for, but the record produced by the Association clearly establishes that the term is ambiguous. We will never know what Higbee had in his mind as he typed the comment, but the explanation he gave makes more sense than the one offered by the University. Higbee says he never uses the term nigger. That is consistent with what we know about how he sees himself – as an outspoken advocate for social and racial justice." [13]

Finally, the arbitrator made the factual finding that Plaintiff's comments were not unduly disruptive.

> "I make no effort to minimize the insult to Turner and others. The question before me is not the measure of the insult. It is the measure of the disruption of the University's business on one hand and the right to free speech on the other.
>
> In performing that balancing test, I need to be guided by the University's commitment to vigorous debate. Quoting former EMU General Counsel Gloria Hage in an exhibit admitted by the Employer in this proceeding:
>
>> To be clear, Eastern Michigan University is deeply committed to protecting and preserving the First Amendment rights of its faculty, staff, students and larger community. The university strongly supports all forms of expression, regardless of whether it intended to reflect positively or negatively on it.
>>
>> The free exchange of ideas is vital to the University's educational mission. Without it, we fail. This is particularly true on the campus of Eastern Michigan University, where our diversity is a point of pride, distinction and competitive advantage. Our students cannot experience a high quality university education with diverse classrooms and a diverse

---

[13] Exhibit 2, Arbitration Opinion and Order, pg. 9

campus.   Our classrooms and our campus provide a
learning environment where students thrive and learn to
support others inclusive of all races, ethnicities, religions,
sexual orientations, gender identities and, significantly,
viewpoints.   Our students leave Eastern better prepared
than their peers to lead in an increasingly diverse and
multicultural world.   We cherish and defend this diversity
and the free exchange of ideas vital to maintaining it.

You are correct that Mr. Higbee's speech reflected an
extreme dissatisfaction with the actions of the EMU
administration.   Such expression is protected by the
University, not punished.

The University does not disagree with your recitation of the
law – punishing speech merely because it is controversial
or offensive runs counter to the protections of the First
Amendment.

In Ms. Hage's view, notwithstanding the language just quoted,
the Grievant's post lies outside of those protections.   I must
disagree.

In judging whether First Amendment protection applies, I must
consider whether the speech was on a matter of public concern,
whether it was made as an employee or as a citizen, whether it
was a targeted racial slur, and whether disruption to the
Employer was so severe that it outweighed the right to free
speech.   In all of those judgements I need to cognizant of the
central role that freedom of speech plays in our law and in our
culture.

Without minimizing either the stupidity or the offensiveness of
Higbee's insult, I am constrained to find that it is protected
speech under the First Amendment.  Since the First Amendment
is incorporated into the CBA by MP 12, the suspension was not
for reasonable and just cause and was issued in violation of the
CBA.  Accordingly, the grievance must be sustained."[14]

---

[14] Exhibit 2, Arbitration Opinion and Order, pgs. 9-10.

As a result of the foregoing, Plaintiff has filed this lawsuit.  In the lawsuit, Plaintiff alleges, *inter alia*, the individual defendants violated his rights under the First Amendment to the Constitution, in violation of 42 USC §1983.  The individual defendants have now collectively brought a motion to dismiss pursuant to Fed.R.Civ.P. 12(B)(6).  In that Motion, Defendants claim the First Amendment did not protect Plaintiff's public EMUTalk Facebook post and, even if it did, the individual defendants are shielded from liability by qualified immunity because Plaintiff's First Amendment rights were not "clearly established" at the time he exercised them.   As this brief will demonstrate, Defendant's motion is without merit and should be denied.

## IV. LEGAL ARGUMENT

### A. The Defendants Are Not Entitled To Dismissal of Plaintiff's 42 USC §1983 Claim Because Plaintiff Engaged In Protected Speech Under the First Amendment of the United States Constitution.

The issue of whether Plaintiff's speech is entitled to First Amendment protection is a question of law to be decided by the Court. *Nair v. Oakland County Community Mental Health Authority,* 443 F.3d 469, 478 (6th Cir. 2006). In order for a government employee's speech to warrant First Amendment protection, the United States Supreme Court's *Pickering* and

*Connick* [15] decisions have long imposed the threshold requirements that the employee (1) must have spoken as a citizen, and (2) must have addressed matters of a public concern. *Weisbarth v. Geauga Park District*, 499 F.3d 538, 542 (6th Cir. 2007). The Supreme Court clarified the first of these requirements in *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006), by holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes."

### 1.   Plaintiff Spoke on a Matter of Public Concern.

For the First Amendment to protect a public employee's speech, the public employee must have spoken on a matter of public concern. The Supreme Court in *City of San Diego v Roe, 543 U.S. 77, 83-84 (2004)* stated:

> [T]he standard for determining whether an expression is of public concern is the same standard used to determine whether a common-law action for invasion of privacy is present . . . . These cases make clear that public concern is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication. (Internal citations omitted)

Speech that relates to matters of political, social, or other concern to the community as opposed to matters only of a personal interest shall be

---

[15] *Pickering v Bd. Of Ed of Tp. High School District 205*, 391 US 563, 88 S.Ct. 1731, 20 L.Ed. 2d 811 (1968); *Connick v Myers*, 481 U.S. 138; 103 S.Ct. 1684, 75 L.Ed 2d 708 (1983).

considered as touching upon matters of public concern. *Connick v. Myers*, 461 U.S. 138, 146-49 (1983); *Cockrel v. Shelby County School District*, 270 F.3d 1036, 1052 (6th Cir. 2001). Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement as revealed by the whole record. *Chappel v. Montgomery County Fire Protection District No. 1*, 131 F.3d 564, 576 (6th Cir. 1997). The employee's entire speech does not have to focus on matters of public concern, as long as some portion of the speech does. *Rodgers v Banks*, 344 F.3d 587, 597 (6th Cir. 2003). The Sixth Circuit in *Dambrot v. Central Michigan University*, 55 F.3d 1177, 1188 (6th Cir. 1995) stated that "one way to evaluate the possibility of the public concern component in questioned speech is to imagine it being discussed in public." Crucially, in *Connick, supra*, the US Supreme Court clearly established that **racial discrimination is inherently a matter of public concern.** *See Connick*, 461 U.S. 138, 148 n. 8 (1983). See also, *Perry v McGinnis*, 209 F.3d 597, 608 (6th Cir. 2000).

Under this authority, Plaintiff's speech was clearly a matter of public concern. As the arbitrator noted -- and Defendants' filings confirm -- the pertinent racial issues at EMU received widespread press coverage,

including in the Washington Post.[16]   Plaintiff's EMUTalk Facebook post

directly concerned racism, which is *per se* a matter of public concern.

*Connick, supra.*  Plaintiff's post further criticized a public institution's (Eastern

Michigan University) response to the racism.  Plaintiff's advocacy was not for

himself, or his job responsibilities; it was for the African-American students

on campus, who he argued racist graffiti threatened.  As the arbitrator aptly

noted, there is no other way to see Plaintiff's speech than as an expression

on a matter of importance to the public.  Thus, Defendants' claim that Plaintiff

speech did not concern a matter of public concern is without merit.

### 2.   Plaintiff Was Speaking as a Private Citizen When He Criticized the Response of the EMU Administration to Campus Racism on the Facebook site, EMUTalk.

Defendants argue that under the Supreme Court's *Garcetti* decision

Plaintiff's First Amendment claims must be dismissed.  Under *Garcetti*, to

come under the protection of the First Amendment, the employee must

speak as a private citizen, and not as an employee pursuant to his official

duties. *Garcetti,* 421.  The leading 6th Circuit case on this issue is *Mayhew

v Town of Smyrna*, 856 F.3d 456, 463, (6th Cir. 2017).  The *Mayhew* court

described the state of the law thusly:

> "To aid in the assessment of a public employee's statement, 'we
> must consider both its content and context.'  In our pre-

---

[16] Exhibit 2, Arbitration Opinion and Order, pg, 7

> *Lane* case law, we recognized several non-exhaustive factors to consider, including: the speech's impetus; its setting; its audience; and its general subject matter. We have continued to utilize these 'who, where, what, when, why, and how' considerations post-*Lane*[17], which inform the answer to *Lane*'s "critical question": "whether the speech at issue is itself ordinarily within the scope of an employee's duties." *Mayhew*, 464 (Citations omitted)."[18]

Plaintiff is a professor of American History at Eastern Michigan University. Plaintiff testified by way of his affidavit that his duties as a Professor of American History are to teach a full load of classes, engage in scholarly research and participate on university committees. Herein, Plaintiff made a comment on a Facebook page, hardly a professional forum. The comment does not concern classes, curriculum or pedagogy: it concerns racism on campus. In the Facebook post, Plaintiff criticized the EMU administration for its disciplinary conduct toward students, not some issue concerning Plaintiff's own job responsibilities. As the Arbitrator noted, Plaintiff is an

---

[17] *Lane v Franks*, 573 U.S. 228 (2014).

[18] It is worth noting that case law strongly implies that the *Garcetti* requirement that the employee's speech must not be pursuant to his official duties does not apply to university professors. "Universities occupy a special niche in our constitutional tradition." *Evans-Marshall v Board of Education*, 624 F.3d 332, 344 (6th Cir. 2010). As such, in the *Garcetti* decision, the Supreme Court explicitly disclaimed any intent to apply its holding to university professors, stating, "We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." *Garcetti*, 425.

outspoken advocate for social and racial justice.  It was in this capacity as a private citizen, not a public employee, that he made his Facebook post.

**3.    Plaintiff's Speech Satisfies the *Pickering* Balancing Test Because His Speech Involved Critical Issues of Public Concern, but Was Not Unduly Burdensome to Defendant University.**

The United States Supreme Court stated in *Pickering v. Board of Education*, 391 U.S. 563, 568(1968), that the Courts must balance the employee's interest, as citizens, in addressing matters of public concern with the employer's interest "as an employer, in promoting the efficiency of the public services it performs through its employees.  In balancing these two competing interests, a Court is to "consider whether an employee's comments meaningfully interfere with the performance of his duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Leary v. Daeschner*, 349 F.3d 888, 900 (6th Cir. 2003); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1053 (6th Cir. 2001).  In essence, the speech complained of must interfere with the job the employee was hired to perform or the functioning of the workplace in general.  *Leary, supra*, at 900; *Pickering, supra*, at 568.

The public employee's speech will be denied constitutional protection only if the *Pickering* balancing test proves the employer's interests outweigh

the employee's interests.  See *Garcetti v Ceballos*, 547 U.S. 410, 418-420 (2006).  The greater the value of the subject of the speech to the public, the more the balance tilts toward permitting the employee to express himself. *Guilloty Perez v Peirlusi*, 339 F.3d 43, 53 (1st Cir. 2003). "[G]iven the nature of academic life, especially at the college level, it was not necessary that [an employee] and the administration enjoy a close working relationship requiring trust and respect - indeed anyone who has spent time on college campuses knows that the vigorous exchange of ideas and resulting tension between an administration and its faculty is as much a part of college life as homecoming and final exams." *Bauer v Sampson*, 261 F.3d 775, 785 (9th Cir. 2001).  "The mere fact that racial issues can be divisive, however, does not excuse retaliation against an employee who in good faith raises perceived racially discriminatory practices in an attempt to promote the welfare of the governmental department." *Victor v McElveen*, 150 F.3d 451, 458 (5th Cir. 1998). The state bears the burden of showing a legitimate justification for discipline.  *Brandenburg v Housing Authority of Irvine*, 253 F.3d 891, 899 (6th Cir. 2001).  In many cases, due to inadequate factual development, the *Pickering* balancing test "cannot be performed on a 12(B)(6) motion." *Perry v McGinnis*, 607.

Herein, weighing the facts, the Arbitrator wrote:

18

"In performing that balancing test, I need to be guided by the University's commitment to vigorous debate.  Quoting former EMU General Counsel Gloria Hage in an exhibit admitted by the Employer in this proceeding:

To be clear, Eastern Michigan University is deeply committed to protecting and preserving the First Amendment rights of its faculty, staff, students and larger community.  The university strongly supports all forms of expression, regardless of whether it intended to reflect to positively or negatively on it.

The free exchange of ideas is vital to the University's educational mission.  Without it, we fail.  This is particularly true on the campus of Eastern Michigan University, where our diversity is a point of pride, distinction and competitive advantage.  Our students cannot experience a high quality university education with diverse classrooms and a diverse campus. Our classrooms and our campus provide a learning environment where students thrive and learn to support others inclusive of all races, ethnicities, religions, sexual orientations, gender identities and, significantly, viewpoints.  Our students leave Eastern better prepared than their peers to lead in an increasingly diverse and multicultural world.  We cherish and defend this diversity and the free exchange of ideas vital to maintaining it.

You are correct that Mr. Higbee's speech reflected an extreme dissatisfaction with the actions of the EMU administration.  Such expression is protected by the University, not punished.

The University does not disagree with your recitation of the law – punishing speech merely because it is controversial or offensive runs counter to the protections of the First Amendment.

In Ms. Hage's view, notwithstanding the language just quoted, the Grievant's post lies outside of those protections.  I must disagree.

In judging whether First Amendment protection applies, I must consider whether the speech was on a matter of public concern, whether it was made as an employee or as a citizen, whether it

19

was a targeted racial slur, and whether disruption to the Employer was so severe that it outweighed the right to free speech. In all of those judgements I need to cognizant of the central role that freedom of speech plays in our law and in our culture.

Without minimizing either the stupidity or the offensiveness of Higbee's insult, I am constrained to find that it is protected speech under the First Amendment. Since the First Amendment is incorporated into the CBA by MP 12, the suspension was not for reasonable and just cause and was issued in violation of the CBA. Accordingly, the grievance must be sustained."

The Arbitrator's analysis is well-taken. Plaintiff's post was on a Facebook forum. Defendants have produced no evidence that it caused disruption to Plaintiff's classroom or workplace. Plaintiff did not work closely with any of administrators, so the quality of their interactions were of *de minimis* value. On the other side of the ledger, the university itself, through its attorney extolled the "free exchange of ideas" as "vital" the University's mission. As such, the *Pickering* balancing test weighs heavily in favor of Plaintiff.

**B.    Defendants' Argument that They Are Entitled to Qualified Immunity Is Without Merit Because the Law Was Well-Established At the Time of Plaintiff's Discipline That A Public Employee Could Not Be Disciplined for Speaking or Writing in a Public Forum, Such as EMUTalk, on Matters of Public Concern, Including Racism.**

Defendant argues that even if Plaintiff's speech was constitutionally protected, they are entitled to qualified immunity because the right was not "clearly established." Nothing could be further from the truth.

It is true that in order for an employee to defeat the employer's claim of qualified immunity, the constitutional right at issue must be clearly established. *See v. Elyria* 502 F3d 484, 491 (6th Cir 2007). In determining whether the constitutional law was clearly established courts look to "Federal constitutional, statutory, and case law existing at the time" *Dominque v Telb* 831 F2d 673, 677 (6th Circuit 1987). When the focus is on decisional law, the courts examine initially the decisions of the U.S. Supreme Court and the Court of the Circuit. *Garvive v. Jackson* 845 F2d 647, 649 (6th Cir. 1988). A government employee is entitled to qualified immunity only if the law is unclear, and not the facts. *McCloud v Testa* 97 F.3d 1536, 1556 (6th Cir. 1996). None of this is to say official action is protected by qualified immunity unless the very action in question had previously been held unlawful. *Anderson v. Creighton* 483 U.S. 635, 640 (1987). To defeat a claim of qualified immunity, a Plaintiff does not have to produce a case directly on point. *White v Pauly*, 580 U.S. __, 196 L.Ed2d 463, 137 S.Ct. 548, 551 (2017).

It is beyond gainsaying that a public employee speaking or writing on a public forum on matters of public concern is cloaked in the protection of the First Amendment. The foundational case of the whole area of law concerning public employee's First Amendment Rights, *Pickering v The*

21

*Board of Education* 391 U.S. U.S. 563 (1968), clearly established the rights

Plaintiff claims in the case-at-bar.   *Pickering* involved a teacher who was

dismissed for sending a letter to a local newspaper in connection with a

recently proposed tax increase.   The letter was critical of the way in which

the administrators of the school district had handled past proposals to raise

new revenue.   The *Pickering* Court held,

> "In sum, we hold that in a case such as this, absent proof of false
> statements knowingly or recklessly made, by him, a teacher's exercise
> of his right to speak on issues of public importance may not furnish the
> basis for his dismissal from public employment.   This principle has
> been repeatedly affirmed by the United States Supreme Court."
> *Pickering*, 574.

A public employee's right to publish in a public forum comments critical of

the public employer was reiterated in *Garcetti v Ceballos,* 547 U.S. 410

(2006).   The *Garcetti* Court wrote, "The [public] employees retained the

prospective constitutional protection for their contributions to the civil

discourse," *Garcetti* 422.   The Court specifically cited that writing a letter to

a local newspaper entitles the employee to First Amendment protection.

*Garcetti*, 433.   In *Lane v. Franks* 573 U.S. 228 (2014) the Supreme Court

once again reiterated the holding of *Pickering* that, "The teacher's letter to

the editor of a local newspaper concerning a school budget constituted

speech on a matter of public concern," *Lane*, 237.   Furthermore, as

previously stated, issues regarding racism are *per se* a matter of public

concern. *Connick, supra.* Logically, then, the Supreme Court has clearly established since the *Pickering* and *Connick* decisions, in 1968 and 1983 respectively, that the First Amendment protects post or letters on the issue race in a public forum

The facts situation in the case-at-bar is the prototypical First Amendment case. Herein, just as the Plaintiff in *Pickering*, Plaintiff took advantage of a public forum to voice concerns about his employer's failure to handle racial issues properly. The Court in *Pickering* found that the letter was on a matter of public concern and was not unduly disruptive, even though it was upsetting to the administrators, and the same is true, here. As the U.S. Supreme Court has recently stated:

> "Speech by citizens on matters of public concern lies at the heart of the First Amendment, which was fashioned to assure unfettered interchange for ideas for the bringing about of political and social changes desired by the people. This remains true when speech concerns information related to or learned through public employment. After all, public employees do not renounce their citizenship when they accept employment, and this Court has cautioned time and again that public employers may not condition employment on the relinquishment of constitutional rights. There is considerable value, moreover, in encouraging, rather than inhibiting, speech by public employees. For "[g]overnment employees are often in the best position to know what ails the agencies for which they work," *Lane v. Franks,* 235-236 (Citations omitted).

Defendants have argued Plaintiff's case is an exception to the long-standing law because Plaintiff used the "N-word." To begin with, Defendant

University admitted at the underlying arbitration it knew, "*punishing speech merely because it is controversial or offensive runs counter to the protections of the First Amendment.*" In any event, **Plaintiff did not use the "N-word" or reference it.** According to both Plaintiff and the Arbitrator, Plaintiff's reference was to the word "negro," which is not a slur. Defendant University knew when Plaintiff used the term "HN in C", he meant "head negro in charge", and did not mean to convey a slur, because Plaintiff said so on EMUTalk well before his discipline took place. There's no ambiguity on this point, but even if there were, it does not affect the issue of qualified immunity.   As stated, a government employee is entitled to qualified immunity only if the law is unclear, not the facts. *McCloud v Testa*, at 1556.

Indeed, Plaintiff's conduct that is the subject of this lawsuit is a prototypical case of a public employee exercising his First Amendment rights, and this has been true since 1968.  As a consequence, Defendants' claim of qualified immunity in this lawsuit should be rejected.

## V.   CONCLUSION

When Plaintiff went on the Facebook page EMUTalk to criticize the actions of EMU administrators, he did so with the protection of the First Amendment.  The subject matter of his speech was racial discrimination on campus, and the administrators' failure to handle it properly.  Pursuant to the

authority of *Connick* and *Pickering*, this is and has long been a matter of public concern. Plaintiff, by communicating via a public forum regarding matters unrelated to his job duties, was acting as a private citizen, not as a public employee. Finally, Defendants have presented no evidence that this imposed a burden to the university. In fact, in Defendant University's own writings it extols the importance of vigorous discussion and debate on campus. For these reasons, Defendants' Motion to Dismiss pursuant to 12(B)(6) should be denied.


Respectfully submitted,


/s/Glen N. Lenhoff
GLEN N. LENHOFF  (P32610)
Law Office of Glen N. Lenhoff
Attorney for Plaintiff
Dated: 03/01/19

/s/Robert D. Kent-Bryant
ROBERT KENT-BRYANT(P40806)
Law Office of Glen N. Lenhoff
Attorney for Plaintiff
Dated: 03/01/19

## INDEX TO EXHIBITS

1. Perry v. McGinnis

2. Arbitration Opinion and Order

3. Plaintiff's Affidavit

4. Pickering v. Bd. Of Ed. Of Township High Sch. Dist.

5. Connick v. Myers

6. Garcetti v. Ceballos

7. Mayhew v. Town of Smyrna

# EXHIBIT 1

Perry v. McGinnis, 209 F.3d 597 (2000)

82 Fair Empl.Prac.Cas. (BNA) 1009, 17 IER Cases 1003, 2000 Fed.App. 0133P

209 F.3d 597
United States Court of Appeals,
Sixth Circuit.

Everett PERRY, Plaintiff–Appellant,

v.

Kenneth McGINNIS, et al., Defendants–Appellees.

No. 98–1607.
|
Argued Nov. 4, 1999
|
Decided and Filed April 13, 2000

**Synopsis**

African-American employee, who had been employed as hearing officer for Michigan Department of Corrections (MDOC), brought action against various prison officials, alleging constitutional violations and alleging that he was terminated due to his race. After earlier dismissing employee's First and Fifth Amendment claims, the United States District Court for the Eastern District of Michigan, Patrick J. Duggan, 2 F.Supp.2d 952, entered summary judgment for defendant officials on remaining claims. Employee appealed. The Court of Appeals, Keith, Circuit Judge, held that: (1) genuine fact issues existed, precluding summary judgment, with respect to employee's race discrimination claims under Fourteenth Amendment and Michigan's Elliott–Larsen Civil Rights Act (ELCRA); (2) employee-hearing officer's decisions made in inmate disciplinary hearings constituted protected "expression " under the First Amendment and concerned matters of public concern; (3) whether MDOC's interest in disciplining its hearing officers outweighed employee's right to speak on matter of public concern was inappropriate for resolution on motion to dismiss; (4) employee's complaint of racially disparate treatment, made by way of an internal grievance, was on a matter of public concern for First Amendment purposes; and (5) employee's First Amendment right to freedom of expression was fundamental right, the alleged violation of which could provide basis for substantive due process claim.

Reversed and remanded.

Alan E. Norris, Circuit Judge, filed opinion concurring in part and dissenting in part.

**Attorneys and Law Firms**

**\*599**  William  Goodman  (argued),  Center  for Constitutional Rights, New York, NY, Julia Ila Sherwin (briefed), Haddad & Sherwin, Oakland, CA, for Plaintiffs–Appellants.

Frank J. Monticello (briefed), Office of the Attorney General, Public Employment and Elections Division, Lansing, MI, for Defendants–Appellees.

Frederick M. Baker, Jr. (briefed), Honigman, Miller, Schwartz & Cohn, Lansing, MI, for Amicus Curiae.

Before: KEITH, NORRIS, and CLAY, Circuit Judges.

KEITH, J., delivered the opinion of the court, in which CLAY, J., joined. **\*600**  ALAN E. NORRIS, J. (pp. —— – ——), delivered a separate opinion concurring in part and dissenting in part.

**OPINION**

KEITH, Circuit Judge.

Plaintiff–Appellant Everett Perry ("Perry") appeals from the district court's decisions on Defendants–Appellees'[1] (the "prison officials") motion for summary judgment pursuant to Federal Rule of Civil Procedure ("FRCP") 56(c) and motion to dismiss for failure to state a claim upon which relief can be granted pursuant to FRCP 12(b)(6). We **REVERSE** the district court's decisions and **REMAND** for further consideration consistent with this opinion.

**I. Background**

On October 30, 1988, Perry, a Black man, was hired by the Michigan Department of Corrections (the "MDOC") as an Administrative Law Examiner ("ALE"). Specifically, he worked for the MDOC's Office of Policy and Hearings as a hearing officer and decision maker in major misconduct disciplinary hearings in Michigan state prisons. On November 5, 1993, Perry was fired.

Perry filed his initial complaint on March 27, 1996. After a volley of motions to dismiss and amended complaints, Perry filed his final amended complaint on September 20, 1996, bringing First and Fifth Amendment claims as well as a Fourteenth Amendment equal protection claim, a claim of equal protection violations in contravention of the Michigan Constitution, and a claim of race discrimination in violation of Michigan's Elliott–Larsen Civil Rights Act (the "ELCRA"). The prison officials subsequently filed a motion to dismiss for failure to state a claim upon which relief can be granted under FRCP 12(b)(6). On March 14, 1997, the court dismissed Perry's First and Fifth Amendment claims, but denied the prison officials' motion with respect to the equal protection and ELCRA claims. Perry, soon thereafter, voluntarily dismissed his equal protection claim brought under the Michigan Constitution. On September 16, 1997, the prison officials filed a motion for summary judgment, and on April 15, 1998, the district court granted summary judgment on the remaining claims. Perry appeals the lower court's grant of summary judgment for the prison officials as well as its grant of the prison officials' motion to dismiss.

## II. Race Discrimination

Perry argues that the district court erred in determining that he failed to raise genuine issues of material fact as to his race discrimination claims under the Fourteenth Amendment and the ELCRA. We agree.

This Court reviews grants of summary judgment *de novo,* and applies the same standard that the district courts apply. That test is set out in FRCP 56(c): "Summary Judgment is only appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In applying this test, it is well settled that "[t]he evidence of the non-movant is to be believed, and that all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Furthermore, summary judgment is generally not well suited for cases in which motive and intent are at issue and in which one party is in control of the proof. *See* **\*601** *Cooper v. North Olmsted,* 795 F.2d 1265, 1272 (6th Cir.1986). In *Gutzwiller v. Fenik,*

860 F.2d 1317, 1325 (6th Cir.1988), this Court established that a plaintiff asserting a Fourteenth Amendment equal protection claim under 42 U.S.C. § 1983 must prove the same elements required to establish a disparate treatment claim under Title VII of the Civil Rights Act of 1964. Both parties agree that in order to establish a *prima facie* case, the plaintiff must set forth the following elements: "1) he was a member of a protected class; 2) he was subject to an adverse employment action; 3) he was qualified for the job; and 4) for the same or similar conduct, he was treated differently from similarly situated non-minority employees." *Perkins v. University of Mich.,* 934 F.Supp. 857, 861 (E.D.Mich.1996); *see Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992). It should be noted that the plaintiff's race need only be a motivating factor not necessarily the sole factor—in order for the plaintiff to succeed in his claim. *See Gutzwiller,* 860 F.2d at 1328.

Both parties agree that Perry has satisfied prongs one and two of this test. The parties, however, disagree with respect to prongs three and four. Perry argues that he was qualified for his job and that he was treated differently from his similarly situated White colleagues. The prison officials disagree.

After reviewing the record, it is clear that genuine issues of material fact exist as to whether Perry was qualified and whether he was treated differently from similarly situated colleagues. As such, the district court inappropriately granted summary judgment for the prison officials. We first address the issue of Perry's disparate treatment and then address his qualifications.

Considering that under summary judgment analysis all justifiable inferences are to be drawn in favor of the non-movant and the non-movant's evidence is to be believed, it is surprising that the district court decided as it did. This Court has held that to qualify as "similarly-situated" in the disciplinary context, the plaintiff and the colleagues to whom he seeks to compare himself "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell,* 964 F.2d at 583. In addition, this Court has asserted that in applying the standard courts should not demand exact correlation, but should instead seek relevant similarity. *See Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th

Cir.1998). Here, all hearing officers were supervised by the same officials, subject to the same standards, and charged with the same duties. They were indeed similarly situated.

Abundant record evidence demonstrates that the prison officials treated Perry differently than these similarly situated non-minority employees. The depositions of non-minority hearing officers, as well as other portions of the record, are replete with instances of disparate treatment. The following represent just a few examples.

The prison officials disciplined Perry on several occasions for typographical errors. Hearing Officer Thomas Craig testified in his deposition that he commits a typographical error in every hearing report that he does. The prison officials, however, have never disciplined Craig for such errors. Similarly, Hearing Officer Miriam Bullock testified in her deposition that she commits a typographical error in all of her hearing reports. Like Craig, Bullock has never been cited for such errors.

Perry failed to correct an incorrect inmate number (that a corrections officer wrote) on a disciplinary ticket, and was disciplined. Officer Bullock *herself* once typed the wrong inmate number for a prisoner, resulting in the wrong prisoner receiving a guilty finding in his record. The **\*602** prison officials, however, did not discipline her.

The prison officials disciplined Perry for stating the charge of "Destruction or Misuse of Property with a Value of $10.00 or More" as "Destruction: Misuse of Property with a Value of $10.00 or More." In other words, they disciplined him for replacing the word "or" with a colon. Officer Bullock, however, testified that she has frequently failed to type the proper name of a charge on the corresponding report, and yet Bullock has never been disciplined for failing to do so.

The prison officials disciplined Perry for re-listing a case to get physical evidence or a photograph of physical evidence that he deemed relevant. Hearing Officer Ann Baerwalde has re-listed cases to get physical evidence or a photograph of physical evidence that she deemed relevant, but has never been disciplined for doing so.

The prison officials disciplined Perry for failing to state in his hearing record that a door is worth more than $10 (when an element of the crime demanded that the property be worth more than $10). Leonard Den

Houter, Supervisor of the Office of Policy and Hearings and Perry's direct supervisor, admits that other hearing officers have made the same mistake, but he does not recall disciplining them.

Perry's infractions and those of his colleagues were obviously of "comparable seriousness," as is required under the standard. *Mitchell,* 964 F.2d at 583 n. 5. As such, it is abundantly clear that genuine issues of material fact exist as to whether the prison officials treated Perry differently from similarly situated non-minority employees. Consequently, we conclude that the district court erred in finding that Perry did not satisfy prong four of the test.

The court erred as to prong three as well. The prison officials accept that Perry would seem qualified for the job in that he has a law degree and is a member of the Michigan Bar, but they argue that his job performance was poor. In doing so, the prison officials rely almost exclusively on Perry's numerous citations for the alleged substandard disposition of cases during his tenure. The discussion of prong four above, however, is enough to derail the prison officials' argument. From the beginning, Perry has insisted that the citations he received were pretextual. Evidence indicating that Perry was often cited for errors for which other hearing officers were not cited and was cited for omissions that seem trivial,[2] supports Perry's contention. There is, therefore, clearly a genuine issue of material fact regarding Perry's qualifications.

The district court erred in failing to draw inferences in favor of Perry and consequently determining that Perry failed to satisfy prongs three and four of the aforementioned test. This error led the district court to grant summary judgment for the prison officials.

We acknowledge the possibility that the prison officials' disparate treatment of Perry had nothing to do with race. Perhaps, the prison officials were upset that his not-guilty/dismissal rate was so high relative to the norm (discussed *infra*). And perhaps, as the prison officials argue, Perry was not carrying his weight as a hearing officer. On the other hand, it is possible that the prison officials disciplined and ultimately terminated Perry because of the color of his skin. Trials exist to resolve such issues of fact, and summary judgment is to be used only when there is no question as to such issues of fact. Here, many questions are left unresolved. These questions must be resolved at trial.

Perry v. McGinnis, 209 F.3d 597 (2000)

82 Fair Empl.Prac.Cas. (BNA) 1009, 17 IER Cases 1003, 2000 Fed.App. 0133P

The grant of summary judgment is reversed and the case is remanded for further consideration. [3]

## *603 III. Freedom of Expression

Perry further argues that the district court erred in granting the prison officials' motion to dismiss his § 1983 claim for violation of his right to freedom of expression under the First Amendment, made applicable to the states by the Fourteenth Amendment. We agree.

An FRCP 12(b)(6) motion to dismiss for failure to state a claim may only be granted if it is clear beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). In determining how to handle the motion, the court must accept all of the plaintiff's factual allegations as true and must construe the complaint in the light most favorable to the plaintiff. *See Sistrunk v. City of Strongsville,* 99 F.3d 194, 197 (6th Cir.1996). Further, "this court will scrutinize with special care any dismissal of a complaint filed under a civil rights statute." *Brooks v. Seiter,* 779 F.2d 1177, 1180 (6th Cir.1985). Finally, this Court must review the district court's dismissal *de novo. See Cameron v. Seitz,* 38 F.3d 264, 270 (6th Cir.1994).

In order to have stated a claim under § 1983, Perry must have alleged in his complaint that 1) he was deprived of a right secured by the Constitution or laws of the United States and that 2) the deprivation was caused by someone acting under color of state law. *See West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

In the instant matter, there is no debate as to the second prong. The prison officials do not dispute that while working under the authority of the MDOC they were acting under color of state law. The question is whether Perry was deprived of a right secured by the Constitution. Perry asserts that he was deprived of his First Amendment right to freedom of expression in two ways: 1) he suffered retaliatory termination because of his findings made as an ALE in prisoner misconduct hearings; and 2) he suffered retaliatory termination because of his complaints of race discrimination. We will deal with the two in turn.

## A.

### 1.

As a threshold matter, we must determine whether Perry's decisions made in inmate disciplinary hearings constitute expression as protected by the First Amendment. We find that they do. The Supreme Court has long held that communicative action is protected by the First Amendment. *See Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 505–506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (holding that the act of wearing a black armband constitutes expressive conduct and is protected by the First Amendment); *Brown v. Louisiana,* 383 U.S. 131, 141–42, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (holding that a sit-in by Black students constitutes symbolic speech).

This Circuit has done the same—most notably and relevantly in *Parate v. Isibor,* 868 F.2d 821 (6th Cir.1989). *Parate* involved an engineering professor at Tennessee State University, Natthu Parate, who refused to alter his evaluation of a student and was subsequently subjected to discipline and threats of termination. Parate assigned the student a "B" while the Dean of Tennessee State's School of Engineering and Technology—whom the Court suggests had a particular affinity for the student involved because of a shared national heritage—insisted that the student receive an "A". When Parate refused, the Dean *604 disciplined Parate and threatened to fire him.

The Court explained that because "the assignment of a letter grade is symbolic communication intended to send a specific message to the student, the individual professor's communicative act" falls within the bounds of the First Amendment. *Parate,* 868 F.2d at 827. The Court then held that the Dean's act of forcing Parate to choose between changing the grade against his professional judgment and keeping his job "unconstitutionally compelled Parate's speech." *Id.* at 830.

Although *Parate* and the instant case involve different sectors of the state's machinery—an educational institution and a correctional institution—the cases involve nearly identical communicative acts protected by the First Amendment. In the instant case, as in *Parate,* the state entrusted one of its employees with the task of reviewing facts, evaluating a set of circumstances,

and making a decision. In *Parate,* the decision was handed down in the form of a letter grade. In the case at bar, the decisions came in the form of guilty/not-guilty determinations. Perry's decisions, like Parate's, are communicative acts—acts aimed squarely at the inmates in question with the goal of reemphasizing the parameters of acceptable behavior in prison.

In *Parate,* this Court decided that the attempt to pervert the communicative acts with discipline and threatened termination was the essence of coerced expression. Such compulsion in the academic realm is certainly of concern. It is, however, particularly unsettling in the instant case because, here, the interference results in the heavy hand of the state's disciplinary authority being brought to bear on inmates who may have done nothing to deserve the invocation of that authority.

We find that a disciplinary hearing decision, like the assignment of a letter grade, is a communicative act entitled to First Amendment protection.

### 2.

A determination that First Amendment-protected expression is involved is, of course, only a preliminary issue in the analysis of a First Amendment retaliatory discharge claim.

It is well established that a government employer cannot "condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). As a logical consequence, retaliation by a government employer against an individual who exercises his First Amendment rights constitutes a First Amendment violation. *See Zilich v. Longo,* 34 F.3d 359, 365 (6th Cir.1994). This is the case even if the employee could have been terminated for any reason. *See Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

The Supreme Court has established a three-pronged test for determining whether a plaintiff can prevail on a First Amendment retaliatory discharge claim. Under the test, commonly called the *Pickering* test, the plaintiff must set forth three elements: 1) the speech involved a matter of public concern, *see Connick,* 461 U.S. at 143, 103 S.Ct.

1684; 2) the interest of the employee "as a citizen, in commenting upon matters of public concern," outweighs the employer's interest "in promoting the efficiency of the public services it performs through its employees," *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); and 3) the speech was a substantial or motivating factor in the denial of the benefit that was sought. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). If the employee satisfies this test, he has established a *prima facie* case. [4]

**\*605** Here, Perry argues that he was fair and impartial in his disposition of disciplinary cases, and that each of his decisions was a communicative act protected by the First Amendment. He further argues that in disciplining and terminating him for that expression, the MDOC infringed upon his freedom of expression. Perry presents the following facts in support of his assertion.

The MDOC conducts probationary evaluations of all new ALEs after three months on the job and again after six months. Perry received satisfactory ratings at both probationary evaluations and continued to receive good reviews for the first year-and-a-half of his tenure. On March 8, 1990, Perry received his first citation from his direct supervisor, Den Houter, regarding a problem with his disposition of a case. During the twenty-seven months between Den Houter's original complaint about Perry's work and June 22, 1992, Perry received only four additional citations regarding his disposition of cases. The rate at which Perry disposed of cases through finding inmates not-guilty and issuing dismissals, however, was higher than the norm. Perry's not-guilty/dismissal rate hovered between 17% and 18%, which was well above the institutional standard of 10%. When Perry's supervisors noticed his not-guilty/dismissal rate, the frequency with which they cited him for substandard disposition of cases increased dramatically.

On June 18, 1992, Den Houter wrote a memorandum to Marjorie Van Ochten, the Administrator of the Office of Policy and Hearings and Den Houter's direct supervisor, noting that pursuant to her request he had reviewed all of Perry's not guilty and dismissed hearing reports, and found that Perry was prone to finding prisoners not guilty. Beginning on June 22, 1992, four days after Den Houter's memorandum to Van Ochten, Perry received the first of *nineteen* memoranda that he would receive over the course

of the following *sixteen* months citing him for mistakes in his disposition of cases. As noted above, Perry's colleagues made many of the same mistakes, but were not cited. Perry was terminated two weeks after receiving the last of those nineteen memoranda.

#### a.

The district court assumed, *arguendo,* that Perry's decisions in inmate disciplinary hearings constituted matters of public concern, and then proceeded to base its disposition of the case on prong two of the *Pickering* test—the balancing prong. When fleshed out, it is clear that Perry's insistence through his decisions that he be impartial and operate within the confines of constitutional law, constitutes speech on a matter of public concern. When Perry conducts hearings, he is doing so at the behest of the Michigan legislature, *see Mich. Comp. Laws* § 791.252 (1979), and is making decisions that can result in a greater or lesser period of incarceration for an inmate. These are intensely public matters.

Furthermore, the public undoubtedly has an interest in a public employee's efforts to remain undeterred by a public employer's policy that seeks to limit constitutionally mandated fairness in inmate disciplinary hearings. *See Marohnic v. Walker,* 800 F.2d 613, 616 (6th Cir.1986). In *Marohnic,* a case in which this Court examined what constitutes a matter of public concern, the Court concluded that "[p]ublic interest is near its zenith when ensuring that public organizations are being operated in accordance with the law." *Id.*

Public interest is certainly near its zenith here. In 1974, in the case of *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court mandated the establishment of prison disciplinary hearings, demanding that inmates **\*606** be afforded due process before being disciplined for major misconduct. The Court acknowledged that "the full panoply of rights due a defendant [in a criminal prosecution] does not apply" with regard to inmate disciplinary hearings, and that the contours of the due process guaranteed an inmate depends to some extent on context. *Id.* at 556, 94 S.Ct. 2963. The Court clearly articulated, however, that due process can only be finessed so much before it ceases to be due process. "The touchstone of due process is protection

of the individual against arbitrary action of government." *Id.* at 558, 94 S.Ct. 2963.[5]

Here, Perry asserts that pursuant to the Supreme Court's mandate in *Wolff,* he acted non-arbitrarily and as an impartial and independent fact finder. He further asserts that through his disciplinary hearing decisions, made with an eye toward justice and impartiality, he was ensuring—at least to the extent of the cases for which he was responsible—that the MDOC was operating in accordance with the law as established by *Wolff.*

Perry alleges that the MDOC, however, was contravening the law by demanding that ALEs find 90% of inmates appearing before them guilty. Van Ochten denies that she or any of the hearing officers under her supervision (of whom Perry was one) were ever formally limited to a particular not-guilty/dismissal rate. Regardless of whether she and her hearing officers were beholden to a formal regulation demanding a certain not-guilty/dismissal rate, overwhelming evidence suggests that there was, *at the very least,* a strong expectation that the not-guilty/dismissal rate should not rise above 10%. In her own deposition, Van Ochten admits that Deputy Director Bolden of the Correctional Facilities Administration decided "that if the not-guilty/dismissal rate at a facility went above a certain percentage, that he was going to view that as a trouble signal." The critical rate was 20% in the early 1980's, but Bolden reduced it to 10% in the early 1990's, noting that he "thought [the MDOC] should be doing better." Van Ochten concedes that the rate was discussed at meetings and that, when not-guilty/dismissal rates got high, there was pressure "put on wardens to bring those rates down." Further still, at trial, Hearing Officer Arvid Perrin testified specifically about the ubiquity of that coercion when asked to recite the names of every hearing officer who complained about the pressure to find inmates guilty:

> I've heard complaints from Hearing Officers about times they were criticized for finding somebody not guilty or dismissing a case.... I think the exception would be, you know, easier.... [P]eople I have seen and talked to, I would say just about all of them I had heard at one time or

another. Just a couple that I haven't heard ever say that.

If hearing officers focus on finding 90% of the defendants before them guilty, as the evidence adduced thus far suggests, they cannot possibly be impartial, as is required by *Wolff.* The prisoner whose case merits a not-guilty finding, but whose case would result in the eleventh not-guilty finding in one hundred decisions, is sunk. His fate is sealed before his file is opened. Such a system reeks of arbitrary justice, which can only be injustice.

Because Perry's speech served to ensure that the MDOC, an arm of the state, was operating in accordance with the law as established in *Wolff,* it concerns the most public of matters.

**b.**

As noted above, the district court surpassed prong one of the *Pickering* test altogether, and based its disposition of the case on prong two, concluding that the MDOC's interest in disciplining ALEs outweighed Perry's right to speak on a matter **\*607** of public concern. In concluding as such, the court erred.

In many cases, due to inadequate factual development, the prong two balancing test "cannot be performed on a 12(b)(6) motion." *Weisbuch v. County of Los Angeles,* 119 F.3d 778, 783 (9th Cir.1997). This is such a case. Because the facts were not well enough developed in the pleadings, the court should not have performed the test. The court, however, performed the test by going beyond the pleadings and engaging in fact finding, which is impermissible at the FRCP 12(b)(6) stage. Reaching beyond the pleadings, the court determined that the MDOC's interests outweighed Perry's rights. The court based its decision on the proposition that the MDOC must be able to discipline its hearing officers for their decisions in order to prevent all ALEs from being insulated from accountability. Nothing in the pleadings could have led the court to such a conclusion. Such a conclusion required the finding of facts. The district court, however, decided against proceeding to the fact-finding stage of the trial. It erred in doing so.

Moreover, the district court struck the balance in an impermissible manner. Both the Supreme Court in *Rankin* and this Court in *Meyers v. City of Cincinnati,* 934 F.2d 726 (6th Cir.1991), have outlined the considerations which a court must take into account when utilizing the balancing test. Taking its cue from *Rankin,* this Court wrote:

> In order to justify a restriction on speech of public concern by a public employee, plaintiff's speech must impair discipline by superiors, have a detrimental impact on close working relationships, undermine a legitimate goal or mission of the employer, impede the performance of the speaker's duties, or impair harmony among co-workers. The state bears the burden of showing a legitimate justification for discipline. As in Rankin, we look for evidence of the impact of the statement on the city's *legitimate* organizational interests.

*Meyers,* 934 F.2d at 730 (citations omitted) (emphasis added). MDOC's organizational interest, therefore, must be *legitimate* if the court is to effectuate a meaningful balancing. The district court concluded that the MDOC's interest was legitimate. We disagree.

The district court asserted that "[t]he MDOC has to be able to discipline its hearing officers for findings and credibility determinations made in prison misconduct hearing reports; otherwise all ALEs would be insulated from accountability for any statements made in that context." Thus, the district court determined that the organizational interest at stake was the MDOC's interest in maintaining accountability among hearing officers. We acknowledge that maintaining accountability is a legitimate interest. Whether the government's interest in maintaining accountability led to Perry's disciplining and ultimate termination, however, is far less clear. Perry has produced substantial evidence suggesting that the MDOC implores its hearing officers to find no less than 90% of the defendant's before them guilty, and he insists that he was disciplined and terminated because of the MDOC's

interest in ensuring guilty findings for no less than 90% of defendants. Drawing all inferences in favor of the plaintiff, as is required under FRCP 12(b)(6), would seemingly lead the district court to the conclusion that part of the government's interest—if not its entire interest—in disciplining and terminating Perry was in maintaining a guilty rate of 90%. As explained above, adherence to a particular guilty rate necessarily results in arbitrary justice for innocent inmates adjudged guilty in the pursuit of this interest. Insistence upon a 90% guilty rate flies in the face of due process as mandated by *Wolff,* and is thus not a legitimate organizational interest.

At the very least, the record is not thorough enough to determine whether the **\*608** MDOC's interest in impairing Perry's First Amendment right through discipline and termination was based on a desire to maintain accountability or a desire to maintain a 90% guilty rate. As such, the district court erred in determining that the *Pickering* balance could only favor the prison officials and in consequently granting the prison officials' motion to dismiss. Therefore, the issue is remanded to the district court for further consideration in line with this opinion.

**B.**

In his complaint, Perry states that while working for the MDOC, he made an internal grievance, asserting that he was being disciplined because of his race, and that he was further disciplined and ultimately terminated, in part, because of those complaints. The *Pickering* test applied in Part III(A) of this opinion governs this analysis as well. In this instance, however, the district court used the first prong of the test to dispose of the issue —determining at the FRCP 12(b)(6) stage that Perry's complaint of racially disparate treatment, which consisted of an internal grievance, did not constitute a matter of public concern.

On appeal, Perry argues that the court simply misunderstood the governing precedent, and that Perry's complaint is, as a matter of law, a matter of public concern. A review of the case law reveals that Perry is correct.

In *Connick,* discussed above, the Supreme Court clearly established that racial discrimination is inherently a

matter of public concern. *See Connick,* 461 U.S. at 148 n. 8, 103 S.Ct. 1684. Furthermore, in *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), the Supreme Court established that an employee's choice to communicate privately with an employer does not strip the concern of its public nature. "Neither the [First] Amendment itself nor our decisions indicate that [freedom of speech] is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public." *Givhan,* 439 U.S. at 415–16, 99 S.Ct. 693. Here, it is undisputed that Perry complained about racial discrimination and that he did so in a private conversation with supervisors.

The prison officials, however, argue that although Perry complained of racial discrimination and did not lose his First Amendment protection by communicating privately, Perry's claim is not a matter of public concern. The prison officials rely on *Rice v. Ohio Department of Transportation,* 887 F.2d 716 (6th Cir.1989), for the proposition that if an employee is not speaking out as a citizen, but is instead advancing his own personal employment dispute, that employee's complaint may not be deemed a matter of public concern. *See Rice,* 887 F.2d at 721. The prison officials note that Perry was complaining in the course of his personal employment dispute, and that the district court, citing *Rice,* decided that Perry's complaint was not a matter of public concern.

The district court, however, made its decision in the instant case on September 11, 1996, over a year before the Sixth Circuit decided *Chappel v. Montgomery County Fire Protection,* 131 F.3d 564 (6th Cir.1997). *Chappel,* a case in which this Court examined what is a matter of public concern, clears up any confusion resulting from *Connick,* and disposes of the issue. In *Chappel,* this Court plainly states that "[t]he fundamental distinction recognized in *Connick* is the distinction between matters of public concern and matters only of personal interest, not civic-minded motives and self-serving motives." *Chappel,* 131 F.3d at 575. Thus, whether Perry's racial discrimination complaint was borne of civic-minded motives or of an individual employment concern is irrelevant. What is relevant is that the subject of Perry's complaint was racial discrimination—a matter inherently of public concern, according to **\*609** the Supreme Court. *See Connick,* 461 U.S. at 148 n. 8, 103 S.Ct. 1684.

We find that Perry's complaint of racially disparate treatment, which consisted of an internal grievance, is a matter of public concern, and as such, we remand the issue to the district court for further consideration in line with this opinion.

## IV. Substantive Due Process

Perry asserts that the district court erred in granting the prison officials' FRCP 12(b)(6) motion to dismiss his substantive due process claim. A substantive due process right may be implicated when a public employee is discharged for reasons that shock the conscience. *See McMaster v. Cabinet for Human Resources*, 824 F.2d 518, 522 (6th Cir.1987). The violation of a fundamental right, however, is necessary for a successful substantive due process claim. *See Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1350 (6th Cir.1992). Therefore, the crux of the question is whether the prison officials violated one of Perry's fundamental rights.

Just as the district court found that Perry's right to freedom of expression was not abused, the court found that his right to freedom of expression could not serve as the fundamental right necessary for due process analysis. On that basis, the court dismissed Perry's substantive due process claim. Because Perry's First Amendment claim was incorrectly dismissed, it logically follows that his substantive due process claim based on the First Amendment claim should not have been dismissed—in that the right to freedom of expression should have been viewed as a fundamental right in the substantive due process analysis. As such, the district court's decision to dismiss Perry's substantive due process claim relating to the fundamental right of free expression is reversed and remanded for further consideration. [6]

## V. Conclusion

For the foregoing reasons, the district court's judgment is **REVERSED**, and the case is **REMANDED**.

ALAN E. NORRIS, Circuit Judge, concurring in part and dissenting in part.

I concur with the majority's decision in Part II and agree that the grant of summary judgment should be reversed with respect to Perry's race discrimination claims under the Fourteenth Amendment and Michigan's Elliott–Larsen Civil Rights Act. However, because Perry did not allege that he engaged in speech involving a matter of public concern, I respectfully dissent from Parts III.A.1, III.A.2.a, III.B, and IV of the majority's opinion and would not reach the issue addressed in Part III.A.2.b. [1]

The majority opinion indicates that Perry's "insistence through his decisions that he be impartial and operate within the confines of constitutional law, constitutes speech on a matter of public concern." I disagree with this conclusion and the implications upon which it relies. In his complaint, Perry alleges that he was terminated because of his "speech and/or conscience in opposing, failing and/or refusing to find a higher percentage of prisoners guilty of misconduct." The complaint later indicates that Perry was deprived of his First Amendment rights when he was disciplined and terminated for "his speech in opposition to ... unlawful pressure to find more prisoners guilty." In my opinion, it is too great a stretch to imply from Perry's findings as an ALE that he was engaging in speech about MDOC's alleged quotas **\*610** for guilty verdicts. Perry never alleges that in his ALE findings he discussed his opinion about MDOC's alleged policies or desire for him to find more prisoners guilty and more prison guards credible. Instead, the first time Perry states his opinion of the alleged quotas is in his complaint to the district court. While MDOC's alleged guilty verdict quota may be improper, the First Amendment is not an appropriate means to address the problem.

I also disagree with the majority's reliance upon *Parate v. Isibor*, 868 F.2d 821 (6th Cir.1989). In *Parate*, this court determined that the assignment of a letter grade is symbolic communication intended to send a specific message to a student, noting that "[t]he message communicated by the letter grade 'A' is virtually indistinguishable from the message communicated by a formal written evaluation indicating 'excellent work.' " *Id.* at 827. In the present case, an analogous message is not at issue. Perry has not suggested that appellees have interfered with the message of his opinions to individual prisoners that they were or were not guilty of misconduct. Instead, Perry focuses on alleged speech about MDOC's requirements for numbers of guilty verdicts. This purported message cannot be implied from

Perry's ALE findings with the ease that a message of "excellent work" can be implied from the assignment of a letter grade "A." Nor do I find the question of academic freedom analogous to the present situation.

For these reasons, I disagree with the majority's determination that Perry engaged in speech on a matter of public concern through his ALE findings. Therefore, I would affirm the district court's dismissal of Perry's First Amendment claim premised on speech in his ALE findings, albeit on a different ground than that articulated by the district court.

The majority also holds that Perry's internal grievance of racially disparate treatment is a matter of public concern. I disagree. A determination of whether speech involves a matter of public concern must be based on the content, form, and context of a given statement, as revealed by the whole record. *Connick v. Myers,* 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). While discussing *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), the Supreme Court has indicated that racial discrimination is "a matter inherently of public concern." *Connick,* 461 U.S. at 148 n. 8, 103 S.Ct. 1684. The Court also noted, however, that the speech at issue in *Givhan* was "not tied to a personal employment dispute." *Id.* Furthermore, this court has determined that "[t]he fact that an employee alleges discrimination on the part of a public employer is not itself sufficient to transform the dispute into a matter of public concern." *Jackson v. City of Columbus,* 194 F.3d 737, 746 (6th Cir.1999). In *Jackson,* a public employee alleged that his right to freedom of speech was violated when the city imposed a gag order on him, forbidding him from speaking with the news media about an investigation into his alleged misconduct while the investigation was pending. *See id.* The court focused on several points when holding that Jackson had sufficiently alleged that his speech involved a matter of public concern. First, the court noted that Jackson was not an ordinary employee, but a high-profile member of the community. *Id.* at 747. Furthermore, the court indicated that "[b]ecause the investigation involved allegations of corruption and abuse of power within the Division of Police, as well as the

City's allegedly racial motivations, the gag order could be construed as *covering more than a private employment dispute.*" *Id.* (emphasis added). Unlike the plaintiff in *Jackson,* there is no indication that Perry is alleging speech regarding anything other than his personal employment dispute.

The case relied upon by the majority, **\*611** *Chappel v. Montgomery County Fire Protection District No. 1,* 131 F.3d 564 (6th Cir.1997), does not alter my conclusion. In *Chappel,* the public employee spoke about his concerns as to serious problems with the finances and management of the fire and ambulance districts in his area. Chappel had a personal motivation for the speech: if enough people agreed with his concerns, his career could benefit. However, this court did not deem Chappel's desire to gain from his speech as dispositive, even assuming that his predominant motivation for the speech was to secure a job for himself. *See id.* at 578. Instead, the court determined that the context showed Chappel's speech was on a matter of public concern because he addressed matters "near the zenith" of public concern, he raised the matters repeatedly in public fora (although the court noted that Chappel's private speech was also protected), his "speech on these matters was almost entirely undiluted by speech indicating purely personal interests," and there was strong public interest in his speech. *Id.* at 578. Unlike Chappel, however, Perry's speech addresses only his personal interests.

For these reasons, I would affirm the district court's dismissal of Perry's free speech claim arising from his workplace complaints of race discrimination because his speech involved only a personal employment dispute, not a matter of public concern.

Finally, because I would affirm the dismissal of Perry's First Amendment allegations, I would also affirm the dismissal of his substantive due process claim.

### All Citations

209 F.3d 597, 82 Fair Empl.Prac.Cas. (BNA) 1009, 17 IER Cases 1003, 2000 Fed.App. 0133P

---

Footnotes

1    Defendants–Appellees are Kenneth McGinnis, Director of the Michigan Department of Corrections (the "MDOC"); Richard Stapleton, Manager of the Hearings and Appeals Division of the Office of Policy and Hearings for the MDOC; Marjorie

**Perry v. McGinnis, 209 F.3d 597 (2000)**

82 Fair Empl.Prac.Cas. (BNA) 1009, 17 IER Cases 1003, 2000 Fed.App. 0133P

Van Ochten, Administrator of the Office of Policy and Hearings for the MDOC; and Leonard Den Houter, Supervisor of the Office of Policy and Hearings for the MDOC.

2   On December 10, 1992, Perry was disciplined for failing to state why a razor blade is dangerous in his report regarding a charge of Possession of Dangerous Contraband.

3   Claims for race discrimination in violation of the ELCRA, like Fourteenth Amendment equal protection claims, are interpreted in accordance with Title VII of the Civil Rights Act of 1964. *See Kitchen v. Chippewa Valley Sch.,* 825 F.2d 1004, 1012 (6th Cir.1987). As such, the discussion in Part II of this opinion is *completely* applicable to the ELCRA claim, and the conclusion is the same—the grant of summary judgment is reversed and the case is remanded.

4   Because prong three of the *Pickering* test involves a determination of fact, normally reserved for a jury or the court in its fact-finding role, *see Tao v. Freeh,* 27 F.3d 635, 639 (D.C.Cir.1994), the district court rightfully did not reach it.

5   The state of Michigan is just as resolute in its prohibition of arbitrary or impartial decision making in prison disciplinary cases. *See Mich. Comp. Laws* § 791.252(i) (1979).

6   At one point, Perry pressed a substantive due process claim based on his right to equal protection, but the prison officials accurately note that Perry agreed below to voluntarily dismiss that claim. As such, Perry has forfeited the claim and cannot advance it now.

1   If I were to consider the issue in Part III.A.2.b, however, I would agree with the majority opinion to the extent that it suggests the district court erred in determining that application of the *Pickering* test could only favor appellees.

**End of Document**
© 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 2

OPINION AND AWARD
IN THE MATTER OF ARBITRATION BETWEEN

THE EASTERN MICHIGAN UNIVERSITY
CHAPTER OF THE AMERICAN ASSOCIATION
OF UNIVERSITY PROFESSORS

Gr Nos. 2017-31, 2018-1
Mark Higbee, Grievant

- and -

EASTERN MICHIGAN UNIVERSITY
_____/

| | |
|---|---|
| **Hearing:** | April 11 and May 14, 2018 |
| **Appearances:** | For the Employer – Mr. Craig Schwartz |
| | For the Union – Mr. Joseph X. Michaels |
| **Briefs:** | The parties filed post-hearing briefs on July 6, 2018. |

## BACKGROUND

In the fall of 2016, someone spray-painted "KKK," "leave niggers," and "niggers out" on buildings at Eastern Michigan University. Students, along with some faculty and staff, protested, marched to the president's house, and occupied the student center overnight. The administration initiated disciplinary proceedings against some of the demonstrators.

A year later, prosecutors filed charges against an African-American former student for spray-painting the racist graffiti. There was considerable press coverage of these events.

EMUTalk is a Facebook page, open to the public and not officially connected to the university, where interested people post comments about EMU. On October 24, 2017 someone posted an article on EMUTalk with the headline "EMU police chief says racist vandalism suspect 'not motivated by race.' Various members of the EMU community posted comments in response. The Grievant, Prof. Mark Higbee, posted the following comments. All quotes are verbatim:

Clearly, the racist vandalism was racist; the hateful words alone show that. W.E.B. Du Bois, among others, wrote about Black self-hatred. This person's vandalism may well involve that, and possibly mental health issues too. It was a racist act of vandalism, on King Hall and later on the art building.

\*     \*     \*

What added fuel to the spark that was the racist vandalism was the inept, initial University response to it; public communications, the president's office, all official comments deplored such an attack on the "EMU Community" without acknowledging that it was a racist attack, and implicit threat, against Black students. This rightly made countless Black students, including many first semester students, feel unprotected and unrecognized by University officials.

\*     \*     \*

Then, when students protested against racism at EMU, EMU management threw the book at them! Confounding the belief of students that EMU administrators were racist.

\*     .  \*     \*

EMU administrators, a small group of well paid white guys in suits (plus one woman and a few lower level "HN in C" functionaries), lacked the insight to imagine that they could ever, possibly, be remotely seen as responsible for institutional racist practices. And so they continued to act as the aggrieved party, needlessly alienating students who objected to racism. Why EMU officials, earning six figures or more, took this stance can only be explained by a combination of 1. ignorance about what racism is, 2. overconfidence that they are the good guys, 3. a lack of knowledge of EMU specifically and of higher education generally.

Lucas Langdon wrote, "Mark Higbee... Can you please clarify what you mean by 'HN in C'? And to whom are you referring?

Kyle Danger Sutherland wrote, "Head N in Chage. HNIC.

Langdon wrote, "I'm hoping that there is another translation. I would hate to think that an esteemed faculty member would publicly refer to our black administrators that way."

2

The EMU administration began to receive complaints about Higbee's post the same night. One anonymous compliant was forwarded from the Office of Diversity and Affirmative Action (ODAA) to Provost Rhonda Longworth, and one was forwarded by Steven Bryant, Director of Diversity and Community Involvement, to Assistant Vice President for Academic Affairs David Woike and Director of ODAA Sharon Abraham. When she received the first complaint, Provost Longworth contacted Dean Kathy Stacey and asked her to speak with Higbee. Stacey met with Higbee on October 31. In that conversation, Higbee admitted he was the author of the post.

Following his conversation with Stacey, Higbee edited his Facebook post to read:

> EMU Administrators, a small group of well paid white guys in suits (plus one woman and a few lower level African American functionaries who much authority and have no independent on the job decision making power), lacked the insight to imagine that they could ever, possibly, be remotely seen as responsible for institutional racist practices. And so they continued to act as the aggrieved party, needlessly alienating students who objected to racism. Why EMU officials, earning six figures or more, took this stance can only be explained by a combination of 1. Ignorance about racism is, 2. Overconfidence that they are the good guys, 3 a lack of knowledge of EMU specifically and of higher education generally.

He also added these comments:

> I haven't looked at EMUTalk since Oct. 24 and did not know my comment on that day had inspired the questions from Lucas Langdon. So sorry to be slow. Lucas, Kyle is right: by "HN in C" I meant head Negro in charge. I regret using that term, as it was unclear and susceptible to being misunderstood. Just now, I edited by Comment. My apologies to all.

>               *         *         *

> The term Head Negro in Charge has been widely used in African American vernacular English for over a century. I first learned it as a college student in 1980, conversing with the late Harold Cruse. He used the term to denote Black official placehold . . .

>               *         *         *

3

It was foolish of me to use the term without defining it. It was also a pointed jab at one particular EMU official. In my comment just now posted, I defined the term as I was using it, in seven or eight lines. Bureaucrat would have been a superior word choice.

\*       \*       \*

The term has in American popular culture acquired wide familiarity in recent years, and been used as a racist put-down of President Obama – further evidence that my comment of October 24, written in about 2 minutes, was poorly praised. The term acqu. . .

\*       \*       \*

I will now step off this professorial podium on EMUTalk. I invite anyone who wishes to discuss this matter further to contact me directly – mhigbee at emich dot edu -- and I'll buy you coffee at a mutually agreeable time. My apologies to all! Peace to all.

The University suspended Higbee without pay for the Winter semester of 2018 for violation of its Employment, Affirmative Action and Civil Rights Policy:

Eastern Michigan University shall not discriminate against any other person because of race, color, religion, creed, sex, age, national origin, ancestry, marital status, veterans status, Vietnam-era veterans status, non-relevant mental or physical disability or any other protected status as provided for and to the extent required by state and federal statutes. Further, the University shall not discriminate against any person because of sexual orientation, gender identity or expression.

The University shall work for the elimination of improper discrimination and harassment in the areas listed above in regards to (1) employees and students, (2) in organizations recognized by the University, and (3) from non-university sources where students and employees of the University are involved.

The Association filed two grievances in response to the suspension. Grievance No. 2017-31 charges that the suspension was not for "reasonable and just cause" under MP 741 and 742 of the CBA. Grievance 2018-1 charges that the suspension was issued in violation of the terms of the following 2009 settlement agreement:

4

## RESOLUTION OF GRIEVANCE 2009-11

1. The Office of Diversity will write procedures for investigation of complaints against EMU personnel.

2. If the Office of Diversity needs documents previously submitted through the Student Grade Grievance process, the Office of Diversity shall request these documents through the head of the appropriate academic unit.

3. The procedures for investigating complaints against EMU faculty members shall include appropriate notification of any faculty member named, including notification of the right to union representation. The Office of Diversity will share these written policies with the Office of Academic Human Resources, and Academic Human Resources will share the document with the EMU AAUP.

4. When the Office of Diversity informs Academic Human Resources that a complaint has been filed against an EMU faculty member, the Office of Academic Human Resources shall inform the EMU-AAUP.

5. The Office of Diversity shall not delegate authority to any individual not aware of the appropriate process for collecting information from faculty members.

The parties agree that both grievances are properly before me for arbitration. Further, while both parties provided careful constitutional analysis of the case, they also stipulated (quoting from the Union's brief) that:

> any decision in this matter will have no preclusive effect on any of Prof. Higbee's claims, and specifically will not prevent a state or federal court from analyzing Prof. Higbee's constitutional claims *de novo.*

## DISCUSSION

Grievance 2018-1, The Settlement Agreement

The facts with regard to this grievance are not in dispute, and the analysis is relatively straightforward. The Association argues that the University did not comply with the terms of the settlement agreement. In particular, it argues that the Grievant was not

advised that he was under investigation and was not advised of his right to have union representation at his meeting with Dean Stacey. Further, the Association was not advised of the complaint or the investigation. The University argues that the settlement agreement does not apply to the Grievant's meeting with Stacey because the meeting was not part of an investigation by ODAA.

Quoting from the University's post-hearing brief:

> Grievance No. 2018-1 should be denied in its entirety as well. The 2009 settlement Grievant refers to <u>only</u> establishes certain protocols for investigations conducted by the Office of Diversity, and the only involvement of that office in this case was to be copied on an anonymous complaint about the undisputed wording of the Facebook posts Dr. Higbee fully concedes he posted. There was no Office of Diversity investigation to trigger the conditions of the 2009 Grievance Settlement.

> The Association also apparently alleges that the 2009 Grievance Settlement was also violated when Dean Kathleen Stacey conducted a meeting with Dr. Higbee on October 31, 2017 to confirm that he had, and in fact, sent the "HN in C" post. Since that settlement is limited to Office of Diversity investigations, and not conversations between a Dean and faculty member, the Association's position on this meeting is devoid of merit as well.

I do not find the University's argument persuasive. Certainly a dean may call a professor in for a conversation without triggering the requirements of the settlement agreement, but the meeting between Higbee and Stacey was not an ordinary chat. The record on this point is clear. The Office of Diversity received a complaint alleging discrimination. Dean Stacey was asked to speak to Higbee to gather information relevant to that complaint. She said so in her testimony. That is sufficient to make their conversation an "investigation" of a complaint of discrimination, and brings it under the terms of the settlement agreement. The University cannot avoid complying with the agreement by having someone outside the ODAA conduct the investigation. The agreement is clear on that point:

> 5.      The Office of Diversity shall not delegate authority to any individual not aware of the appropriate process for collecting information from faculty members.

If find, therefore, that the University violated the terms of the settlement agreement by failing to notify the Grievant that he was being investigated for alleged discrimination,

failing to give him notice of his right to be represented by the union, and failing to notify the EMU-AAUP. Grievance 2018-1 is sustained.

Grievance 2017-31, Reasonable and Just Cause

Here the situation is more complicated. First, the University takes the position that, as a labor arbitrator, I do not have jurisdiction to hear a First Amendment claim. It argues that the CBA specifically mentions other statutes, but there is no mention of the Constitution. Counsel for the University emphasized the point by quoting a decision of mine from several years ago where I said I do not make rulings on the basis of external law.

I agree that a labor arbitrator ordinarily should avoid questions of external law. But I disagree with counsel's reading of this CBA. Margin Paragraph 12 reads:

> Faculty Members, while not conducting their Faculty responsibilities, shall have the same rights to participate in political activities as other citizens. This statement shall not be construed to constitute an infringement upon the academic freedom of any Faculty Member.

That provision does not name the First Amendment, but any fair reading of the language "the same rights to participate in political activities as other citizens" must include the rights to freedom of speech, of the press and the right to petition the government for redress of grievances. I find that the CBA implicitly incorporates First Amendment rights.

Two closely related questions follow. The first is whether, in commenting on EMUTalk, the Grievant was or was not conducting his faculty responsibilities. In other words, was he commenting as a citizen or as an employee? The second is whether he was commenting on "a matter of public concern." If he was speaking as an employee on a matter of concern only to employees, then the Constitution is not relevant. If he was speaking as a citizen on a matter of public concern, it is.

The answer is abundantly clear to anyone who isn't a lawyer: he was both. He was commenting as a citizen on a matter of public concern, and he was at the same time commenting as an employee about goings on at his place of employment. Some facts point to one role; other facts point to the other. For instance, the offensive post was posted at the time that the Grievant was scheduled to be holding his office hours. That supports the conclusion that he was "on duty" and acting as an employee. On the other hand, the original incident was covered in the Washington Post. That supports the

conclusion that it was a matter of public concern, and in commenting on it the Grievant was acting as a citizen.

There is a further test. While political speech on a matter of public concern may be protected, a targeted racial slur may not. So it is necessary to go back to the offending comment and look carefully at precisely what the Grievant said. His comment was:

> EMU administrators, a small group of well paid white guys in suits (plus one woman and a few lower level "HN in C" functionaries), lacked the insight to imagine that they could ever, possibly, be remotely seen as responsible for institutional racist practices. And so they continued to act as the aggrieved party, needlessly alienating students who objected to racism. Why EMU officials, earning six figures or more, took this stance can only be explained by a combination of 1. ignorance about racism is, 2. overconfidence that they are the good guys, 3. a lack of knowledge of EMU specifically and of higher education generally.

Fascinatingly, what is wrong with this statement is precisely what the Grievant says is wrong with the EMU administration. It is "needlessly alienating." It could only be made by someone who "lacked the insight to imagine that [he] could ever, possibly, be remotely seen as responsible for ... racist practices." And it could only be explained by "overconfidence that [he] is the good guy."

That said, what is the statement about? It is about University governance. It is a criticism of a public University's handling of a widely publicized, racial incident. It is, as Higbee acknowledged, also "a pointed jab at one particular EMU official," but it was a political statement in a more important sense than it was a personal one. The point was to criticize the administration.

In this context, it is important to acknowledge that we do not know exactly what the N stands for in HN in C. We know what members of the administration believed it stood for, but the record produced by the Association clearly establishes that the term is ambiguous. We will never know what Higbee had in his mind as he typed the comment, but the explanation he gave makes more sense than the one offered by the University. Higbee says he never uses the term nigger. That is consistent with what we know about how he sees himself - as an outspoken advocate for social and racial justice.

The final consideration is whether on balance the grievant's right to free speech is outweighed by the disruption his comment caused to the University. The most powerful

moment in the hearing came when counsel was cross-examining David Turner, Vice President for Human Resources:

> Q.   Obviously, you felt that Mark Higbee was criticizing you in this post. What are some other criticisms of your leadership in the past?
>
> **A.   I'm sorry. You said I thought he was criticizing me in this post?**
>
> Q.   Yes.
>
> **A.   No. I thought he called me a nigger in this post. That's different.**

I make no effort to minimize the insult to Turner and others. The question before me is not the measure of the insult. It is the measure of the disruption of the University's business on one hand and the right to free speech on the other.

In performing that balancing test, I need to be guided by the University's commitment to vigorous debate. Quoting former EMU General Counsel Gloria Hage in an exhibit admitted by the Employer in this proceeding:

> To be clear, Eastern Michigan University is deeply committed to protecting and preserving the First Amendment rights of its faculty, staff, students and larger community. The University strongly supports all forms of expression, regardless of whether it intended to reflect positively or negatively on it.
>
> The free exchange of ideas is vital to the University's educational mission. Without it, we fail. This is particularly true on the campus of Eastern Michigan University, where our diversity is a point of pride, distinction and competitive advantage. Our students cannot experience a high quality university education without diverse classrooms and a diverse campus. Our classrooms and our campus provide a learning environment where students thrive and learn to support others inclusive of all races, ethnicities, religions, sexual orientations, gender identities and, significantly, viewpoints. Our students leave Eastern better prepared than their peers to lead in an increasingly diverse and multicultural world. We cherish and defend this diversity and the free exchange of ideas vital to maintaining it.

\*       \*       \*

You are correct that Mr. Higbee's speech reflected an extreme dissatisfaction with the actions of the EMU administration. Such expression is *protected* by the University, not punished.

\*       \*       \*

The University does not disagree with your recitation of the law – punishing speech merely because it is controversial or offensive runs counter to the protections of the First Amendment.

In Ms. Hage's view, notwithstanding the language just quoted, the Grievant's post lies outside of those protections. I must disagree.

In judging whether First Amendment protection applies, I must consider whether the speech was on a matter of public concern, whether it was made as an employee or as a citizen, whether it was a targeted racial slur, and whether the disruption to the Employer was so severe that it outweighed the right to free speech. In all of those judgments I need to cognizant of the central role that freedom of speech plays in our law and in our culture.

Without minimizing either the stupidity or the offensiveness of Higbee's insult, I am constrained to find that it is protected speech under the First Amendment. Since the First Amendment is incorporated into the CBA by MP 12, the suspension was not for reasonable and just cause and was issued in violation of the CBA. Accordingly, the grievance must be sustained.

## AWARD

The grievance is sustained. The Grievant is to be made whole for all losses.

I will retain jurisdiction in the event there are questions with regard to the implementation of this award.

Barry Goldman, Arbitrator
July 23, 2018

# EXHIBIT 3

## AFFIDAVIT OF MARK HIGBEE

I, Mark Higbee, being duly sworn, depose and state as follows:

1.     My name is Mark Higbee.  I am the Plaintiff in *Mark Higbee v Eastern Michigan University,* United States District Court for the Eastern District of Michigan Southern Division Case No. 2:18-cv-13761.

2.      I have been a Professor of American History at Eastern Michigan University since 1994.  My job duties as a professor are to maintain a full load of classroom teaching, teach my students effectively; perform scholarly research and publication; and participate in University service activities.   My job duties do not include posting comments on Facebook.

3.      I have little contact with administrators of Eastern Michigan University in the performance of my job duties, and none on a daily or even weekly basis, aside from with my Department Head.

4.     When I made my October 24, 2017 post to EMUTalk, I used the term "HN in C functionaries" as shorthand for "Head Negro in Charge functionaries."  It was not meant as a racial slur.  In fact, approximately one week after my original post, I explicitly clarified on EMUTalk that "HN in C" was short for "Head Negro in Charge."  I never use the n word.

5.     The term "Head Negro in Charge" has wide usage among scholars of the African-American experience, of which I am one.  I learned the term in 1980 while taking a class taught by Harold Cruse (who in the late 1960s had been the founding director of the University of Michigan's Black Studies program).  In 1994 Harold Cruse was a Visiting

1

Professor at EMU during my first year on the EMU faculty and I had many conversations with him that year.

6.     Cornel West, the noted philosopher, activist and author, now at Harvard, used the term "Head Negro in Charge", in his bestselling book *Race Matters,* published in 1993. In an essay published in 2018, Dr. West used the term "HNIC (Head Negro in Charge)" to analyze an aspect of Martin Luther King, Jr.'s career. In neither book was Cornel West using the term as a racial slur, against Dr. King or anyone. When I was a student in Professor West's class at Columbia University in the 1980s, "HNIC" was defined and used in its full historical and political context. It was not a slur. Around the year 2000, Cornel West was a guest speaker at Eastern Michigan University and spoke to an overflowing crowd.

7.     Scores of other scholars of African-American History and race relations have likewise used the terms "HNIC" as a shorthand for "Head Negro in Charge", never as a slur.


FURTHER AFFIANT SAYETH NOT.


Dated: _3-1-2019_                  _Mark Higbee_
                                MARK HIGBEE, Plaintiff

     Sworn & subscribed to before me on this _1_ day of March, 2019.

Chelsea Klosowski
NOTARY PUBLIC STATE OF MICHIGAN
County of Genesee
My Commission Expires 11/24/2024
Acting in the County of Genesee

_Chelsea Klosowski_

G:/clients/Higbee/aff plaintiff

2

# EXHIBIT 4

88 S.Ct. 1731
Supreme Court of the United States

Marvin L. PICKERING, Appellant,

v.

BOARD OF EDUCATION OF
TOWNSHIP HIGH SCHOOL DISTRICT
205, WILL COUNTY, ILLINOIS.

No. 510.

|

Argued March 27, 1968.

|

Decided June 3, 1968.

## Synopsis

Action by dismissed teacher against board of education seeking reinstatement. The Circuit Court of Will County, Illinois, affirmed decision of school board, and the teacher appealed. The Illinois Supreme Court, 36 Ill.2d 568, 225 N.E.2d 1, affirmed, and the teacher appealed. The United States Supreme Court, Mr. Justice Marshall, held that question whether school system requires additional funds is matter of legitimate public concern on which judgment of school administration, including school board, cannot be taken as conclusive and it is thus essential that teachers, who, as a class, are members of community most likely to have informed and definite opinions as to how funds allotted to operation of schools should be spent, be able to speak out freely on such questions without fear of retaliatory dismissal. The court further held that act of school teacher, in writing and sending letter to local newspaper, in connection with proposed tax increase, that was critical of manner in which board of education had handled past proposals to raise new revenue for schools did not, in absence of proof of false statements knowingly or recklessly made, afford basis for teacher's dismissal.

Judgment reversed and case remanded with directions.

Mr. Justice White dissented in part.

## Attorneys and Law Firms

**1732   *564   John Ligtenberg, Chicago, Ill., for appellant.

John F. Cirricione, Joliet, Ill., for appellee.

## Opinion

Mr. Justice MARSHALL delivered the opinion of the Court.

Appellant Marvin L. Pickering, a teacher in Township High School District 205, Will County, Illinois, was dismissed from his position by the appellee Board of Education for sending a letter to a local newspaper in connection with **1733 a recently proposed tax increase that was critical of the way in which the Board and the district superintendent of schools had handled past proposals to raise new revenue for the schools. Appellant's dismissal resulted from a determination by the Board, after a full hearing, that the publication of the letter was 'detrimental to the efficient operation and administration of the schools of the district' and hence, under the relevant *565 Illinois statute, Ill.Rev.Stat., c. 122, s 10 —22.4(1963), that 'interests of the schools require(d) (his dismissal).'

Appellant's claim that his writing of the letter was protected by the First and Fourteenth Amendments was rejected. Appellant then sought review of the Board's action in the Circuit Court of Will County, which affirmed his dismissal on the ground that the determination that appellant's letter was detrimental to the interests of the school system was supported by substantial evidence and that the interests of the schools overruled appellant's First Amendment rights. On appeal, the Supreme Court of Illinois, two Justices dissenting, affirmed the judgment of the Circuit Court. 36 Ill.2d 568, 225 N.E.2d 1 (1967). We noted probable jurisdiction of appellant's claim that the Illinois statute permitting his dismissal on the facts of this case was unconstitutional as applied under the First and Fourteenth Amendments.[1] 389 U.S. 925 88 S.Ct. 291, 19 L.Ed.2d 276 (1967). For the reasons detailed below we agree that appellant's rights to freedom of speech were violated and we reverse.

### I.

In February of 1961 the appellee Board of Education asked the voters of the school district to approve a bond issue to raise $4,875,000 to erect two new schools. The proposal was defeated. Then, in December of 1961, the Board submitted another bond proposal to the voters which called for the raising of $5,500,000 to build two new schools. This second proposal passed and the schools

were built with the money raised by the bond **\*566** sales. In May of 1964 a proposed increase in the tax rate to be used for educational purposes was submitted to the voters by the Board and was defeated. Finally, on September 19, 1964, a second proposal to increase the tax rate was submitted by the Board and was likewise defeated. It was in connection with this last proposal of the School Board that appellant wrote the letter to the editor (which we reproduce in an Appendix to this opinion) that resulted in his dismissal.

Prior to the vote on the second tax increase proposal a variety of articles attributed to the District 205 Teachers' Organization appeared in the local paper. These articles urged passage of the tax increase and stated that failure to pass the increase would result in a decline in the quality of education afforded children in the district's schools. A letter from the superintendent of schools making the same point was published in the paper two days before the election and submitted to the voters in mimeographed form the following day. It was in response to the foregoing material, together with the failure of the tax increase to pass, that appellant submitted the letter in question to the editor of the local paper.

The letter constituted, basically, an attack on the School Board's handling of the 1961 bond issue proposals and its subsequent allocation of financial resources **\*\*1734** between the schools' educational and athletic programs. It also charged the superintendent of schools with attempting to prevent teachers in the district from opposing or criticizing the proposed bond issue.

The Board dismissed Pickering for writing and publishing the letter. Pursuant to Illinois law, the Board was then required to hold a hearing on the dismissal. At the hearing the Board charged that numerous statements in the letter were false and that the publication **\*567** of the statements unjustifiably impugned the 'motives, honesty, integrity, truthfulness, responsibility and competence' of both the Board and the school administration. The Board also charged that the false statements damaged the professional reputations of its members and of the school administrators, would be disruptive of faculty discipline, and would tend to foment 'controversy, conflict and dissension' among teachers, administrators, the Board of Education, and the residents of the district. Testimony was introduced from a variety of witnesses on the truth or falsity of the particular statements in the letter with which the Board took issue. The Board found the statements to

be false as charged. No evidence was introduced at any point in the proceedings as to the effect of the publication of the letter on the community as a whole or on the administration of the school system in particular, and no specific findings along these lines were made.

The Illinois courts reviewed the proceedings solely to determine whether the Board's findings were supported by substantial evidence and whether, on the facts as found, the Board could reasonably conclude that appellant's publication of the letter was 'detrimental to the best interests of the schools.' Pickering's claim that his letter was protected by the First Amendment was rejected on the ground that his acceptance of a teaching position in the public schools obliged him to refrain from making statements about the operation of the schools 'which in the absence of such position he would have an undoubted right to engage in.' It is not altogether clear whether the Illinois Supreme Court held that the First Amemdment had no applicability to appellant's dismissal for writing the letter in question or whether it determined that the particular statements made in the letter were not entitled to First Amendment protection.

**\*568**  In any event, it clearly rejected Pickering's claim that, on the facts of this case, he could not constitutionally be dismissed from his teaching position.

## II.

To the extent that the Illinois Supreme Court's opinion may be read to suggest that teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work, it proceeds on a premise that has been unequivocally rejected in numerous prior decisions of this Court. E.g., Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247 (1960); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675 (1967). '(T)he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.' Keyishian v. Board of Regents, supra, 385 U.S. at 605—606, 87 S.Ct. at 685. At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.

The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest **1735 of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

### III.

The Board contends that 'the teacher by virtue of his public employment has a duty of loyalty to support his superiors in attaining the generally accepted goals of education and that, if he must speak out publicly, he should do so factually and accurately, commensurate with *569 his education and experience.' Appellant, on the other hand, argues that the test applicable to defamatory statements directed against public officials by persons having no occupational relationship with them, namely, that statements to be legally actionable must be made 'with knowledge that (they were) * * * false or with reckless disregard of whether (they were) * * * false or not,' New York Times Co. v. Sullivan, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964), should also be applied to public statements made by teachers. Because of the enormous variety of fact situations in which critical statements by teachers and other public employees may be thought by their superiors, against whom the statements are directed to furnish grounds for dismissal, we do not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged. However, in the course of evaluating the conflicting claims of First Amendment protection and the need for orderly school administration in the context of this case, we shall indicate some of the general lines along which an analysis of the controlling interests should run.

An examination of the statements in appellant's letter objected to by the Board[2] reveals that they, like the letter as a whole, consist essentially of criticism of the Board's allocation of school funds between educational and athletic programs, and of both the Board's and the superintendent's methods of informing, or preventing the informing of, the district's taxpayers of the real reasons why additional tax revenues were being sought for the schools. The statements are in no way directed towards any person with whom appellant would normally be in *570 contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate superiors or harmony among coworkers is presented here. Appellant's employment

relationships with the Board and, to a somewhat lesser extent, with the superintendent are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning. Accordingly, to the extent that the Board's position here can be taken to suggest that even comments on matters of public concern that are substantially correct, such as statements (1)—(4) of appellant's letter, see Appendix, infra, may furnish grounds for dismissal if they are sufficiently critical in tone, we unequivocally reject it.[3]

**1736 We next consider the statements in appellant's letter which we agree to be false. The Board's original charges included allegations that the publication of the letter damaged the professional reputations of the Board and the superintendent and would foment controversy and conflict among the Board, teachers, administrators, and the residents of the district. However, no evidence to support these allegations was introduced at the hearing. So far as the record reveals, Pickering's letter was greeted by everyone but its main target, the Board, with massive apathy and total disbelief. The Board must, therefore, *571 have decided, perhaps by analogy with the law of libel, that the statements were per se harmful to the operation of the schools.

However, the only way in which the Board could conclude, absent any evidence of the actual effect of the letter, that the statements contained therein were per se detrimental to the interest of the schools was to equate the Board members' own interests with that of the schools. Certainly an accusation that too much money is being spent on athletics by the administrators of the school system (which is precisely the import of that portion of appellant's letter containing the statements that we have found to be false, see Appendix, infra) cannot reasonably be regarded as per se detrimental to the district's schools. Such an accusation reflects rather a difference of opinion between Pickering and the Board as to the preferable manner of operating the school system, a difference of opinion that clearly concerns an issue of general public interest.

In addition, the fact that particular illustrations of the Board's claimed undesirable emphasis on athletic programs are false would not normally have any necessary impact on the actual operation of the schools, beyond its tendency to anger the Board. For example, Pickering's

letter was written after the defeat at the polls of the second proposed tax increase. It could, therefore, have had no effect on the ability of the school district to raise necessary revenue, since there was no showing that there was any proposal to increase taxes pending when the letter was written.

More importantly, the question whether a school system requires additional funds is a matter of legitimate public concern on which the judgment of the school administration, including the School Board, cannot, in a society that leaves such questions to popular vote, be taken as conclusive. On such a question free and open *572 debate is vital to informed decision-making by the electorate. Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.

In addition, the amounts expended on athletics which Pickering reported erroneously were matters of public record on which his position as a teacher in the district did not qualify him to speak with any greater authority than any other taxpayer. The Board could easily have rebutted appellant's errors by publishing the accurate figures itself, either via a letter to the same newspaper or otherwise. We are thus not presented with a situation in which a teacher has carelessly made false statements about matters so closely related to the day-to-day operations of the schools that any harmful impact on the public would be difficult to counter because of the teacher's presumed greater access to the real facts. Accordingly, we have no occasion to consider at this time whether under such circumstances a school board could reasonably require that a teacher make substantial **1737 efforts to verify the accuracy of his charges before publishing them.[4]

What we do have before us is a case in which a teacher has made erroneous public statements upon issues then currently the subject of public attention, which are critical of his ultimate employer but which are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in *573 the classroom[5] or to have interfered with the regular operation of the schools generally. In these circumstances we conclude that the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public.

## IV.

The public interest in having free and unhindered debate on matters of public importance—the core value of the Free Speech Clause of the First Amendment—is so great that it has been held that a State cannot authorize the recovery of damages by a public official for defamatory statements directed at him except when such statements are shown to have been made either with knowledge of their falsity or with reckless disregard for their truth or falsity. New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710 (1964); St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). Compare Linn v. United Plant Guard Workers, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). The same test has been applied to suits for invasion of privacy based on false statements where a 'matter of public interest' is involved. Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). It is therefore perfectly clear that, were appellant a member of the general public, the State's power to afford the appellee Board of Education or its members any legal right to sue him for writing the letter at issue here would be limited by the requirement that the letter be judged by the standard laid down in New York Times.

*574 This Court has also indicated, in more general terms, that statements by public officials on matters of public concern must be accorded First Amendment protection despite the fact that the statements are directed at their nominal superiors. Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); Wood v. Georgia, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962). In Garrison, the New York Times test was specifically applied to a case involving a criminal defamation conviction stemming from statements made by a district attorney about the judges before whom he regularly appeared.

While criminal sanctions and damage awards have a somewhat different impact on the exercise of the right to freedom of speech from dismissal from employment, it is apparent that the threat of dismissal from public employment is nonetheless a potent means of inhibiting speech. We have already noted our disinclination to make an across-the-board equation of dismissal from

Pickering v. Board of Ed. of Tp. High School Dist. 205, Will..., 391 U.S. 563 (1968)

88 S.Ct. 1731, 20 L.Ed.2d 811, 1 IER Cases 8

public employment for remarks critical of superiors with awarding damages in a libel **1738 suit by a public official for similar criticism. However, in a case such as the present one, in which the fact of employment is only tangentially and insubstantially involved in the subject matter of the public communication made by a teacher, we conclude that it is necessary to regard the teacher as the member of the general public he seeks to be.

In sum, we hold that, in a case such as this, absent proof of false statements knowingly or recklessly made by him,[6] a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment. Since no *575 such showing has been made in this case regarding appellant's letter, see Appendix, infra, his dismissal for writing it cannot be upheld and the judgment of the Illinois Supreme Court must, accordingly, be reversed and the case remanded for further proceedings not inconsistent with this opinion. It is so ordered.

Judgment reversed and case remanded with directions.

Mr. Justice DOUGLAS, with whom Mr. Justice BLACK joins, concurs in the judgment of the Court for the reasons set out in his concurring opinions in Time, Inc. v. Hill, 385 U.S. 374, 401, 87 S.Ct. 534, 548, Rosenblatt v. Baer, 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597, and Garrison v. Louisiana, 379 U.S. 64, 80, 85 S.Ct. 209, 218, and in the separate opinions of Mr. Justice Black in Curtis Publishing Co. v. Butts, 388 U.S. 130, 170, 87 S.Ct. 1975, 1999, 18 L.Ed.2d 1094 and New York Times Co. v. Sullivan, 376 U.S. 254, 293, 84 S.Ct. 710, 733.

### APPENDIX TO OPINION OF THE COURT

*A. Appellant's letter.*

### LETTERS TO THE EDITOR

* * * Graphic Newspapers, Inc. Thursday, September 24, 1964, Page 4
Dear Editor:

I enjoyed reading the back issues of your paper which you loaned to me. Perhaps others would enjoy reading them in order to see just how far the two new high schools have deviated from the original promises by the Board of Education. First, let me state that I am referring to the February thru November, 1961 issues of your paper, so that it can be checked.

One statement in your paper declared that swimming pools, athletic fields, and auditoriums had been left out of the program. They may have been left out but they got put back in very quickly because Lockport West has both an auditorium and athletic field. In fact, Lockport West has a better athletic field than Lockport Central. It has a track that isn't quite regulation distance even *576 though the board spent a few thousand dollars on it. Whose fault is that? Oh, I forgot, it wasn't supposed to be there in the first place. It must have fallen out of the sky. Such responsibility has been touched on in other letters but it seems one just can't help noticing it. I am not saying the school shouldn't have these facilities, because I think they should, but promises are promises, or are they?

Since there seems to be a problem getting all the facts to the voter on the twice defeated bond issue, many letters have been written to this paper and probably more will follow, I feel I must **1739 say something about the letters and their writers. Many of these letters did not give the whole story. Letters by your Board and Administration have stated that teachers' salaries total $1,297,746 for one year. Now that must have been the total payroll, otherwise the teachers would be getting $10,000 a year. I teach at the high school and I know this just isn't the case. However, this shows their 'stop at nothing' attitude. To illustrate further, do you know that the superintendent told the teachers, and I quote, 'Any teacher that opposes the referendum should be prepared for the consequences.' I think this gets at the reason we have problems passing bond issues. Threats take something away; these are insults to voters in a free society. We should try to sell a program on its merits, if it has any.

Remember those letters entitled 'District 205 Teachers Speak,' I think the voters should know that those letters have been written and agreed to by only five or six teachers, not 98% of the teachers in the high school. In fact, many teachers didn't even know who was writing them. Did you know that those letters had to have the approval of the superintendent before they could be put in the paper? That's the kind of totalitarianism teachers *577 live in at the high school, and your children go to school in.

Pickering v. Board of Ed. of Tp. High School Dist. 205, Will..., 391 U.S. 563 (1968)

88 S.Ct. 1731, 20 L.Ed.2d 811, 1 IER Cases 8

In last week's paper, the letter written by a few uninformed teachers threatened to close the school cafeteria and fire its personnel. This is ridiculous and insults the intelligence of the voter because properly managed school cafeterias do not cost the school district any money. If the cafeteria is losing money, then the board should not be packing free lunches for athletes on days of athletic contests. Whatever the case, the taxpayer's child should only have to pay about 30¢ for his lunch instead of 35¢ to pay for free lunches for the athletes.

In a reply to this letter your Board of Administration will probably state that these lunches are paid for from receipts from the games. But $20,000 in receipts doesn't pay for the $200,000 a year they have been spending on varsity sports while neglecting the wants of teachers.

You see we don't need an increase in the transportation tax unless the voters want to keep paying $50,000 or more a year to transport athletes home after practice and to away games, etc. Rest of the $200,000 is made up in coaches' salaries, athletic directors' salaries, baseball pitching machines, sodded football fields, and thousands of dollars for other sports equipment.

These things are all right, provided we have enough money for them. To sod football fields on borrowed money and then not be able to pay teachers' salaries is getting the cart before the horse.

If these things aren't enough for you, look at East High. No doors on many of the classrooms, a plant room without any sunlight, no water in a first aid treatment room, are just a few of many things. The taxpayers were really taken to the cleaners. A part of the sidewalk in front of the building has already collapsed. Maybe Mr. Hess would be interested to know that we need blinds on the windows in that building also.

**\*578** Once again, the board must have forgotten they were going to spend $3,200,000 on the West building and $2,300,000 on the East building.

As I see it, the bond issue is a fight between the Board of Education that is trying to push tax-supported athletics down our throats with education, and a public that has mixed emotions about both of these items because they feel they are already paying enough taxes, and simply don't know whom to trust with any more tax money.

I must sign this letter as a citizen, taxpayer and voter, not as a teacher, **\*1740** since that freedom has been taken from the teachers by the administration. Do you really know what goes on behind those stone walls at the high school?

Respectfully,

Marvin L. Pickering.

B. Analysis.

The foregoing letter contains eight principal statements which the Board found to be false.[1] Our independent review of the record[2] convinces us that Justice **\*579** Schaefer was correct in his dissenting opinion in this case when he concluded that many of appellant's statements which were found by the Board to be false were in fact substantially correct. We shall deal with each of the statements found to be false in turn. (1) Appellant asserted in his letter that the two new high schools when constructed deviated substantially from the original promises made by the Board during the campaign on the bond issue about the facilities they would contain. The Board based its conclusion that this statement was false on its determination that the promises referred to were those made in the campaign to pass the second bond issue in December of 1961. In the campaign on the first bond issue the Board stated that the plans for the two schools did not include such items as swimming pools, auditoriums, and athletic fields. The publicity put out by the Board on the second bond issue mentioned nothing about the addition of an auditorium to the plans and also mentioned nothing specific about **\*580** athletic fields, although a general reference to 'state required physical education' facilities was included that was similar to a reference made in the material issued by the Board during the first campaign.

In sum, the Board first stated that certain facilities were not to be included in the new high schools as an economy measure, changed its mind after the **\*1741** defeat of the first bond issue and decided to include some of the facilities previously omitted, and never specifically or even generally indicated to the taxpayers the change. Appellant's claim that the original plans, as disclosed to the public, deviated from the buildings actually constructed is thus substantially correct and his characterization of the Board's prior statement as

a 'promise' is fair as a matter of opinion. The Board's conclusion to the contrary based on its determination that appellant's statement referred only to the literature distributed during the second bond issue campaign is unreasonable in that it ignores the word 'original' that modifies 'promises' in appellant's letter.

(2) Appellant stated that the Board incorrectly informed the public that 'teachers' salaries' total $1,297,746 per year. The Board found that statement false. However, the superintendent of schools admitted that the only way the Board's figure could be regarded as accurate was to change the word 'teachers' to 'instructional' whereby the salaries of deans, principals, librarians, counselors, and four secretaries at each of the district's three high schools would be included in the total. Appellant's characterization of the Board's figure as incorrect is thus clearly accurate.

(3) Pickering claimed that the superintendent had said that any teacher who did not support the 1961 bond issue referendum should be prepared for the consequences. The Board found this claim false. However, the claim statement was corroborated by the testimony of two other teachers, although the superintendent denied making the *581 remark attributed to him. The Illinois Supreme Court appears to have agreed that something along the lines stated by appellant was said, since it relied, in upholding the Board's finding that appellant's version of the remark was false, on testimony by one of the two teachers that he interpreted the remark to be a prediction about the adverse consequences for the schools should the referendum not pass rather than a threat against noncooperation by teachers. However, the other teacher testified that he didn't know how to interpret the remark. Accordingly, while appellant may have misinterpreted the meaning of the remark, he did not misreport it.

(4) Appellant's letter stated that letters from teachers to newspapers had to have the approval of the superintendent before they could be submitted for publication. The Board relied in finding this statement false on the testimony by the superintendent that no approval was required by him. However, the Handbook for Teachers of the district specifically stated at that time that material submitted to local papers should be checked with the building principal and submitted in triplicate to the publicity coordinator. In particular, the teachers' letters to which appellant was specifically referring in his own letter had in fact been submitted to

the superintendent prior to their publication. Thus this statement is substantially correct.

The other four statements challenged by the Board, are factually incorrect in varying degrees. (5) Appellant's letter implied that providing athletes in the schools with free lunches meant that other students must pay 35¢ instead of 30¢ for their lunches. This statement is erroneous in that while discontinuing free lunches for athletes would have permitted some small decrease in the 35¢ charge for lunch to other students, the decrease would not have brought the price down to 30¢. (6) Appellant claimed that the Board had been spending $200,000 a year on athletics while neglecting the wants *582 of teachers. This claim is incorrect in that the $200,000 per year figure included over $130,000 of nonrecurring capital expenditures. (7) Appellant also claimed that the **1742 Board had been spending $50,000 a year on transportation for athletes. This claim is completely false in that the expenditures on travel for athletes per year were about $10,000. (8) Finally, appellant stated that football fields had been sodded on borrowed money, while the Board had been unable to pay teachers' salaries. This statement is substantially correct as to the football fields being sodded with borrowed money because the money spent was the proceeds of part of the bond issue, which can fairly be characterized as borrowed. It is incorrect insofar as it suggests that the district's teachers had actually not been paid upon occasion, but correct if taken to mean that the Board had at times some difficulty in obtaining the funds with which to pay teachers. The manner in which the last four statements are false is perfectly consistent with good-faith error, and there is no evidence in the record to show that anything other than carelessness or insufficient information was responsible for their being made.

Mr. Justice WHITE, concurring in part and dissenting in part.

The Court holds that truthful statements by a school teacher critical of the school board are within the ambit of the First Amendment. So also are false statements innocently or negligently made. The State may not fire the teacher for making either unless, as I gather it, there are special circumstances, not present in this case, demonstrating an overriding state interest, such as the need for confidentiality or the special obligations which a teacher in a particular position may owe to his superiors. [1] *583 The core of today's decision is the holding that

Pickering v. Board of Ed. of Tp. High School Dist. 205, Will..., 391 U.S. 563 (1968)

88 S.Ct. 1731, 20 L.Ed.2d 811, 1 IER Cases 8

Pickering's discharge must be tested by the standard of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710 (1964). To this extent I am in agreement.

The Court goes on, however, to reopen a question I had thought settled by New York Times and the cases that followed it, particularly Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209 (1964). The Court devotes several pages to reexamining the facts in order to reject the determination below that Pickering's statements harmed the school system, ante, at 1735—1737, when the question of harm is clearly irrelevant given the Court's determination that Pickering's statements were neither knowingly nor recklessly false and its ruling that in such circumstances a teacher may not be fired even if the statements are injurious. The Court then gratuitously suggests that when statements are found to be knowingly or recklessly false, it is an open question whether the First Amendment still protects them unless they are shown or can be presumed to have caused harm. Ante, at 1738, n. 6. Deliberate or reckless falsehoods serve no First Amendment ends and deserve no protection under that Amendment. The Court unequivocally recognized this in Garrison, where after reargument the Court said that 'the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.' 379 U.S., at 75, 85 S.Ct., at 216. The Court **1743 today neither *584 explains nor justifies its withdrawal from the firm stand taken in Garrison. As I see it, a teacher may be fired without violation of the First Amendment for knowingly or recklessly making false statements regardless of their harmful impact on the schools. As the Court holds, however, in the absence

of special circumstances he may not be fired if his statements were true or only negligently false, even if there is some harm to the school system. I therefore see no basis or necessity for the Court's foray into fact-finding with respect to whether the record supports a finding as to injury.[2] If Pickering's false statements were either knowingly or recklessly made, injury to the school system becomes irrelevant, and the First Amendment would not prevent his discharge. For the State to be constitutionally precluded from terminating his employment, reliance on some other constitutional provision would be required.

Nor can I join the Court in its findings with regard to whether Pickering knowingly or recklessly published false statements. Neither the State in presenting its evidence nor the state tribunals in arriving at their findings and conclusions of law addressed themselves to the elements of the new standard which the Court holds the First Amendment to require in the circumstances of this case. Indeed, the state courts expressly rejected the applicability of both New York Times and Garrison. I find it wholly unsatisfactory for this Court to make the initial determination of knowing or reckless falsehood from the cold record now before us. It would be far more appropriate to remand this case to the state courts for further proceedings in light of the constitutional standard which the Court deems applicable to this case, once the relevant facts have been ascertained in appropriate proceedings.

**All Citations**

391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811, 1 IER Cases 8

Footnotes

1    Appellant also challenged that statutory standard on which the Board based his dismissal as vague and overbroad. See
     Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); NAACP v. Button, 371 U.S. 415, 83
     S.Ct. 328, 9 L.Ed.2d 405 (1963); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). Because of our
     disposition of this case we do not reach appellant's challenge to the statute on its face.

2    We have set out in the Appendix our detailed analysis of the specific statements in appellant's letter which the Board
     found to be false, together with our reasons for concluding that several of the statements were, contrary to the findings
     of the Board, substantially correct.

3    It is possible to conceive of some positions in public employment in which the need for confidentiality is so great that
     even completely correct public statements might furnish a permissible ground for dismissal. Likewise, positions in public
     employment in which the relationship between superior and subordinate is of such a personal and intimate nature that
     certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the
     working relationship between them can also be imagined. We intimate no views as to how we would resolve any specific
     instances of such situations, but merely note that significantly different considerations would be involved in such cases.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Pickering v. Board of Ed. of Tp. High School Dist. 205, Will..., 391 U.S. 563 (1968)

88 S.Ct. 1731, 20 L.Ed.2d 811, 1 IER Cases 8

4      There is likewise no occasion furnished by this case for consideration of the extent to which teachers can be required by narrowly drawn grievance procedures to submit complaints about the operation of the schools to their superiors for action thereon prior to bringing the complaints before the public.

5      We also note that this case does not present a situation in which a teacher's public statements are so without foundation as to call into question his fitness to perform his duties in the classroom. In such a case, of course, the statements would merely be evidence of the teacher's general competence, or lack thereof, and not an independent basis for dismissal.

6      Because we conclude that appellant's statements were not knowingly or recklessly false, we have no occasion to pass upon the additional question whether a statement that was knowingly or recklessly false would, if it were neither shown nor could reasonably be presumed to have had any harmful effects, still be protected by the First Amendment. See also n. 5, supra.

1      We shall not bother to enumerate some of the statements which the Board found to be false because their triviality is so readily apparent that the Board could not rationally have considered them as detrimental to the interests of the schools regardless of their truth or falsity.

2      This Court has regularly held that where constitutional rights are in issue an independent examination of the record will be made in order that the controlling legal principles may be applied to the actual facts of the case. E.g., Norris v. State of Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); Pennekamp v. State of Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946); New York Times Co. v. Sullivan, 376 U.S. 254, 285, 84 S.Ct. 710, 728 (1964). However, even in cases where the upholding or rejection of a constitutional claim turns on the resolution of factual questions, we also consistently give great, if not controlling, weight to the findings of the state courts. In the present case the trier of fact was the same body that was also both the victim of appellant's statements and the prosecutor that brought the charges aimed at securing his dismissal. The state courts made no independent review of the record but simply contented themselves with ascertaining, in accordance with statute, whether there was substantial evidence to support the Board's findings. Appellant requests us to reverse the state courts' decisions upholding his dismissal on the independent ground that the procedure followed above deprived him of due process in that he was not afforded an impartial tribunal. However, appellant makes this contention for the first time in this Court, not having raised it at any point in the state proceedings. Because of this, we decline to treat appellant's claim as an independent ground for our decision in this case. On the other hand, we do not propose to blind ourselves to the obvious defects in the fact-finding process occasioned by the board's multiple functioning vis-a -vis appellant. Compare Tumey v. State of Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955). Accordingly, since the state courts have at no time given de novo consideration to the statements in the letter, we feel free to examine the evidence in this case completely independently and to afford little weight to the factual determinations made by the Board.

1      See ante, at 1735, 1736 and nn. 3, 4. The Court does not elaborate upon its suggestion that there may be situations in which, with reference to certain areas of public comment, a teacher may have special obligations to his superiors. It simply holds that in this case, with respect to the particular public comment made by Pickering, he is more like a member of the general public and apparently, too remote from the school board to require placing him into any special category. Further, as I read the Court's opinion, it does not foreclose the possibility that under the First Amendment a school system may have an enforceable rule, applicable to teachers, that public statements about school business must first be submitted to the authorities to check for accuracy.

2      Even if consideration of harm were necessary in this case, I could not join the Court in concluding on this record that harm to the school administration was not proved and could not be presumed.

---

**End of Document**                                         © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 5

Connick v. Myers, 461 U.S. 138 (1983)

103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

103 S.Ct. 1684
Supreme Court of the United States

Harry CONNICK, Individually and in His
Capacity as District Attorney, etc., Petitioner,
v.
Sheila MYERS.

No. 81–1251.
|
Argued Nov. 8, 1982.
|
Decided April 20, 1983.

**Synopsis**

Former assistant district attorney brought civil rights action in which she contended that her employment was terminated because she exercised her constitutionally guaranteed right of free speech. The United States District Court for the Eastern District of Louisiana, Jack M. Gordon, J., 507 F.Supp. 752, held that attorney was entitled to reinstatement, back pay, and compensatory damages, and appeal was taken. The Court of Appeals, in an unpublished opinion, 654 F.2d 719, affirmed, and certiorari was granted. The Supreme Court, Justice White, held that discharge of former assistant district attorney did not violate attorney's constitutionally protected right of free speech.

Reversed.

Justice Brennan filed a dissenting opinion in which Justices Marshall, Blackmun and Stevens joined.

**1685 *Syllabus* *

*138 Respondent was employed as an Assistant District Attorney in New Orleans with the responsibility of trying criminal cases. When petitioner District Attorney proposed to transfer respondent to prosecute cases in a different section of the criminal court, she strongly opposed the transfer, expressing her view to several of her supervisors, including petitioner. Shortly thereafter, she prepared a questionnaire that she distributed to the other Assistant District Attorneys in the office concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and

whether employees felt pressured to work in political campaigns. Petitioner then informed respondent that she was being terminated for refusal to accept the transfer, and also told her that her distribution of the questionnaire was considered an act of insubordination. Respondent filed suit in Federal District Court under 42 U.S.C. § 1983 (1976 ed., Supp. IV), alleging that she was wrongfully discharged because she had exercised her constitutionally protected right of free speech. The District Court agreed, ordered her reinstated, and awarded backpay, damages, and attorney's fees. Finding that the questionnaire, not the refusal to accept the transfer, was the real reason for respondent's termination, the court held that the questionnaire involved matters of public concern and that the State had not "clearly demonstrated" that the questionnaire interfered with the operation of the District Attorney's office. The Court of Appeals affirmed.

*Held:* Respondent's discharge did not offend the First Amendment. Pp. 1687–1693.

(a) In determining a public employee's rights of free speech, the problem is to arrive "at a balance between the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811. P. 1687.

(b) When a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not *139 the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction **1686 to the employee's behavior. Here, except for the question in respondent's questionnaire regarding pressure upon employees to work in political campaigns, the questions posed do not fall under the rubric of matters of "public concern." Pp. 1687–1691.

(c) The District Court erred in imposing an unduly onerous burden on the State to justify respondent's discharge by requiring it to "clearly demonstrate" that the speech involved "substantially interfered" with the operation of the office. The State's burden in justifying a particular discharge varies depending upon the nature of the employee's expression. P. 1691.

103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

(d) The limited First Amendment interest involved here did not require petitioner to tolerate action that he reasonably believed would disrupt the office, undermine his authority, and destroy the close working relationships within the office. The question on the questionnaire regarding the level of confidence in supervisors was a statement that carried the clear potential for undermining office relations. Also, the fact that respondent exercised her rights to speech at the office supports petitioner's fears that the function of his office was endangered. And the fact that the questionnaire emerged immediately after a dispute between respondent and petitioner and his deputies, requires that additional weight be given to petitioner's view that respondent threatened his authority to run the office. Pp. 1691–1693.

654 F.2d 719 (CA5 1981), reversed.

**Attorneys and Law Firms**

*William F. Wessel* argued the cause for petitioner. With him on the brief was *Victoria Lennox Bartels.*

*George M. Strickler, Jr.,* argued the cause for respondent. With him on the brief were *Ann Woolhandler* and *Michael G. Collins.**

* Briefs of *amici curiae* urging affirmance were filed by *Mark C. Rosenblum, Nadine Strossen,* and *Charles S. Sims* for the American Civil Liberties Union et al.; and by *Robert H. Chanin, Laurence Gold,* and *Marsha S. Berzon* for the National Education Association et al.

**Opinion**

*140 Justice WHITE delivered the opinion of the Court.

In *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), we stated that a public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment. We also recognized that the State's interests as an employer in regulating the speech of its employees "differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.,* at 568, 88 S.Ct., at 1734. The problem, we thought, was arriving "at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the

interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Ibid.* We return to this problem today and consider whether the First and Fourteenth Amendments prevent the discharge of a state employee for circulating a questionnaire concerning internal office affairs.

I

The respondent, Sheila Myers, was employed as an Assistant District Attorney in New Orleans for five and a half years. She served at the pleasure of petitioner Harry Connick, the District Attorney for Orleans Parish. During this period Myers competently performed her responsibilities of trying criminal cases.

In the early part of October, 1980, Myers was informed that she would be transferred to prosecute cases in a different section of the criminal court. Myers was strongly opposed to the proposed transfer [1] and expressed her view to several of her supervisors, including Connick. Despite her objections, on October 6 Myers was notified that she was being transferred. *141 Myers again spoke with Dennis Waldron, one of the first assistant district attorneys, expressing her reluctance to accept the transfer. A number of other office matters were **1687 discussed and Myers later testified that, in response to Waldron's suggestion that her concerns were not shared by others in the office, she informed him that she would do some research on the matter.

That night Myers prepared a questionnaire soliciting the views of her fellow staff members concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns. [2] Early the following morning, Myers typed and copied the questionnaire. She also met with Connick who urged her to accept the transfer. She said she would "consider" it. Connick then left the office. Myers then distributed the questionnaire to 15 assistant district attorneys. Shortly after noon, Dennis Waldron learned that Myers was distributing the survey. He immediately phoned Connick and informed him that Myers was creating a "mini-insurrection" within the office. Connick returned to the office and told Myers that she was being terminated because of her refusal to accept the transfer. She was also told that her distribution of the

Connick v. Myers, 461 U.S. 138 (1983)

103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

questionnaire was considered an act of insubordination. Connick particularly objected to the question which inquired whether employees "had confidence in and would rely on the word" of various superiors in the office, and to a question concerning pressure to work in political campaigns which he felt would be damaging if discovered by the press.

Myers filed suit under 42 U.S.C. § 1983, contending that her employment was wrongfully terminated because she had exercised her constitutionally-protected right of free speech. The District Court agreed, ordered Myers reinstated, and awarded backpay, damages, and **\*142** attorney's fees. 507 F.Supp. 752 (E.D.La.1981).[3] The District Court found that although Connick informed Myers that she was being fired because of her refusal to accept a transfer, the facts showed that the questionnaire was the real reason for her termination. The court then proceeded to hold that Myers' questionnaire involved matters of public concern and that the state had not "clearly demonstrated" that the survey "substantially interfered" with the operations of the District Attorney's office.

Connick appealed to the United States Court of Appeals for the Fifth Circuit, which affirmed on the basis of the District Court's opinion. 654 F.2d 719 (1981). Connick then sought review in this Court by way of certiorari, which we granted. 455 U.S. 999, 102 S.Ct. 1629, 71 L.Ed.2d 865 (1982).

## II

For at least 15 years, it has been settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression. *Keyishian v. Board of Regents,* 385 U.S. 589, 605–606, 87 S.Ct. 675, 684–685, 17 L.Ed.2d 629 (1967); *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *Branti v. Finkel,* 445 U.S. 507, 515–516, 100 S.Ct. 1287, 1293, 63 L.Ed.2d 574 (1980). Our task, as we defined it in *Pickering,* is to seek "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S.,

at 568, 88 S.Ct., at 1734. The District Court, and thus the Court of Appeals as well, misapplied our decision in *Pickering* and consequently, in our view, erred in striking the balance for respondent.

### \*143 \*\*1688 A

The District Court got off on the wrong foot in this case by initially finding that, "[t]aken as a whole, the issues presented in the questionnaire relate to the effective functioning of the District Attorney's Office and are matters of public importance and concern." 507 F.Supp., at 758. Connick contends at the outset that no balancing of interests is required in this case because Myers' questionnaire concerned only internal office matters and that such speech is not upon a matter of "public concern," as the term was used in *Pickering.* Although we do not agree that Myers' communication in this case was wholly without First Amendment protection, there is much force to Connick's submission. The repeated emphasis in *Pickering* on the right of a public employee "as a citizen, in commenting upon matters of public concern," was not accidental. This language, reiterated in all of *Pickering's* progeny,[4] reflects both the historical evolvement of the rights of public employees, and the common sense realization that government offices could not function if every employment decision became a constitutional matter.[5]

For most of this century, the unchallenged dogma was that a public employee had no right to object to conditions placed upon the terms of employment—including those which restricted the exercise of constitutional rights. The classic formulation of this position was Justice Holmes', who, when sitting on the Supreme Judicial Court of Massachusetts, observed: "A policeman may have a constitutional **\*144** right to talk politics, but he has no constitutional right to be a policeman." *McAuliffe v. Mayor of New Bedford,* 155 Mass. 216, 220, 29 N.E. 517, 517 (1892). For many years, Holmes' epigram expressed this Court's law. *Adler v. Board of Education,* 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952); *Garner v. Board of Public Works,* 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317 (1951); *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947); *United States v. Wurzbach,* 280 U.S. 396, 50 S.Ct. 167, 74 L.Ed. 508 (1930); *Ex parte Curtis,* 106 U.S. 371, 1 S.Ct. 381, 27 L.Ed. 232 (1882).

The Court cast new light on the matter in a series of cases arising from the widespread efforts in the 1950s and early 1960s to require public employees, particularly teachers, to swear oaths of loyalty to the state and reveal the groups with which they associated. In *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), the Court held that a State could not require its employees to establish their loyalty by extracting an oath denying past affiliation with Communists. In *Cafeteria Workers v. McElroy,* 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), the Court recognized that the government could not deny employment because of previous membership in a particular party. See also *Shelton v. Tucker,* 364 U.S. 479, 490, 81 S.Ct. 247, 253, 5 L.Ed.2d 231 (1960); *Torcaso v. Watkins,* 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961); *Cramp v. Board of Public Instruction,* 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961). By the time *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), was decided, it was already "too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." **1689 *Id.,* at 404, 83 S.Ct., at 1794. It was therefore no surprise when in *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), the Court invalidated New York statutes barring employment on the basis of membership in "subversive" organizations, observing that the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, had been uniformly rejected. *Id.,* at 605–606, 87 S.Ct., at 684–685.

In all of these cases, the precedents in which *Pickering* is rooted, the invalidated statutes and actions sought to suppress the rights of public employees to participate in public *145 affairs. The issue was whether government employees could be prevented or "chilled" by the fear of discharge from joining political parties and other associations that certain public officials might find "subversive." The explanation for the Constitution's special concern with threats to the right of citizens to participate in political affairs is no mystery. The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498; *New York Times Co. v. Sullivan,* 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). "[S]peech concerning public affairs is more than self-expression; it

is the essence of self-government." *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–216, 13 L.Ed.2d 125 (1964). Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the "highest rung of the heirarchy of First Amendment values," and is entitled to special protection. *NAACP v. Claiborne Hardware Co.,* —— U.S.——, ——, 102 S.Ct. 3409, 3426, 73 L.Ed.2d 1215 (1982); *Carey v. Brown,* 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1980).

*Pickering v. Board of Education, supra,* followed from this understanding of the First Amendment. In *Pickering,* the Court held impermissible under the First Amendment the dismissal of a high school teacher for openly criticizing the Board of Education on its allocation of school funds between athletics and education and its methods of informing taxpayers about the need for additional revenue. Pickering's subject was "a matter of legitimate public concern" upon which "free and open debate is vital to informed decision-making by the electorate." 391 U.S., at 571–572, 88 S.Ct., at 1736.

Our cases following *Pickering* also involved safeguarding speech on matters of public concern. The controversy in *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), arose from the failure to rehire a teacher in the state college system who had testified before committees of the Texas legislature and had become involved in public disagreement over whether the college should be elevated to four-year status—a change opposed by the Regents. In *Mt. Healthy City Board of Ed. v.* *146 *Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), a public school teacher was not rehired because, allegedly, he had relayed to a radio station the substance of a memorandum relating to teacher dress and appearance that the school principal had circulated to various teachers. The memorandum was apparently prompted by the view of some in the administration that there was a relationship between teacher appearance and public support for bond issues, and indeed, the radio station promptly announced the adoption of the dress code as a news item. Most recently, in *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), we held that First Amendment protection applies when a public employee arranges to communicate privately with his employer rather than to express his views publicly. Although the subject-matter of Mrs. Givhan's statements were not the issue before the Court, it is clear that her statements concerning the school

Connick v. Myers, 461 U.S. 138 (1983)

103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

district's allegedly racially discriminatory policies involved a matter of public concern.

**\*\*1690** *Pickering,* its antecedents and progeny, lead us to conclude that if Myers' questionnaire cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her discharge.[6] When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable. **\*147** *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Bishop v. Wood,* 426 U.S. 341, 349–350, 96 S.Ct. 2074, 2079–2080, 48 L.Ed.2d 684 (1976).

We do not suggest, however, that Myers' speech, even if not touching upon a matter of public concern, is totally beyond the protection of the First Amendment. "The First Amendment does not protect speech and assembly only to the extent it can be characterized as political. 'Great secular causes, with smaller ones, are guarded.' " *United Mine Workers v. Illinois State Bar Association,* 389 U.S. 217, 223, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967), *quoting Thomas v. Collins,* 323 U.S. 516, 531, 65 S.Ct. 315, 323, 89 L.Ed. 430 (1945). We in no sense suggest that speech on private matters falls into one of the narrow and well-defined classes of expression which carries so little social value, such as obscenity, that the State can prohibit and punish such expression by all persons in its jurisdiction. See *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). For example, an employee's false criticism of his employer on grounds not of public concern may be cause for his discharge but would be entitled to the same protection in a libel action accorded an identical statement made by a man on the street. We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior. *Cf. Bishop v. Wood,* 426 U.S. 341, 349–350, 96 S.Ct. 2074, 2079–2080, 48 L.Ed.2d 684 (1976). Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government; this does not require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the state.

Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context **\*148** of a given statement, as revealed by the whole record.[7] In this case, with but one exception, the questions posed by Myers to her coworkers do not fall under the rubric of matters of "public concern." We view the questions pertaining to the confidence and trust that Myers' coworkers possess in various supervisors, the level of office morale, and the need for a grievance committee as mere extensions of Myers' dispute over her transfer to another section of the criminal court. Unlike the dissent, *post,* at 1698, we do not believe these questions are of public import in evaluating the performance of the District Attorney as an elected official. Myers did not seek to inform the public that the District Attorney's office was not discharging **\*\*1691** its governmental responsibilities in the investigation and prosecution of criminal cases. Nor did Myers seek to bring to light actual or potential wrongdoing or breach of public trust on the part of Connick and others. Indeed, the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo. While discipline and morale in the workplace are related to an agency's efficient performance of its duties, the focus of Myers' questions is not to evaluate the performance of the office but rather to gather ammunition for another round of controversy with her superiors. These questions reflect one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a cause célèbre.[8]

**\*149** To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to

constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

One question in Myers' questionnaire, however, does touch upon a matter of public concern. Question 11 inquires if assistant district attorneys "ever feel pressured to work in political campaigns on behalf of office supported candidates." We have recently noted that official pressure upon employees to work for political candidates not of the worker's own choice constitutes a coercion of belief in violation of fundamental constitutional rights. *Branti v. Finkel,* 445 U.S. 507, 515–516, 100 S.Ct. 1287, 1293, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). In addition, there is a demonstrated interest in this country that government service should depend upon meritorious performance rather than political service. *CSC v. Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). Given this history, we believe it apparent that the issue of whether assistant district attorneys are pressured to work in political campaigns is a matter of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal.

**B**

Because one of the questions in Myers' survey touched upon a matter of public concern, and contributed to her discharge we must determine whether Connick was justified in discharging Myers. Here the District Court again erred in imposing an unduly onerous burden on the state to justify **\*150** Myers' discharge. The District Court viewed the issue of whether Myers' speech was upon a matter of "public concern" as a threshold inquiry, after which it became the government's burden to "clearly demonstrate" that the speech involved "substantially interfered" with official responsibilities. Yet *Pickering* unmistakably states, and respondent agrees[9], **\*\*1692** that the state's burden in justifying a particular discharge varies depending upon the nature of the employee's expression. Although such particularized balancing is difficult, the courts must reach the most appropriate possible balance of the competing interests.[10]

**C**

The *Pickering* balance requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public. One hundred years ago, the Court noted the government's legitimate purpose in "promot[ing] **\*151** efficiency and integrity in the discharge of official duties, and to maintain proper discipline in the public service." *Ex parte Curtis,* 106 U.S. 371, 373, 1 S.Ct. 381, 384, 27 L.Ed. 232 (1882). As Justice POWELL explained in his separate opinion in *Arnett v. Kennedy,* 416 U.S. 134, 168, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15 (1974):

> "To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency."

We agree with the District Court that there is no demonstration here that the questionnaire impeded Myers' ability to perform her responsibilities. The District Court was also correct to recognize that "it is important to the efficient and successful operation of the District Attorney's office for Assistants to maintain close working relationships with their superiors." 507 F.Supp., at 759. Connick's judgment, and apparently also that of his first assistant Dennis Waldron, who characterized Myers' actions as causing a "mini-insurrection", was that Myers' questionnaire was an act of insubordination which interfered with working relationships.[11] When close working relationships are essential to fulfilling public **\*152** responsibilities, a wide degree of deference to the employer's judgment is appropriate. Furthermore, we do not see the necessity for an employer to allow events to

unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.[12] We caution that a stronger **1693 showing may be necessary if the employee's speech more substantially involved matters of public concern.

The District Court rejected Connick's position because "unlike a statement of fact which might be deemed critical of one's superiors, [Myers'] questionnaire was not a statement of fact, but the presentation and solicitation of ideas and opinions," which are entitled to greater constitutional protection because "under the First Amendment there is no such thing as a false idea." 507 F.Supp., at 759. This approach, while perhaps relevant in weighing the value of Myers' speech, bears no logical relationship to the issue of whether the questionnaire undermined office relationships. Questions, no less than forcefully stated opinions and facts, carry messages and it requires no unusual insight to conclude that the purpose, if not the likely result, of the questionnaire is to seek to precipitate a vote of no confidence in Connick and his supervisors. Thus, Question 10, which asked whether or not the Assistants had confidence in and relied on the word of five named supervisors, is a statement that carries the clear potential for undermining office relations.

Also relevant is the manner, time, and place in which the questionnaire was distributed. As noted in *Givhan v. Western Line Consolidated School Dist., supra* at 415, n. 4, 99 S.Ct., at 696, n. 4, "Private expression ... may in some situations bring additional *153 factors to the *Pickering* calculus. When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered." Here the questionnaire was prepared, and distributed at the office; the manner of distribution required not only Myers to leave her work but for others to do the same in order that the questionnaire be completed.[13] Although some latitude in when official work is performed is to be allowed when professional employees are involved, and Myers did not violate announced office policy[14], the fact that Myers, unlike Pickering, exercised her rights to speech at the office supports Connick's fears that the functioning of his office was endangered.

Finally, the context in which the dispute arose is also significant. This is not a case where an employee, out of purely academic interest, circulated a questionnaire so as to obtain useful research. Myers acknowledges that it is no coincidence that the questionnaire followed upon the heels of the transfer notice. When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office. Although we accept the District Court's factual finding that Myers' reluctance to accede to the transfer order was not a sufficient cause in itself for her dismissal, and thus does not constitute a sufficient defense under *Mt. Healthy* *154 *City Board of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), this does not render irrelevant the fact that the questionnaire emerged after a persistent dispute between Myers and Connick and his deputies over office transfer policy.

III

Myers' questionnaire touched upon matters of public concern in only a most limited **1694 sense; her survey, in our view, is most accurately characterized as an employee grievance concerning internal office policy. The limited First Amendment interest involved here does not require that Connick tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships. Myers' discharge therefore did not offend the First Amendment. We reiterate, however, the caveat we expressed in *Pickering, supra,* at 569, 88 S.Ct., at 1735: "Because of the enormous variety of fact situations in which critical statements by ... public employees may be thought by their superiors ... to furnish grounds for dismissal, we do not deem it either appropriate or feasible to lay down a general standard against which all such statements may be judged."

Our holding today is grounded in our long-standing recognition that the First Amendment's primary aim is the full protection of speech upon issues of public concern, as well as the practical realities involved in the administration of a government office. Although today the balance is struck for the government, this is no defeat for the First Amendment. For it would indeed be a Pyrrhic victory for the great principles of free expression if the

Amendment's safeguarding of a public employee's right, as a citizen, to participate in discussions concerning public affairs were confused with the attempt to constitutionalize the employee grievance that we see presented here. The judgment of the Court of Appeals is

*Reversed.*

**\*155** APPENDIX A

Questionnaire distributed by respondent on October 7, 1980

*PLAINTIFFS EXHIBIT 2,* App. 191

Please take the few minutes it will require to fill this out. You can freely express your opinion *WITH ANONYMITY GUARANTEED.*

1. How long have you been in the Office? ...................

2. Were you moved as a result of the recent transfers? ..

3. Were the transfers as they effected [sic] you discussed with you by any superior prior to the notice of them being posted? ...........................................................

4. Do you think as a matter of policy, they should have been? ........................................................................

5. From your experience, do you feel office procedure regarding transfers has been fair? ............................

6. Do you believe there is a rumor mill active in the office? ........................................................................

7. If so, how do you think it effects [sic] overall working performance of A.D.A. personnel? ...........................

8. If so, how do you think it effects [sic] office morale? ..

9. Do you generally first learn of office changes and developments through rumor? .................................

10. Do you have confidence in and would you rely on the word of:

   Bridget Bane ...........................................................

   Fred Harper ............................................................

   Lindsay Larson .......................................................

   Joe Meyer ...............................................................

   Dennis Waldron .....................................................

11. Do you ever feel pressured to work in political campaigns on behalf of office supported candidates? .

12. Do you feel a grievance committee would be a worthwhile addition to the office structure? ............

   **\*156** 13. How would you rate office morale? ............

14. Please feel free to express any comments or feelings you have. ................................................................

THANK YOU FOR YOUR COOPERATION IN THIS SURVEY.

**\*\*1695** Justice BRENNAN, with whom Justice MARSHALL, Justice BLACKMUN, and Justice STEVENS join, dissenting.

Sheila Myers was discharged for circulating a questionnaire to her fellow Assistant District Attorneys seeking information about the effect of petitioner's personnel policies on employee morale and the overall work performance of the District Attorney's Office. The Court concludes that her dismissal does not violate the First Amendment, primarily because the questionnaire addresses matters that, in the Court's view, are not of public concern. It is hornbook law, however, that speech about "the manner in which government is operated or should be operated" is an essential part of the communications necessary for self-governance the protection of which was a central purpose of the First Amendment. *Mills v. Alabama,* 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966). Because the questionnaire addressed such matters and its distribution did not adversely affect the operations of the District Attorney's Office or interfere with Myers' working relationship with her fellow employees, I dissent.

I

The Court correctly reaffirms the long established principle that the government may not constitutionally compel persons to relinquish their First Amendment

rights as a condition of public employment. *E.g.,*
*Keyishian v. Board of Regents,* 385 U.S. 589, 605–606, 87
S.Ct. 675, 684–685, 17 L.Ed.2d 629 (1967); *Pickering v.*
*Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734,
20 L.Ed.2d 811 (1968); *Perry v. Sindermann,* 408 U.S. 593,
597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). *Pickering*
held that the First Amendment protects the rights of
public employees "as citizens to comment on matters of
public interest" in connection with the operation of the
government agencies for which they work. 391 U.S., at
568, 88 S.Ct., at 1734. We recognized, however, that the
**\*157** government has legitimate interests in regulating
the speech of its employees that differ significantly from its
interests in regulating the speech of people generally. *Ibid.*
We therefore held that the scope of public employees' First
Amendment rights must be determined by balancing "the
interests of the [employee], as a citizen, in commenting
upon matters of public concern and the interest of the
State, as an employer, in promoting the efficiency of the
public services it performs through its employees." *Ibid.*

The balancing test articulated in *Pickering* comes into
play only when a public employee's speech implicates
the government's interests as an employer. When public
employees engage in expression unrelated to their
employment while away from the work place, their First
Amendment rights are, of course, no different from those
of the general public. See *id.,* at 574, 88 S.Ct., at 1737.
Thus, whether a public employee's speech addresses a
matter of public concern is relevant to the constitutional
inquiry only when the statements at issue—by virtue of
their content or the context in which they were made—
may have an adverse impact on the government's ability
to perform its duties efficiently.[1]

The Court's decision today is flawed in three respects.
First, the Court distorts the balancing analysis required
under *Pickering* by suggesting that one factor, the **\*\*1696**
context in which a statement is made, is to be weighed
*twice*—first in **\*158** determining whether an employee's
speech addresses a matter of public concern and then
in deciding whether the statement adversely affected
the government's interest as an employer. See *ante,* at
1690, 1693. Second, in concluding that the effect of
respondent's personnel policies on employee morale and
the work performance of the District Attorney's Office is
not a matter of public concern, the Court impermissibly
narrows the class of subjects on which public employees
may speak out without fear of retaliatory dismissal.

See *ante,* at 1690–1691. Third, the Court misapplies
the *Pickering* balancing test in holding that Myers
could constitutionally be dismissed for circulating a
questionnaire addressed to at least one subject that *was*
"a matter of interest to the community," *ante,* at 1691,
in the absence of evidence that her conduct disrupted the
efficient functioning of the District Attorney's Office.

II

The District Court summarized the contents of
respondent's questionnaire as follows:

> "Plaintiff solicited the views of her fellow Assistant
> District Attorneys on a number of issues, including
> office transfer policies and the manner in which
> information of that nature was communicated within
> the office. The questionnaire also sought to determine
> the views of the Assistants regarding office morale,
> the need for a grievance committee, and the level of
> confidence felt by the Assistants for their supervisors.
> Finally, the questionnaire inquired as to whether the
> Assistants felt pressured to work in political campaigns
> on behalf of office-supported candidates." 507 F.Supp.,
> at 758.

After reviewing the evidence, the District Court found
that "[t]aken as a whole, the issues presented in the
questionnaire relate to the effective functioning of the
District Attorney's Office and are matters of public
importance and concern." *Ibid.* The Court of Appeals
affirmed on the basis of **\*159** the District Court's
findings and conclusions. App. to Pet. for Cert. A–23. The
Court nonetheless concludes that Myers' questions about
the effect of petitioner's personnel policies on employee
morale and overall work performance are not "of public
import in evaluating the performance of the District
Attorney as an elected official." *Ante,* at 1690. In so
doing, it announces the following standard: "Whether an
employee's statement addresses a matter of public concern
must be determined by the content, form and context of a
given statement...." *Ibid.*

The standard announced by the Court suggests that the
manner and context in which a statement is made must
be weighed on *both* sides of the *Pickering* balance. It is
beyond dispute that how and where a public employee
expresses his views are relevant in the second half of the

Connick v. Myers, 461 U.S. 138 (1983)

103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

*Pickering* inquiry—determining whether the employee's speech adversely affects the government's interests as an employer. The Court explicitly acknowledged this in *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), where we stated that when a public employee speaks privately to a supervisor, "the employing agency's institutional efficiency may be threatened not only by the content of the ... message but also by the manner, time, and place in which it is delivered." *Id.,* at 415, n. 4, 99 S.Ct., at 696, n. 4. But the fact that a public employee has chosen to express his views in private has nothing whatsoever to do with the first half of the *Pickering* calculus—whether those views relate to a matter of public concern. This conclusion is implicit in *Givhan's* holding that the freedom of speech guaranteed by the First Amendment is not "lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public." *Id.,* at 415–416, 99 S.Ct., at 696–697.

The Court seeks to distinguish *Givhan* on the ground that speech protesting racial **1697 discrimination is "inherently of public concern." *Ante,* at 1691, n. 8. In so doing, it suggests that there are two classes of speech of public concern: statements "of public import" because of their content, form and context, *160 and statements that, by virtue of their subject matter, are "inherently of public concern." In my view, however, whether a particular statement by a public employee is addressed to a subject of public concern does not depend on where it was said or why. The First Amendment affords special protection to speech that may inform public debate about how our society is to be governed—regardless of whether it actually becomes the subject of a public controversy.[2]

"[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. *161 Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–216, 13 L.Ed.2d 125 (1965). "The maintenance of the opportunity for free political discussion to the end that the government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system." *Stromberg v. California,* 283 U.S. 359, 369, 51 S.Ct. 532, 536, 75 L.Ed. 1117 (1931).

We have long recognized that one of the central purposes of the First Amendment's guarantee of freedom of

expression is to protect the dissemination of information on the basis of which members of our society may make reasoned decisions about the government. *Mills v. Alabama,* 384 U.S., at 218–219, 86 S.Ct., at 1436–1437; *New York Times Co. v. Sullivan,* 376 U.S. 254, 269–270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). See A. Mieklejohn, Free Speech and Its Relation to Self-Government 22–27 (1948). "No aspect of that constitutional guarantee is more rightly treasured than its protection of the ability of our people through free and open debate to consider and resolve their own destiny." *Saxbe v. Washington Post Co.,* 417 U.S. 843, 862, 94 S.Ct. 2811, 2821, 41 L.Ed.2d 514 (1974) (POWELL, J., dissenting).

Unconstrained discussion concerning the manner in which the government performs its duties is an essential element of the public discourse necessary to informed self-government.

"Whatever differences may exist about interpretations of the First Amendment, **1698 there is practically universal agreement that a major purpose of that Amendment was the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, *the manner in which government is operated or should be operated,* and all such matters relating to political processes." *Mills v. Alabama, supra,* at 218–219, 86 S.Ct., at 1436–1437 (emphasis added).

*162 The constitutionally protected right to speak out on governmental affairs would be meaningless if it did not extend to statements expressing criticism of governmental officials. In *New York Times Co. v. Sullivan, supra,* we held that the Constitution prohibits an award of damages in a libel action brought by a public official for criticism of his official conduct absent a showing that the false statements at issue were made with "actual malice." 384 U.S., at 279–280, 84 S.Ct., at 725–726. We stated there that the First Amendment expresses "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.,* at 270, 84 S.Ct., at 720. See *Garrison v. Louisiana,* 379 U.S., at 76, 85 S.Ct., at 216.

In *Pickering* we held that the First Amendment affords similar protection to critical statements by a public school teacher directed at the Board of Education for whom he

Connick v. Myers, 461 U.S. 138 (1983)

103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

worked. 391 U.S., at 574, 88 S.Ct., at 1737. In so doing, we recognized that "free and open debate" about the operation of public schools "is vital to informed decision-making by the electorate." *Id.,* at 571–572, 88 S.Ct., at 1736. We also acknowledged the importance of allowing teachers to speak out on school matters.

> "Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allocated to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such matters without fear of retaliatory dismissal." *Id.,* at 572, 88 S.Ct., at 1736.

See also *Arnett v. Kennedy,* 416 U.S. 134, 228, 94 S.Ct. 1633, 1680, 40 L.Ed.2d 15 (1974) (MARSHALL, J., dissenting) (describing "[t]he importance of Government employees being assured of their right to freely comment on the conduct of Government, to inform the public of abuses of power and of the misconduct of their superiors ...").

***163** Applying these principles, I would hold that Myers' questionnaire addressed matters of public concern because it discussed subjects that could reasonably be expected to be of interest to persons seeking to develop informed opinions about the manner in which the Orleans Parish District Attorney, an elected official charged with managing a vital governmental agency, discharges his responsibilities. The questionnaire sought primarily to obtain information about the impact of the recent transfers on morale in the District Attorney's Office. It is beyond doubt that personnel decisions that adversely affect discipline and morale may ultimately impair an agency's efficient performance of its duties. See *Arnett v. Kennedy, supra,* at 168, 94 S.Ct., at 1651 (Opinion of POWELL, J.). Because I believe the First Amendment protects the right of public employees to discuss such matters so that the public may be better informed about how their elected officials fulfill their responsibilities, I would affirm the District Court's conclusion that the questionnaire related to matters of public importance and concern.

The Court's adoption of a far narrower conception of what subjects are of public concern seems prompted by its fears that a broader view "would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case." *Ante,* at 1691. Obviously, not every remark directed

at a public official by a public employee is protected by the First **1699** Amendment[3]. But deciding whether a particular matter is of public concern is an inquiry that, by its very nature, is a sensitive one for judges charged with interpreting a constitutional provision intended to put "the decision as to what views shall be *164 voiced largely into the hands of each of us...." *Cohen v. California,* 403 U.S. 15, 24, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971).[4] The Court recognized the sensitive nature of this determination in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), which held that the scope of the constitutional privilege in defamation cases turns on whether or not the plaintiff is a public figure, not on whether the statements at issue address a subject of public concern. In so doing, the Court referred to the "difficulty of forcing state and federal judges to decide on an *ad hoc* basis which publications address issues of 'general or public interest' and which do not," and expressed "doubt [about] the wisdom of committing this task to the conscience of judges." *Id.,* at 346, 94 S.Ct., at 3010. See also *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 79, 91 S.Ct. 1811, 1837, 29 L.Ed.2d 296 (1971) (MARSHALL, J., dissenting). In making such a delicate inquiry, we must bear in mind that "the citizenry is the final judge of the proper conduct of public business." *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 495, 95 S.Ct. 1029, 1046, 43 L.Ed.2d 328 (1975).

The Court's decision ignores these precepts. Based on its own narrow conception of which matters are of public concern, the Court implicitly determines that information concerning *165 employee morale at an important government office will not inform public debate. To the contrary, the First Amendment protects the dissemination of such information so that the people, not the courts, may evaluate its usefulness. The proper means to ensure that the courts are not swamped with routine employee grievances mischaracterized as First Amendment cases is not to restrict artificially the concept of "public concern," but to require that adequate weight be given to the public's important interests in the efficient performance of governmental functions and in preserving employee discipline and harmony sufficient to achieve that end. See part III, *infra.*[5]

*166 **1700 III

103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

Although the Court finds most of Myers' questionnaire unrelated to matters of public interest, it does hold that one question—asking whether Assistants felt pressured to work in political campaigns on behalf of office-supported candidates—addressed a matter of public importance and concern. The Court also recognizes that this determination of public interest must weigh heavily in the balancing of competing interests required by *Pickering*. Having gone that far however, the Court misapplies the *Pickering* test and holds—against our previous authorities —that a public employer's mere apprehension that speech will be disruptive justifies suppression of that speech when all the objective evidence suggests that those fears are essentially unfounded.

*Pickering* recognized the difficulty of articulating "a general standard against which all ... statements may be judged," 391 U.S., at 569, 88 S.Ct., at 1735; it did, however, identify a number of factors that may affect the balance in particular cases. Those relevant here are whether the statements are directed to persons with whom the speaker "would normally be in contact in the course of his daily work"; whether they had an adverse effect on "discipline by intermediate supervisors or harmony among coworkers"; whether the employment relationship in question is "the kind ... for which it can persuasively **\*167** be claimed that personal loyalty and confidence are necessary to their proper functioning"; and whether the statements "have in any way impeded [the employee's] proper performance of his daily duties ... or ... interfered with the regular operations of the [office]." *Id.,* at 568–573, 88 S.Ct., at 1734–1737. In addition, in *Givhan,* we recognized that when the statements in question are made in private to an employee's immediate supervisor, "the employing agency's institutional efficiency may be threatened not only by the content of the ... message but also by the manner, time, and place in which it is delivered." 439 U.S., at 415, n. 4, 99 S.Ct., at 696, n. 4. See *ante,* at 1687–2688.

The District Court weighed all of the relevant factors identified by our cases. It found that petitioner failed to establish that Myers violated either a duty of confidentiality or an office policy. 507 F.Supp., at 758–759. Noting that most of the questionnaires were distributed during lunch, it rejected the contention that the distribution of the questionnaire impeded **\*\*1701** Myers' performance of her duties, and it concluded that "Connick has not shown *any* evidence to indicate that the

plaintiff's work performance was adversely affected by her expression." *Id.,* at 754–755, 759 (emphasis supplied).

The Court accepts all of these findings. See *ante,* at 1692. It concludes, however, that the District Court failed to give adequate weight to the context in which the questionnaires were distributed and to the need to maintain close working relationships in the District Attorney's Office. In particular, the Court suggests the District Court failed to give sufficient weight to the disruptive potential of Question 10, which asked whether the Assistants had confidence in the word of five named supervisors. *Ante,* at 1693. The District Court, however, explicitly recognized that this was petitioner's "most forceful argument"; but after hearing the testimony of four of the five supervisors named in the question, it found that the question had no adverse effect on Myers' relationship with her superiors. 507 F.Supp., at 759.

**\*168** To this the Court responds that an employer need not wait until the destruction of working relationships is manifest before taking action. In the face of the District Court's finding that the circulation of the questionnaire had no disruptive effect, the Court holds that respondent may be dismissed because petitioner "reasonably believed [the action] would disrupt the office, undermine his authority and destroy close working relationships." *Ante,* at 1694. Even though the District Court found that the distribution of the questionnaire did not impair Myers' working relationship with her supervisors, the Court bows to petitioner's judgment because "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Ante,* at 1692.

Such extreme deference to the employer's judgment is not appropriate when public employees voice critical views concerning the operations of the agency for which they work. Although an employer's determination that an employee's statements have undermined essential working relationships must be carefully weighed in the *Pickering* balance, we must bear in mind that "the threat of dismissal from public employment is ... a potent means of inhibiting speech." *Pickering, supra,* at 574, 88 S.Ct., at 1737. See *Keyishian v. Board of Regents, supra,* 385 U.S., at 604, 87 S.Ct., at 684. If the employer's judgment is to be controlling, public employees will not speak out when what they have to say is critical of their supervisors. In order to protect public employees' First Amendment right

to voice critical views on issues of public importance, the courts must make their own appraisal of the effects of the speech in question.

In this regard, our decision in *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), is controlling. *Tinker* arose in a public school, a context similar to the one in which the present case arose in that the determination of the scope of the Constitution's guarantee of freedom of speech required consideration of the "special *169 characteristics of the ... environment" in which the expression took place. See *id.,* at 506, 89 S.Ct., at 736. At issue was whether public high school students could constitutionally be prohibited from wearing black armbands in school to express their opposition to the Vietnam conflict. The District Court had ruled that such a ban "was reasonable because it was based on [school officials'] fear of a disturbance from the wearing of armbands." *Id.,* at 508, 89 S.Ct., at 737. We found that justification inadequate, because "in our system, undifferentiated fear or apprehension of a disturbance is not enough to overcome the right to freedom of expression." *Ibid.* We concluded:

> "In order for the State ... to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany **1702 an unpopular viewpoint. *Certainly where there is no finding and no showing that engaging in the forbidden conduct would "materially and substantially interfere with the requirements of appropriate discipline in the operation*

*of the school," the prohibition cannot be sustained." Id.,* at 509, 89 S.Ct., at 738 (emphasis supplied) (quoting *Burnside v. Byars,* 363 F.2d 744, 749 (CA5 1966)).

Because the speech at issue addressed matters of public importance, a similar standard should be applied here. After reviewing the evidence, the District Court found that "it cannot be said that the defendant's interest in promoting the efficiency of the public services performed through his employees was either adversely affected or substantially impeded by plaintiff's distribution of the questionnaire." 507 F.Supp., at 759. Based on these findings the District Court concluded that the circulation of the questionnaire was protected by the First Amendment. The District Court applied the proper legal standard and reached an acceptable accommodation between the competing interests. I would affirm its decision and the judgment of the Court of Appeals.

*170 IV

The Court's decision today inevitably will deter public employees from making critical statements about the manner in which government agencies are operated for fear that doing so will provoke their dismissal. As a result, the public will be deprived of valuable information with which to evaluate the performance of elected officials. Because protecting the dissemination of such information is an essential function of the First Amendment, I dissent.

**All Citations**

461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

Footnotes

* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed.2d 499.

1 Myers' opposition was at least partially attributable to her concern that a conflict of interest would have been created by the transfer because of her participation in a counseling program for convicted defendants released on probation in the section of the criminal court to which she was to be assigned.

2 The questionnaire is reproduced as Appendix A.

Connick v. Myers, 461 U.S. 138 (1983)

103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

3   Petitioner has also objected to the assessment of damages as being in violation of the Eleventh Amendment and to the award of attorney's fees. Because of our disposition of the case, we do not reach these questions.

4   See *Perry v. Sindermann*, 408 U.S. 593, 598, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972); *Mt. Healthy City School Dist. Board of Ed. v. Doyle*, 429 U.S. 274, 284, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977); *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 414, 99 S.Ct. 693, 695, 58 L.Ed.2d 619 (1979).

5   The question of whether expression is of a kind that is of legitimate concern to the public is also the standard in determining whether a common-law action for invasion of privacy is present. See Restatement (Second) of Torts, § 652D. See also *Cox Broadcasting Co. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) (action for invasion of privacy cannot be maintained when the subject-matter of the publicity is matter of public record); *Time, Inc. v. Hill*, 385 U.S. 374, 387–388, 87 S.Ct. 534, 541–542, 17 L.Ed.2d 456 (1967).

6   See, *Clark v. Holmes*, 474 F.2d 928 (CA7 1972) cert. denied, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973); *Schmidt v. Fremont County School Dist.*, 558 F.2d 982, 984 (CA10 1977).

7   The inquiry into the protected status of speech is one of law, not fact. See n. 10, *infra*.

8   This is not a case like *Givhan, supra*, where an employee speaks out as a citizen on a matter of general concern, not tied to a personal employment dispute, but arranges to do so privately. Mrs. Givhan's right to protest racial discrimination—a matter inherently of public concern—is not forfeited by her choice of a private forum. 439 U.S., at 415–416, 99 S.Ct., at 696–697. Here, however, a questionnaire not otherwise of public concern does not attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest. The dissent's analysis of whether discussions of office morale and discipline could be matters of public concern is beside the point—it does not answer whether *this* questionnaire is such speech.

9   See Brief for Respondent 9 ("These factors, including the degree of the 'importance' of plaintiff's speech, were proper considerations to be weighed in the *Pickering* balance."); Tr. of Oral Arg. 30 (Counsel for Respondent) ("I certainly would not disagree that the content of the questionnaire, whether it affects a matter of great public concern or only a very narrow internal matter, is a relevant circumstance to be weighed in the *Pickering* analysis.")

10   "The Constitution has imposed upon this Court final authority to determine the meaning and application of those words of that instrument which require interpretation to resolve judicial issues. With that responsibility, we are compelled to examine for ourselves the statements in issue and the circumstances under which they are made to see whether or not they ... are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect." *Pennekamp v. Florida*, 328 U.S. 331, 335, 66 S.Ct. 1029, 1031, 90 L.Ed. 1295 (1946) (footnote omitted).

   Because of this obligation, we cannot "avoid making an independent constitutional judgment on the facts of the case." *Jacobellis v. Ohio*, 378 U.S. 184, 190, 84 S.Ct. 1676, 1679, 12 L.Ed.2d 793 (1964) (Opinion of BRENNAN, J.). See *Edwards v. South Carolina*, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963); *New York Times v. Sullivan*, 376 U.S. 254, 285, 84 S.Ct. 710, 728, 11 L.Ed.2d 686 (1964); *NAACP v. Claiborne Hardware Co.*, —— U.S. ——, ——, n. 50, 102 S.Ct. 3409, 3427, n. 50, 73 L.Ed.2d 1215 (1982).

11   Waldron testified that from what he had learned of the events on October 7, Myers "was trying to stir up other people not to accept the changes [transfers] that had been made on the memorandum and that were to be implemented." App. 167. In his view, the questionnaire was a "final act of defiance" and that, as a result of Myers' action, "there were going to be some severe problems about the changes." *Ibid.* Connick testified that he reached a similar conclusion after conducting his own investigation. "After I satisfied myself that not only wasn't she accepting the transfer but that she was affirmatively opposing it and disrupting the routine of the office by this questionnaire, I called her in ... [and dismissed her]." App. 130.

12   Cf. *Perry Ed. Assn. v. Perry Local Ed. Assn.*, —— U.S. ——, ——, 103 S.Ct. 948, 957, 74 L.Ed.2d 794 (1983) (proof of future disruption not necessary to justify denial of access to non-public forum on grounds that the proposed use may disrupt the property's intended function.); *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (same).

13   The record indicates that some, though not all, of the questionnaires were distributed during lunch. Employee speech which transpires entirely on the employee's own time, and in non-work areas of the office, bring different factors into the *Pickering* calculus, and might lead to a different conclusion. Cf. *NLRB v. Magnavox Co.*, 415 U.S. 322, 94 S.Ct. 1099, 39 L.Ed.2d 358 (1974).

14   The violation of such a rule would strengthen Connick's position. See *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S., at 284, 97 S.Ct., at 574.

1   Although the Court's opinion states that "if Myers' questionnaire cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her discharge," *ante*, at 1689–1690 (footnote omitted), I do not understand it to imply that a governmental employee's First Amendment rights outside the

**Connick v. Myers, 461 U.S. 138 (1983)**

103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

employment context are limited to speech on matters of public concern. To the extent that the Court's opinion may be read to suggest that the dismissal of a public employee for speech unrelated to a subject of public interest does not implicate First Amendment interests, I disagree, because our cases establish that public employees enjoy the full range of First Amendment rights guaranteed to members of the general public. Under the balancing test articulated in *Pickering*, however, the government's burden to justify such a dismissal may be lighter. See *infra*, at 1699, n. 4.

2   Although the parties offered no evidence on whether the subjects addressed by the questionnaire were, in fact, matters of public concern, extensive local press coverage shows that the issues involved are of interest to the people of Orleans Parish. Shortly after the District Court took the case under advisement, a major daily newspaper in New Orleans carried a seven-paragraph story describing the questionnaire, the events leading to Myers' dismissal, and the filing of this action. The Times Picayune/The States Item, Dec. 6, 1980, section 1, p. 21, col. 1. The same newspaper also carried a sixteen-paragraph story when the District Court ruled in Myers' favor, Feb. 11, 1981, section 1, p. 15, col. 2; a nine-paragraph story when the Court of Appeals affirmed the District Court's decision, July 28, 1981, section 1, p. 11, col. 1; a twelve-paragraph story when this Court granted Connick's petition for certiorari, March 9, 1982, section 1, p. 15, col. 5.; and a seventeen-paragraph story when we heard oral argument, Nov. 9, 1982, section 1, p. 13, col. 5.

In addition, matters affecting the internal operations of the Orleans Parish District Attorney's Office often receive extensive coverage in the same newspaper. For example, The Times Picayune/The States Item carried a lengthy story reporting that the agency moved to "plush new offices," and describing in detail the "privacy problem" faced by Assistant District Attorneys because the Office was unable to obtain modular furniture with which to partition its new space. January 25, 1981, section 8, p. 13, col. 1. It also carried a sixteen-paragraph story when a committee of the Louisiana State Senate voted to prohibit petitioner from retaining a public relations specialist. July 9, 1982, section 1, p. 14, col. 1. In light of the public's interest in the operations of the District Attorney's Office in general, and in the dispute between the parties in particular, it is quite possible that, contrary to Court's view, *ante*, at 1690–1691, Myers' comments concerning morale and working conditions in the Office would actually have engaged the public's attention had she stated them publicly. Moreover, as a general matter, the media frequently carry news stories reporting that personnel policies in effect at a government agency have resulted in declining employee morale and deteriorating agency performance.

3   Perhaps the simplest example of a statement by a public employee that would not be protected by the First Amendment would be answering "No" to a request that the employee perform a lawful task within the scope of his duties. Although such a refusal is "speech," which implicates First Amendment interests, it is also insubordination, and as such it may serve as the basis for a lawful dismissal.

4   Indeed, it has been suggested that "a classification that bases the right to First Amendment protection on some estimate of how much general interest there is in the communication is surely in conflict with the whole idea of the First Amendment." T. Emerson, The System of Freedom of Expression 554 (1970). The degree to which speech is of interest to the public may be relevant in determining whether a public employer may constitutionally be required to tolerate some degree of disruption resulting from its utterance. See *ante*, at 1692–1693. In general, however, whether a government employee's speech is of "public concern" must be determined by reference to the broad conception of the First Amendment's guarantee of freedom of speech found necessary by the Framers

"to supply the public need for information and education with respect to the significant issues of the times.... Freedom of discussion, if it would fill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill v. Alabama*, 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093 (1940) (footnote omitted).

See *Wood v. Georgia*, 370 U.S. 375, 388, 82 S.Ct. 1364, 1371, 8 L.Ed.2d 569 (1962).

5   The Court's narrow conception of which matters are of public interest is also inconsistent with the broad view of that concept articulated in our cases dealing with the constitutional limits on liability for invasion of privacy. In *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), we held that a defendant may not constitutionally be held liable for an invasion of privacy resulting from the publication of a false or misleading report of "matters of public interest" in the absence of proof that the report was published with knowledge of its falsity or reckless disregard for its truth. *Id.*, at 389–391, 87 S.Ct., at 542–543. In that action, Hill had sought damages resulting from the publication of an allegedly false report that a new play portrayed the experience of him and his family when they were held hostage in their home in a publicized incident years earlier. We entertained "no doubt that ... the opening of a new play linked to an actual incident is a matter of public interest." *Id.*, at 388, 87 S.Ct., at 542. See also *Cox Broadcasting Co. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) (holding that a radio station could not constitutionally be held liable for broadcasting the name of a rape victim, because the victim's name was contained in public records). Our discussion in *Time, Inc. v. Hill* of the breadth of the First Amendment's protections is directly relevant here:

**Connick v. Myers, 461 U.S. 138 (1983)**

103 S.Ct. 1684, 75 L.Ed.2d 708, 1 IER Cases 178

"The guarantees of speech and press are not the preserve of political expression or comment upon public affairs, essential as those are to healthy government. One need only pick up any newspaper to comprehend the vast range of published matter which exposes persons to public view, both private citizens and public officials.... 'Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed to cope with the exigencies of their period.' *Thornhill v. Alabama,* 310 U.S. 88, 102 [60 S.Ct. 736, 744, 84 L.Ed. 1093]. 'No suggestion can be found in the Constitution that the freedom there guaranteed for speech and the press bears an inverse ratio to the timeliness and the importance of the ideas seeking expression.' *Bridges v. California,* 314 U.S. 252, 269 [62 S.Ct. 190, 196, 86 L.Ed. 192]." 385 U.S., at 388, 87 S.Ct., at 542.

The quoted passage makes clear that, contrary to the Court's view, *ante,* at 1688, n. 5, the subjects touched upon in respondent's questionnaire fall within the broad conception of "matters of public interest" that defines the scope of the constitutional privilege in invasion of privacy cases. See Restatement (Second) of Torts § 652D, comment *j* (1977):

> "The scope of a matter of legitimate concern to the public is not limited to 'news,' in the sense of reports of current events or activities. It extends also to the use of names, likenesses or facts in giving information to the public for purposes of education, amusement or enlightenment, when the public may reasonably be expected to have a legitimate interest in what is published."

---

**End of Document**                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 6

Case 2:18-cv-13761-SFC-APP ECF No. 34 filed 03/04/19 PageID.554 Page 90 of 118

Garcetti v. Ceballos, 547 U.S. 410 (2006)

126 S.Ct. 1951, 87 Empl. Prac. Dec. P 42,353, 164 L.Ed.2d 689, 74 USLW 4257...

126 S.Ct. 1951
Supreme Court of the United States

Gil GARCETTI et al., Petitioners,
v.
Richard CEBALLOS.

No. 04–473.
|
Argued March 21, 2006.
|
Decided May 30, 2006.

**Synopsis**

**Background:** Deputy district attorney filed § 1983 complaint against county and supervisors at district attorneys' office, alleging that he was subject to adverse employment actions in retaliation for engaging in protected speech, that is, for writing a disposition memorandum in which he recommended dismissal of a case on the basis of purported governmental misconduct. The United States District Court for the Central District of California, A. Howard Matz, J., granted defendants' motion for summary judgment, and district attorney appealed. The Court of Appeals for the Ninth Circuit, Reinhardt, Circuit Judge, 361 F.3d 1168, reversed and remanded. Certiorari was granted.

**Holdings:** The United States Supreme Court, Justice Kennedy, held that:

when public employees make statements pursuant to their official duties, they are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline, and

here, district attorney did not speak as a citizen when he wrote his memo and, thus, his speech was not protected by the First Amendment.

Reversed and remanded.

Justice Stevens filed a dissenting opinion.

Justice Souter filed a dissenting opinion in which Justices Stevens and Ginsburg joined.

Justice Breyer filed a dissenting opinion.

**\*\*1953 \*410** *Syllabus* \*

Respondent Ceballos, a supervising deputy district attorney, was asked by defense counsel to review a case in which, counsel claimed, the affidavit police used to obtain a critical search warrant was inaccurate. Concluding after the review that the affidavit made serious misrepresentations, Ceballos relayed his findings to his supervisors, petitioners here, and followed up with a disposition memorandum recommending dismissal. Petitioners nevertheless proceeded with the prosecution. At a hearing on a defense motion to challenge the warrant, Ceballos recounted his observations about the affidavit, but the trial court rejected the challenge. Claiming that petitioners then retaliated against him for his memo in violation of the First and Fourteenth Amendments, Ceballos filed a 42 U.S.C. § 1983 suit. The District Court granted petitioners summary judgment, ruling, *inter alia,* that the memo was not protected speech because Ceballos wrote it pursuant to his employment duties. Reversing, the Ninth Circuit held that the memo's allegations were protected under the First Amendment analysis in *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811, and *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708.

*Held:* When public employees make statements pursuant to their official duties, they are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline. Pp. 1957 – 1962.

(a) Two inquiries guide interpretation of the constitutional protections accorded public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. See *Pickering, supra,* at 568, 88 S.Ct. 1731. If the answer is no, the employee has no First Amendment cause of action based on the employer's reaction to the speech. See *Connick, supra,* at 147, 103 S.Ct. 1684. If the answer is yes, the possibility of a First Amendment claim arises. The question becomes whether the government employer had an adequate

Garcetti v. Ceballos, 547 U.S. 410 (2006)

126 S.Ct. 1951, 87 Empl. Prac. Dec. P 42,353, 164 L.Ed.2d 689, 74 USLW 4257...

justification for treating the employee differently from any other member of the general public. See *Pickering, supra,* at 568, 88 S.Ct. 1731. This consideration reflects the importance of the relationship between the speaker's expressions and employment. Without a significant degree of control over its employees' **\*411** words and actions, a government employer would have little chance to provide public services efficiently. Cf. *Connick, supra,* at 143, 103 S.Ct. 1684. Thus, a government entity has broader discretion to restrict speech when it acts in its employer role, but the restrictions it imposes must be directed at speech that has some potential to affect its operations. On the other hand, a citizen who works for the government is nonetheless still a citizen. The First Amendment limits a public employer's ability to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens. See *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570. So long as employees are speaking as citizens about **\*\*1954** matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively. See, *e.g., Connick, supra,* at 147, 103 S.Ct. 1684. Pp. 1957 – 1959.

(b) Proper application of the Court's precedents leads to the conclusion that the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities. Because Ceballos' memo falls into this category, his allegation of unconstitutional retaliation must fail. The dispositive factor here is not that Ceballos expressed his views inside his office, rather than publicly, see, *e.g., Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 414, 99 S.Ct. 693, 58 L.Ed.2d 619, nor that the memo concerned the subject matter of his employment, see, *e.g., Pickering, supra,* at 573, 88 S.Ct. 1731. Rather, the controlling factor is that Ceballos' expressions were made pursuant to his official duties. That consideration distinguishes this case from those in which the First Amendment provides protection against discipline. Ceballos wrote his disposition memo because that is part of what he was employed to do. He did not act as a citizen by writing it. The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance. Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as

a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created. Cf. *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700. This result is consistent with the Court's prior emphasis on the potential societal value of employee speech and on affording government employers sufficient discretion to manage their operations. Ceballos' proposed contrary rule, adopted by the Ninth Circuit, would commit state and federal courts to a new, permanent, and intrusive role, mandating judicial oversight of communications between and among government employees and their superiors in the course of official business. This displacement of managerial discretion by judicial supervision finds **\*412** no support in the Court's precedents. The doctrinal anomaly the Court of Appeals perceived in compelling public employers to tolerate certain employee speech made publicly but not speech made pursuant to an employee's assigned duties misconceives the theoretical underpinnings of this Court's decisions and is unfounded as a practical matter. Pp. 1959 – 1962.

(c) Exposing governmental inefficiency and misconduct is a matter of considerable significance, and various measures have been adopted to protect employees and provide checks on supervisors who would order unlawful or otherwise inappropriate actions. These include federal and state whistle-blower protection laws and labor codes and, for government attorneys, rules of conduct and constitutional obligations apart from the First Amendment. However, the Court's precedents do not support the existence of a constitutional cause of action behind every statement a public employee makes in the course of doing his or her job. P. 1962.

361 F.3d 1168, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, THOMAS, and ALITO, JJ., joined. STEVENS, J., filed a dissenting opinion, *post,* p. 1962. SOUTER, J., filed a dissenting opinion, in which STEVENS and GINSBURG, JJ., joined, *post,* p. 1963. **\*\*1955** BREYER, J., filed a dissenting opinion, *post,* p. 1973.

### Attorneys and Law Firms

Dan Himmelfarb, for the United States as amicus curiae, by special leave of the Court, supporting the petitioners.

Case 2:18-cv-13761-SFC-APP ECF No. 34 filed 03/04/19 PageID.556 Page 92 of 118

Garcetti v. Ceballos, 547 U.S. 410 (2006)

126 S.Ct. 1951, 87 Empl. Prac. Dec. P 42,353, 164 L.Ed.2d 689, 74 USLW 4257...

Bonnie E. Robin-Vergeer, for respondent.

Cindy S. Lee, Counsel of Record, Jin S. Choi, Franscell, Strickland, Roberts & Lawrence, Glendale, California, Office Of The County Counsel, Raymond G. Fortner, Jr., County Counsel, Philip S. Miller, Assistant County Counsel, Doraine F. Meyer, Senior Deputy County Counsel, Los Angeles, California, Counsel for Petitioners.

Cindy S. Lee, Counsel of Record, Jin S. Choi, Franscell, Strickland, Roberts & Lawrence, Glendale, California, Counsel for Petitioners Admitted to the Bar of the Supreme Court on July 17, 1998.

Bonnie I. Robin-Vergeer, Counsel of Record, Scott L. Nelson, Brian Wolfman, Public Citizen Litigation Group, Washington, DC, Humberto Guizar Moreno, Becerra, Guerrero & Casillas, Montebello, CA, Counsel for Respondent.

**Opinion**

Justice KENNEDY delivered the opinion of the Court.

**\*413** It is well settled that "a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The question presented by the instant case is whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties.

I

Respondent Richard Ceballos has been employed since 1989 as a deputy district attorney for the Los Angeles County District Attorney's Office. During the period relevant to this case, Ceballos was a calendar deputy in the office's Pomona branch, and in this capacity he exercised certain supervisory responsibilities over other lawyers. In February 2000, a defense attorney contacted Ceballos about a pending criminal case. The defense attorney said there were inaccuracies in an affidavit used to obtain a critical search warrant. The attorney informed Ceballos that he **\*414** had filed a motion to traverse, or challenge, the warrant, but he also wanted Ceballos to review the case. According to Ceballos, it was not unusual for defense

attorneys to ask calendar deputies to investigate aspects of pending cases.

After examining the affidavit and visiting the location it described, Ceballos determined the affidavit contained serious misrepresentations. The affidavit called a long driveway what Ceballos thought should have been referred to as a separate roadway. Ceballos also questioned the affidavit's statement that tire tracks led from a stripped-down truck to the premises covered by the warrant. His doubts arose from his conclusion that the roadway's composition in some places made it difficult or impossible to leave visible tire tracks.

Ceballos spoke on the telephone to the warrant affiant, a deputy sheriff from the Los Angeles County Sheriff's Department, but he did not receive a satisfactory explanation for the perceived inaccuracies. He relayed his findings to his supervisors, petitioners Carol Najera and Frank Sundstedt, and followed up by preparing a disposition memorandum. The memo explained **\*\*1956** Ceballos' concerns and recommended dismissal of the case. On March 2, 2000, Ceballos submitted the memo to Sundstedt for his review. A few days later, Ceballos presented Sundstedt with another memo, this one describing a second telephone conversation between Ceballos and the warrant affiant.

Based on Ceballos' statements, a meeting was held to discuss the affidavit. Attendees included Ceballos, Sundstedt, and Najera, as well as the warrant affiant and other employees from the sheriff's department. The meeting allegedly became heated, with one lieutenant sharply criticizing Ceballos for his handling of the case.

Despite Ceballos' concerns, Sundstedt decided to proceed with the prosecution, pending disposition of the defense motion to traverse. The trial court held a hearing on the motion. Ceballos was called by the defense and recounted **\*415** his observations about the affidavit, but the trial court rejected the challenge to the warrant.

Ceballos claims that in the aftermath of these events he was subjected to a series of retaliatory employment actions. The actions included reassignment from his calendar deputy position to a trial deputy position, transfer to another courthouse, and denial of a promotion. Ceballos initiated an employment grievance, but the grievance was denied based on a finding that he had

Case 2:18-cv-13761-SFC-APP ECF No. 34 filed 03/04/19 PageID.557 Page 93 of 118

Garcetti v. Ceballos, 547 U.S. 410 (2006)
126 S.Ct. 1951, 87 Empl. Prac. Dec. P 42,353, 164 L.Ed.2d 689, 74 USLW 4257...

not suffered any retaliation. Unsatisfied, Ceballos sued in the United States District Court for the Central District of California, asserting, as relevant here, a claim under Rev. Stat. § 1979, 42 U.S.C. § 1983. He alleged petitioners violated the First and Fourteenth Amendments by retaliating against him based on his memo of March 2.

Petitioners responded that no retaliatory actions were taken against Ceballos and that all the actions of which he complained were explained by legitimate reasons such as staffing needs. They further contended that, in any event, Ceballos' memo was not protected speech under the First Amendment. Petitioners moved for summary judgment, and the District Court granted their motion. Noting that Ceballos wrote his memo pursuant to his employment duties, the court concluded he was not entitled to First Amendment protection for the memo's contents. It held in the alternative that even if Ceballos' speech was constitutionally protected, petitioners had qualified immunity because the rights Ceballos asserted were not clearly established.

The Court of Appeals for the Ninth Circuit reversed, holding that "Ceballos's allegations of wrongdoing in the memorandum constitute protected speech under the First Amendment." 361 F.3d 1168, 1173 (C.A.9 2004). In reaching its conclusion the court looked to the First Amendment analysis set forth in *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and *Connick, supra,* 103 S.Ct. 1684. *Connick* instructs courts to begin by considering **\*416** whether the expressions in question were made by the speaker "as a citizen upon matters of public concern." See *id.,* at 146–147, 103 S.Ct. 1684. The Court of Appeals determined that Ceballos' memo, which recited what he thought to be governmental misconduct, was "inherently a matter of public concern." 361 F.3d, at 1174. The court did not, however, consider whether the speech was made in Ceballos' capacity as a citizen. Rather, it relied on Circuit precedent rejecting the idea that "a public employee's speech is deprived of First Amendment protection whenever those views are expressed, to government workers or others, pursuant to an employment responsibility." *Id.,* at 1174–1175 (citing cases including **\*\*1957** *Roth v. Veteran's Admin. of Govt. of United States,* 856 F.2d 1401 (C.A.9 1988)).

Having concluded that Ceballos' memo satisfied the public-concern requirement, the Court of Appeals proceeded to balance Ceballos' interest in his speech against his supervisors' interest in responding to it. See *Pickering, supra,* at 568, 88 S.Ct. 1731. The court struck the balance in Ceballos' favor, noting that petitioners "failed even to suggest disruption or inefficiency in the workings of the District Attorney's Office" as a result of the memo. See 361 F.3d, at 1180. The court further concluded that Ceballos' First Amendment rights were clearly established and that petitioners' actions were not objectively reasonable. See *id.,* at 1181–1182.

Judge O'Scannlain specially concurred. Agreeing that the panel's decision was compelled by Circuit precedent, he nevertheless concluded Circuit law should be revisited and overruled. See *id.,* at 1185. Judge O'Scannlain emphasized the distinction "between speech offered by a public employee acting *as an employee* carrying out his or her ordinary job duties and that spoken by an employee acting *as a citizen* expressing his or her personal views on disputed matters of public import." *Id.,* at 1187. In his view, "when public employees speak in the course of carrying out their routine, required employment obligations, they have no *personal* interest **\*417** in the content of that speech that gives rise to a First Amendment right." *Id.,* at 1189.

We granted certiorari, 543 U.S. 1186, 125 S.Ct. 1395, 161 L.Ed.2d 188 (2005), and we now reverse.

II

As the Court's decisions have noted, for many years "the unchallenged dogma was that a public employee had no right to object to conditions placed upon the terms of employment—including those which restricted the exercise of constitutional rights." *Connick,* 461 U.S., at 143, 103 S.Ct. 1684. That dogma has been qualified in important respects. See *id.,* at 144–145, 103 S.Ct. 1684. The Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern. See, *e.g., Pickering, supra,* at 568, 88 S.Ct. 1731; *Connick, supra,* at 147, 103 S.Ct. 1684; *Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987);

Garcetti v. Ceballos, 547 U.S. 410 (2006)
126 S.Ct. 1951, 87 Empl. Prac. Dec. P 42,353, 164 L.Ed.2d 689, 74 USLW 4257...

*United States v. Treasury Employees,* 513 U.S. 454, 466, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995).

*Pickering* provides a useful starting point in explaining the Court's doctrine. There the relevant speech was a teacher's letter to a local newspaper addressing issues including the funding policies of his school board. 391 U.S., at 566, 88 S.Ct. 1731. "The problem in any case," the Court stated, "is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.,* at 568, 88 S.Ct. 1731. The Court found the teacher's speech "neither [was] shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally." *Id.,* at 572–573, 88 S.Ct. 1731 (footnote omitted). Thus, the Court concluded that "the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly **\*418** greater than its interest in limiting a similar contribution **\*\*1958** by any member of the general public." *Id.,* at 573, 88 S.Ct. 1731.

*Pickering* and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. See *id.,* at 568, 88 S.Ct. 1731. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. See *Connick, supra,* at 147, 103 S.Ct. 1684. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. See *Pickering,* 391 U.S., at 568, 88 S.Ct. 1731. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.

To be sure, conducting these inquiries sometimes has proved difficult. This is the necessary product of "the enormous variety of fact situations in which critical statements by teachers and other public employees may be thought by their superiors ... to furnish grounds for dismissal." *Id.,* at 569., 88 S.Ct. 1731 The Court's overarching objectives, though, are evident.

When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom. See, *e.g., Waters v. Churchill,* 511 U.S. 661, 671, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion) ("[T]he government as employer indeed has far broader powers than does the government as sovereign"). Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. Cf. **\*419** *Connick, supra,* at 143, 103 S.Ct. 1684 ("[G]overnment offices could not function if every employment decision became a constitutional matter"). Public employees, moreover, often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions.

At the same time, the Court has recognized that a citizen who works for the government is nonetheless a citizen. The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens. See *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively. See, *e.g., Connick, supra,* at 147, 103 S.Ct. 1684 ("Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government").

The Court's employee-speech jurisprudence protects, of course, the constitutional rights of public employees. Yet the First Amendment interests at stake extend beyond the individual speaker. The Court has acknowledged the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion. *Pickering* again provides an instructive example. The Court characterized its **\*\*1959** holding as rejecting the attempt of school administrators to "limi[t] teachers' opportunities to contribute to public debate." 391 U.S., at 573, 88 S.Ct. 1731. It also noted

Garcetti v. Ceballos, 547 U.S. 410 (2006)

126 S.Ct. 1951, 87 Empl. Prac. Dec. P 42,353, 164 L.Ed.2d 689, 74 USLW 4257...

that teachers are "the members of a community most likely to have informed and definite opinions" about school expenditures. *Id.,* at 572, 88 S.Ct. 1731. The Court's approach acknowledged the necessity for informed, vibrant dialogue in a democratic society. It suggested, in addition, that widespread costs may arise when dialogue is repressed. The Court's more recent cases have expressed similar concerns. **\*420** See, *e.g., San Diego v. Roe,* 543 U.S. 77, 82, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) *(per curiam)* ("Were [public employees] not able to speak on [the operation of their employers], the community would be deprived of informed opinions on important public issues. The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it" (citation omitted)); cf. *Treasury Employees,* 513 U.S., at 470, 115 S.Ct. 1003 ("The large-scale disincentive to Government employees' expression also imposes a significant burden on the public's right to read and hear what the employees would otherwise have written and said").

The Court's decisions, then, have sought both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions. See, *e.g., Rankin,* 483 U.S., at 384, 107 S.Ct. 2891 (recognizing "the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment"). Underlying our cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to "constitutionalize the employee grievance." *Connick,* 461 U.S., at 154, 103 S.Ct. 1684.

### III

With these principles in mind we turn to the instant case. Respondent Ceballos believed the affidavit used to obtain a search warrant contained serious misrepresentations. He conveyed his opinion and recommendation in a memo to his supervisor. That Ceballos expressed his views inside his office, rather than publicly, is not dispositive. Employees in some cases may receive First Amendment protection for expressions made at work. See, *e.g., Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 414, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). Many citizens do much of their

talking inside their respective workplaces, and it would not serve the goal of treating public **\*421** employees like "any member of the general public," *Pickering,* 391 U.S., at 573, 88 S.Ct. 1731, to hold that all speech within the office is automatically exposed to restriction.

The memo concerned the subject matter of Ceballos' employment, but this, too, is nondispositive. The First Amendment protects some expressions related to the speaker's job. See, *e.g., ibid.; Givhan, supra,* at 414, 99 S.Ct. 693. As the Court noted in *Pickering:* "Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." 391 U.S., at 572, 88 S.Ct. 1731. The same is true of many other categories of public employees.

The controlling factor in Ceballos' case is that his expressions were **\*\*1960** made pursuant to his duties as a calendar deputy. See Brief for Respondent 4 ("Ceballos does not dispute that he prepared the memorandum 'pursuant to his duties as a prosecutor' "). That consideration—the fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case—distinguishes Ceballos' case from those in which the First Amendment provides protection against discipline. We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.

Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do. It is immaterial whether he experienced some personal gratification from writing the memo; his First Amendment rights do not depend on his job satisfaction. The significant point is that the memo was written pursuant to Ceballos' official duties. Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe **\*422** any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created. Cf. *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) ("[W]hen

Case 2:18-cv-13761-SFC-APP ECF No. 34 filed 03/04/19 PageID.560 Page 96 of 118

Garcetti v. Ceballos, 547 U.S. 410 (2006)

126 S.Ct. 1951, 87 Empl. Prac. Dec. P 42,353, 164 L.Ed.2d 689, 74 USLW 4257...

the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes"). Contrast, for example, the expressions made by the speaker in *Pickering,* whose letter to the newspaper had no official significance and bore similarities to letters submitted by numerous citizens every day.

Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee. The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance.

This result is consistent with our precedents' attention to the potential societal value of employee speech. See *supra,* at 1958 – 1959. Refusing to recognize First Amendment claims based on government employees' work product does not prevent them from participating in public debate. The employees retain the prospect of constitutional protection for their contributions to the civic discourse. This prospect of protection, however, does not invest them with a right to perform their jobs however they see fit.

Our holding likewise is supported by the emphasis of our precedents on affording government employers sufficient discretion to manage their operations. Employers have heightened interests in controlling speech made by an employee in his or her professional capacity. Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure **\*423** that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission. Ceballos' memo is illustrative. It demanded the attention of his supervisors and led to a heated meeting with employees from the sheriff's department. If Ceballos' superiors thought his memo was inflammatory or **\*\*1961** misguided, they had the authority to take proper corrective action.

Ceballos' proposed contrary rule, adopted by the Court of Appeals, would commit state and federal courts to a new, permanent, and intrusive role, mandating judicial oversight of communications between and among government employees and their superiors in the course of official business. This displacement of managerial discretion by judicial supervision finds no support in our precedents. When an employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences. When, however, the employee is simply performing his or her job duties, there is no warrant for a similar degree of scrutiny. To hold otherwise would be to demand permanent judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and the separation of powers.

The Court of Appeals based its holding in part on what it perceived as a doctrinal anomaly. The court suggested it would be inconsistent to compel public employers to tolerate certain employee speech made publicly but not speech made pursuant to an employee's assigned duties. See 361 F.3d, at 1176. This objection misconceives the theoretical underpinnings of our decisions. Employees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government. The same goes for writing a letter to a local newspaper, see *Pickering, supra,* 88 S.Ct. 1731, or discussing politics with a co-worker, see **\*424** *Rankin,* 483 U.S. 378, 107 S.Ct. 2891. When a public employee speaks pursuant to employment responsibilities, however, there is no relevant analogue to speech by citizens who are not government employees.

The Court of Appeals' concern also is unfounded as a practical matter. The perceived anomaly, it should be noted, is limited in scope: It relates only to the expressions an employee makes pursuant to his or her official responsibilities, not to statements or complaints (such as those at issue in cases like *Pickering* and *Connick* ) that are made outside the duties of employment. If, moreover, a government employer is troubled by the perceived anomaly, it has the means at hand to avoid it. A public employer that wishes to encourage its employees to voice concerns privately retains the option of instituting internal policies and procedures that are receptive to employee criticism. Giving employees an internal forum for their speech will discourage them from concluding that

Garcetti v. Ceballos, 547 U.S. 410 (2006)

126 S.Ct. 1951, 87 Empl. Prac. Dec. P 42,353, 164 L.Ed.2d 689, 74 USLW 4257...

the safest avenue of expression is to state their views in public.

Proper application of our precedents thus leads to the conclusion that the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities. Because Ceballos' memo falls into this category, his allegation of unconstitutional retaliation must fail.

Two final points warrant mentioning. First, as indicated above, the parties in this case do not dispute that Ceballos wrote his disposition memo pursuant to his employment duties. We thus have no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate. We reject, however, the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions. See *post*, at 1965, n. 2 (SOUTER, J., dissenting). The proper inquiry is a practical one. **\*\*1962** Formal job descriptions often bear little resemblance to the duties an employee actually is **\*425** expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

Second, Justice SOUTER suggests today's decision may have important ramifications for academic freedom, at least as a constitutional value. See *post*, at 1969 – 1970. There is some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence. We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching.

## IV

Exposing governmental inefficiency and misconduct is a matter of considerable significance. As the Court noted in *Connick*, public employers should, "as a matter of good judgment," be "receptive to constructive criticism offered by their employees." 461 U.S., at 149, 103 S.Ct. 1684. The dictates of sound judgment are reinforced

by the powerful network of legislative enactments—such as whistle-blower protection laws and labor codes—available to those who seek to expose wrongdoing. See, *e.g.*, 5 U.S.C. § 2302(b)(8); Cal. Govt.Code Ann. § 8547.8 (West 2005); Cal. Lab.Code Ann. § 1102.5 (West Supp.2006). Cases involving government attorneys implicate additional safeguards in the form of, for example, rules of conduct and constitutional obligations apart from the First Amendment. See, *e.g.*, Cal. Rule Prof. Conduct 5–110 (2005) ( "A member in government service shall not institute or cause to be instituted criminal charges when the member knows or should know that the charges are not supported by probable cause"); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). These imperatives, as well as obligations arising from any **\*426** other applicable constitutional provisions and mandates of the criminal and civil laws, protect employees and provide checks on supervisors who would order unlawful or otherwise inappropriate actions.

We reject, however, the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties. Our precedents do not support the existence of a constitutional cause of action behind every statement a public employee makes in the course of doing his or her job.

The judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

Justice STEVENS, dissenting.

The proper answer to the question "whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties," *ante*, at 1955, is "Sometimes," not "Never." Of course a supervisor may take corrective action when such speech is "inflammatory or misguided," *ante*, at 1960 – 1961. But what if it is just unwelcome speech because it reveals facts that the supervisor would rather not have anyone else discover?[*]

**\*\*1963** **\*427** As Justice SOUTER explains, public employees are still citizens while they are in the office. The notion that there is a categorical difference between speaking as a citizen and speaking in the course of one's

Case 2:18-cv-13761-SFC-APP ECF No. 34 filed 03/04/19 PageID.562 Page 98 of 118

**Garcetti v. Ceballos, 547 U.S. 410 (2006)**

126 S.Ct. 1951, 87 Empl. Prac. Dec. P 42,353, 164 L.Ed.2d 689, 74 USLW 4257...

employment is quite wrong. Over a quarter of a century has passed since then-Justice Rehnquist, writing for a unanimous Court, rejected "the conclusion that a public employee forfeits his protection against governmental abridgment of freedom of speech if he decides to express his views privately rather than publicly." *Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 414, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). We had no difficulty recognizing that the First Amendment applied when Bessie Givhan, an English teacher, raised concerns about the school's racist employment practices to the principal. See *id.,* at 413–416, 99 S.Ct. 693. Our silence as to whether or not her speech was made pursuant to her job duties demonstrates that the point was immaterial. That is equally true today, for it is senseless to let constitutional protection for exactly the same words hinge on whether they fall within a job description. Moreover, it seems perverse to fashion a new rule that provides employees with an incentive to voice their concerns publicly before talking frankly to their superiors.

While today's novel conclusion to the contrary may not be "inflammatory," for the reasons stated in Justice SOUTER's dissenting opinion it is surely "misguided."

Justice SOUTER, with whom Justice STEVENS and Justice GINSBURG join, dissenting.
The Court holds that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Ante,* at 1960. I respectfully dissent. **\*428** I agree with the majority that a government employer has substantial interests in effectuating its chosen policy and objectives, and in demanding competence, honesty, and judgment from employees who speak for it in doing their work. But I would hold that private and public interests in addressing official wrongdoing and threats to health and safety can outweigh the government's stake in the efficient implementation of policy, and when they do public employees who speak on these matters in the course of their duties should be eligible to claim First Amendment protection.

I

Open speech by a private citizen on a matter of public importance lies at the heart of expression subject to protection by the First Amendment. See, *e.g., Schenck v. Pro–Choice Network of Western N. Y.,* 519 U.S. 357, 377, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997). At the other extreme, **\*\*1964** a statement by a government employee complaining about nothing beyond treatment under personnel rules raises no greater claim to constitutional protection against retaliatory response than the remarks of a private employee. See *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). In between these points lies a public employee's speech unwelcome to the government but on a significant public issue. Such an employee speaking as a citizen, that is, with a citizen's interest, is protected from reprisal unless the statements are too damaging to the government's capacity to conduct public business to be justified by any individual or public benefit thought to flow from the statements. *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Entitlement to protection is thus not absolute.

This significant, albeit qualified, protection of public employees who irritate the government is understood to flow from the First Amendment, in part, because a government paycheck does nothing to eliminate the value to an individual of speaking on public matters, and there is no good **\*429** reason for categorically discounting a speaker's interest in commenting on a matter of public concern just because the government employs him. Still, the First Amendment safeguard rests on something more, being the value to the public of receiving the opinions and information that a public employee may disclose. "Government employees are often in the best position to know what ails the agencies for which they work." *Waters v. Churchill,* 511 U.S. 661, 674, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994).

The reason that protection of employee speech is qualified is that it can distract co-workers and supervisors from their tasks at hand and thwart the implementation of legitimate policy, the risks of which grow greater the closer the employee's speech gets to commenting on his own workplace and responsibilities. It is one thing for an office clerk to say there is waste in government and quite another to charge that his own department pays full-time salaries to part-time workers. Even so, we have regarded eligibility for protection by *Pickering* balancing as the proper approach when an employee

126 S.Ct. 1951, 87 Empl. Prac. Dec. P 42,353, 164 L.Ed.2d 689, 74 USLW 4257...

speaks critically about the administration of his own government employer. In *Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), we followed *Pickering* when a teacher was fired for complaining to a superior about the racial composition of the school's administrative, cafeteria, and library staffs, 439 U.S., at 413–414, 99 S.Ct. 693, and the same point was clear in *Madison Joint School Dist. No. 8 v. Wisconsin Employment Relations Comm'n,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976). That case was decided, in part, with reference to the *Pickering* framework, and the Court there held that a schoolteacher speaking on behalf of himself and others at a public school board meeting could not be penalized for criticizing pending collective-bargaining negotiations affecting professional employment. *Madison* noted that the teacher "addressed the school board not merely as one of its employees but also as a concerned citizen, seeking to express his views on an important decision of his government." **\*430** 429 U.S., at 174–175, 97 S.Ct. 421. In each case, the Court realized that a public employee can wear a citizen's hat when speaking on subjects closely tied to the employee's own job, and *Givhan* stands for the same conclusion even when the speech is not addressed to the public at large. Cf. *Pegram v. Herdrich,* 530 U.S. 211, 225, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000) (recognizing that, factually, a **\*\*1965** trustee under the Employee Retirement Income Security Act of 1974 can both act as ERISA fiduciary and act on behalf of the employer).

The difference between a case like *Givhan* and this one is that the subject of Ceballos's speech fell within the scope of his job responsibilities, whereas choosing personnel was not what the teacher was hired to do. The effect of the majority's constitutional line between these two cases, then, is that a *Givhan* schoolteacher is protected when complaining to the principal about hiring policy, but a school personnel officer would not be if he protested that the principal disapproved of hiring minority job applicants. This is an odd place to draw a distinction, [1] and while necessary judicial line-drawing sometimes looks arbitrary, any distinction obliges a court to justify its choice. Here, there is no adequate justification for the majority's line categorically denying *Pickering* protection to any speech uttered "pursuant to ... official duties," *ante,* at 1960.

As all agree, the qualified speech protection embodied in *Pickering* balancing resolves the tension between individual and public interests in the speech, on the one hand, and the government's interest in operating efficiently without distraction or embarrassment by talkative or headline-grabbing employees. The need for a balance hardly disappears when an employee speaks on matters his job requires him to address; rather, it seems obvious that the individual and public **\*431** value of such speech is no less, and may well be greater, when the employee speaks pursuant to his duties in addressing a subject he knows intimately for the very reason that it falls within his duties. [2]

As for the importance of such speech to the individual, it stands to reason that a citizen may well place a very high value on a right to speak on the public issues he decides to make the subject of his work day after day. Would anyone doubt that a school principal evaluating the performance of teachers for promotion or pay adjustment retains a citizen's interest in addressing the quality of teaching in the schools? (Still, the majority indicates he could be fired without First Amendment recourse for fair but unfavorable comment when the teacher under review is the superintendent's daughter.) Would anyone deny that a prosecutor like Richard Ceballos may claim the interest of any citizen in **\*\*1966** speaking out against a rogue law enforcement officer, simply because his job requires him to express a judgment about the officer's performance? (But the majority says the First Amendment gives Ceballos no protection, even if his judgment in this case was sound and appropriately expressed.)

Indeed, the very idea of categorically separating the citizen's interest from the employee's interest ignores the fact that the ranks of public service include those who share the poet's "object ... to unite [m]y avocation and my vocation"; [3] these citizen servants are the ones whose civic interest rises highest when they speak pursuant to their duties, and these are exactly the ones government employers most want to attract. [4] There is no question that public employees speaking on matters they are obliged to address would generally **\*433** place a high value on a right to speak, as any responsible citizen would.

Nor is there any reason to raise the counterintuitive question whether the public interest in hearing informed employees evaporates when they speak as required on some subject at the core of their jobs. Last Term, we recalled the public value that the *Pickering* Court

Case 2:18-cv-13761-SFC-APP ECF No. 34 filed 03/04/19 PageID.564 Page 100 of 118

Garcetti v. Ceballos, 547 U.S. 410 (2006)

126 S.Ct. 1951, 87 Empl. Prac. Dec. P 42,353, 164 L.Ed.2d 689, 74 USLW 4257...

perceived in the speech of public employees as a class: "Underlying the decision in *Pickering* is the recognition that public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public. Were they not able to speak on these matters, the community would be deprived of informed opinions on important public issues. The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." *San Diego v. Roe,* 543 U.S. 77, 82, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) *(per curiam)* (citation omitted). This is not a whit less true when an employee's job duties require him to speak about such things: when, for example, a public auditor speaks on his discovery of embezzlement of public funds, when a building inspector makes an obligatory **1967 report of an attempt to bribe him, or when a law enforcement officer expressly balks at a superior's order to violate constitutional rights he is sworn to protect. (The majority, however, places all these speakers beyond the reach of First Amendment protection against retaliation.)

Nothing, then, accountable on the individual and public side of the *Pickering* balance changes when an employee speaks "pursuant" to public duties. On the side of the government employer, however, something is different, and to this extent, I agree with the majority of the Court. The majority is rightly concerned that the employee who speaks out on matters subject to comment in doing his own work has the greater leverage to create office uproars and fracture the government's authority to set policy to be carried out *434 coherently through the ranks. "Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission." *Ante,* at 1960. Up to a point, then, the majority makes good points: government needs civility in the workplace, consistency in policy, and honesty and competence in public service.

But why do the majority's concerns, which we all share, require categorical exclusion of First Amendment protection against any official retaliation for things said on the job? Is it not possible to respect the unchallenged individual and public interests in the speech through a *Pickering* balance without drawing the strange line I mentioned before, *supra,* at 1965? This is, to be sure, a

matter of judgment, but the judgment has to account for the undoubted value of speech to those, and by those, whose specific public job responsibilities bring them face to face with wrongdoing and incompetence in government, who refuse to avert their eyes and shut their mouths. And it has to account for the need actually to disrupt government if its officials are corrupt or dangerously incompetent. See n. 4, *supra.* It is thus no adequate justification for the suppression of potentially valuable information simply to recognize that the government has a huge interest in managing its employees and preventing the occasionally irresponsible one from turning his job into a bully pulpit. Even there, the lesson of *Pickering* (and the object of most constitutional adjudication) is still to the point: when constitutionally significant interests clash, resist the demand for winner-take-all; try to make adjustments that serve all of the values at stake.

Two reasons in particular make me think an adjustment using the basic *Pickering* balancing scheme is perfectly feasible here. First, the extent of the government's legitimate authority over subjects of speech required by a public job *435 can be recognized in advance by setting in effect a minimum heft for comments with any claim to outweigh it. Thus, the risks to the government are great enough for us to hold from the outset that an employee commenting on subjects in the course of duties should not prevail on balance unless he speaks on a matter of unusual importance and satisfies high standards of responsibility in the way he does it. The examples I have already given indicate the eligible subject matter, and it is fair to say that only comment on official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety can weigh out in an employee's favor. If promulgation of this standard should fail to discourage meritless actions premised on 42 U.S.C. § 1983 (or *Bivens* **1968 *v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)) before they get filed, the standard itself would sift them out at the summary-judgment stage. [5]

My second reason for adapting *Pickering* to the circumstances at hand is the experience in Circuits that have recognized claims like Ceballos's here. First Amendment protection less circumscribed than what I would recognize has been available in the Ninth Circuit for over 17 years, and neither there nor in other Circuits that accept claims like this one has there been a debilitating

Case 2:18-cv-13761-SFC-APP ECF No. 34 filed 03/04/19 PageID.565 Page 101 of 118

**Garcetti v. Ceballos, 547 U.S. 410 (2006)**

126 S.Ct. 1951, 87 Empl. Prac. Dec. P 42,353, 164 L.Ed.2d 689, 74 USLW 4257...

flood of litigation. There has indeed been some: as represented by Ceballos's lawyer at oral argument, each year over the last five years, approximately 70 cases in the different Courts of Appeals and approximately 100 in the various District Courts. Tr. of Oral Arg. 58–59. But even these figures reflect a readiness to litigate that might well have been cooled by my view about **\*436** the importance required before *Pickering* treatment is in order.

For that matter, the majority's position comes with no guarantee against factbound litigation over whether a public employee's statements were made "pursuant to ... official duties," *ante,* at 1960. In fact, the majority invites such litigation by describing the enquiry as a "practical one," *ante,* at 1961, apparently based on the totality of employment circumstances.[6] See n. 2, *supra.* Are prosecutors' discretionary statements about cases addressed to the press on the courthouse steps made "pursuant to their official duties"? Are government nuclear scientists' complaints to their supervisors about a colleague's improper handling of radioactive materials made "pursuant" to duties?

## II

The majority seeks support in two lines of argument extraneous to *Pickering* doctrine. The one turns on a fallacious reading of cases on government speech, the other on a mistaken assessment of protection available under whistle-blower statutes.

## A

The majority accepts the fallacy propounded by the county petitioners and the Federal Government as *amicus* that any statement made within the scope of public employment is (or should be treated as) the government's own speech, see *ante,* at 1960, and should thus be differentiated as a matter of law from the personal statements the First Amendment protects, see *Broadrick v. Oklahoma,* 413 U.S. 601, 610, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). The majority invokes the interpretation set out in *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), of *Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), which **\*437** held there was no infringement of the speech rights of Title X funds recipients and their staffs

when the Government forbade any on-the-job counseling in favor of abortion as a method of family planning, *id.,* at 192–200, 111 S.Ct. 1759. We have read *Rust* to mean that "when the government appropriates **\*\*1969** public funds to promote a particular policy of its own it is entitled to say what it wishes." *Rosenberger, supra,* at 833, 115 S.Ct. 2510.

The key to understanding the difference between this case and *Rust* lies in the terms of the respective employees' jobs and, in particular, the extent to which those terms require espousal of a substantive position prescribed by the government in advance. Some public employees are hired to "promote a particular policy" by broadcasting a particular message set by the government, but not everyone working for the government, after all, is hired to speak from a government manifesto. See *Legal Services Corporation v. Velazquez,* 531 U.S. 533, 542, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001). There is no claim or indication that Ceballos was hired to perform such a speaking assignment. He was paid to enforce the law by constitutional action: to exercise the county government's prosecutorial power by acting honestly, competently, and constitutionally. The only sense in which his position apparently required him to hew to a substantive message was at the relatively abstract point of favoring respect for law and its evenhanded enforcement, subjects that are not at the level of controversy in this case and were not in *Rust.* Unlike the doctors in *Rust,* Ceballos was not paid to advance one specific policy among those legitimately available, defined by a specific message or limited by a particular message forbidden. The county government's interest in his speech cannot therefore be equated with the terms of a specific, prescribed, or forbidden substantive position comparable to the Federal Government's interest in *Rust,* and *Rust* is no authority for the notion that government may exercise plenary control over every comment made by a public employee in doing his job.

**\*438** It is not, of course, that the district attorney lacked interest of a high order in what Ceballos might say. If his speech undercut effective, lawful prosecution, there would have been every reason to rein him in or fire him; a statement that created needless tension among law enforcement agencies would be a fair subject of concern, and the same would be true of inaccurate statements or false ones made in the course of doing his work. But these interests on the government's part are entirely distinct from any claim that Ceballos's speech was government

Garcetti v. Ceballos, 547 U.S. 410 (2006)
126 S.Ct. 1951, 87 Empl. Prac. Dec. P 42,353, 164 L.Ed.2d 689, 74 USLW 4257...

speech with a preset or proscribed content as exemplified in *Rust*. Nor did the county petitioners here even make such a claim in their answer to Ceballos's complaint, see n. 13, *infra*.

The fallacy of the majority's reliance on *Rosenberger's* understanding of *Rust* doctrine, moreover, portends a bloated notion of controllable government speech going well beyond the circumstances of this case. Consider the breadth of the new formulation:

> "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Ante*, at 1960.

This ostensible domain beyond the pale of the First Amendment is spacious enough to include even the teaching of a public university professor, and I have to hope that today's majority does not mean to imperil First Amendment protection of academic freedom in public colleges and universities, whose teachers necessarily speak and write "pursuant to ... official duties." See *Grutter v. Bollinger,* 539 U.S. 306, 329, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) ("We have long recognized that, given the **\*\*1970** important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional **\*439** tradition"); *Keyishian v. Board of Regents of Univ. of State of N. Y.,* 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) ("Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. 'The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools' " (quoting *Shelton v. Tucker,* 364 U.S. 479, 487, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960))); *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (a governmental enquiry into the contents of a scholar's lectures at a state university "unquestionably was an invasion of [his] liberties in the areas of academic freedom and political expression— areas in which government should be extremely reticent to tread").

## B

The majority's second argument for its disputed limitation of *Pickering* doctrine is that the First Amendment has little or no work to do here owing to an assertedly comprehensive complement of state and national statutes protecting government whistle-blowers from vindictive bosses. See *ante,* at 1962. But even if I close my eyes to the tenet that " '[t]he applicability of a provision of the Constitution has never depended on the vagaries of state or federal law,' " *Board of Comm'rs, Wabaunsee Cty. v. Umbehr,* 518 U.S. 668, 680, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996), the majority's counsel to rest easy fails on its own terms. [7]

**\*440** To begin with, speech addressing official wrongdoing may well fall outside protected whistle-blowing, defined in the classic sense of exposing an official's fault to a third party or to the public; the teacher in *Givhan,* for example, who raised the issue of unconstitutional hiring bias, would not have qualified as that sort of whistle-blower, for she was fired after a private conversation with the school principal. In any event, the combined variants of statutory whistle-blower definitions and protections add up to a patchwork, not a showing that worries may be remitted to legislatures for relief. See D. Westman & N. Modesitt, Whistleblowing: Law of Retaliatory Discharge 67–75, 281–307 (2d ed.2004). Some state statutes protect all government workers, including the employees of municipalities and other subdivisions; [8] others stop at state employees. [9] Some limit protection **\*\*1971** to employees who tell their bosses before they speak out; [10] others forbid bosses from imposing any requirement to warn. [11] As for the federal Whistleblower Protection Act of 1989, **\*441** 5 U.S.C. § 1213 *et seq.* (2000 ed. and Supp. III), current case law requires an employee complaining of retaliation to show that " 'a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee [could] reasonably conclude that the actions of the government evidence gross mismanagement,' " *White v. Department of Air Fornce,* 391 F.3d 1377, 1381 (C.A.Fed.2004) (quoting *Lachance v. White,* 174 F.3d 1378, 1381 (C.A.Fed.1999), cert. denied, 528 U.S. 1153, 120 S.Ct. 1157, 145 L.Ed.2d 1069 (2000)). And federal employees have been held to have no protection for disclosures made to immediate supervisors, see *Willis v. Department of Agriculture,* 141

Garcetti v. Ceballos, 547 U.S. 410 (2006)
126 S.Ct. 1951, 87 Empl. Prac. Dec. P 42,353, 164 L.Ed.2d 689, 74 USLW 4257...

F.3d 1139, 1143 (C.A.Fed.1998); *Horton v. Department of Navy,* 66 F.3d 279, 282 (C.A.Fed.1995), cert. denied, 516 U.S. 1176, 116 S.Ct. 1271, 134 L.Ed.2d 218 (1996), or for statements of facts publicly known already, see *Francisco v. Office of Personnel Management,* 295 F.3d 1310, 1314 (C.A.Fed.2002). Most significantly, federal employees have been held to be unprotected for statements made in connection with normal employment duties, *Huffman v. Office of Personnel Management,* 263 F.3d 1341, 1352 (C.A.Fed.2001), the very speech that the majority says will be covered by "the powerful network of legislative enactments ... available to those who seek to expose wrongdoing," *ante,* at 1962.[12] My point is not to disparage particular statutes or speak here to the merits of interpretations by other federal courts, but merely to show the current understanding of statutory protection: individuals doing the same sorts of governmental jobs and saying the same sorts of things addressed to civic concerns will get different protection depending on the local, state, or federal jurisdictions that happened to employ them.

### III

The Court remands because the Court of Appeals considered only the disposition memorandum and because Ceballos **\*442** charges retaliation for some speech apparently outside the ambit of utterances "pursuant to their official duties." When the Court of Appeals takes up this case once again, it should consider some of the following facts that escape emphasis in the majority opinion owing to its focus.[13] Ceballos says he sought his position out of a personal commitment to perform civic work. After showing his superior, petitioner Frank Sundstedt, the disposition memorandum at issue in this case, Ceballos complied with Sundstedt's direction to tone down some accusatory rhetoric out of **\*\*1972** concern that the memorandum would be unnecessarily incendiary when shown to the Sheriff's Department. After meeting with members of that department, Ceballos told his immediate supervisor, petitioner Carol Najera, that he thought *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), obliged him to give the defense his internal memorandum as exculpatory evidence. He says that Najera responded by ordering him to write a new memorandum containing nothing but the deputy sheriff's statements, but that he balked at that. Instead, he proposed to turn over the existing memorandum with his own conclusions redacted as

work product, and this is what he did. The issue over revealing his conclusions arose again in preparing for the suppression hearing. Ceballos maintains that Sundstedt ordered Najera, representing the prosecution, to give the trial judge a full picture of the circumstances, but that Najera told Ceballos he would suffer retaliation if he testified that the affidavit contained intentional fabrications. In any event, Ceballos's testimony generally stopped short of his own conclusions. After the hearing, the trial judge denied the motion to suppress, explaining that he found grounds independent of the challenged material sufficient to show probable cause for the warrant.

**\*443** Ceballos says that over the next six months his supervisors retaliated against him[14] not only for his written reports, see *ante,* at 1956, but also for his spoken statements to them and his hearing testimony in the pending criminal case. While an internal grievance filed by Ceballos challenging these actions was pending, Ceballos spoke at a meeting of the Mexican–American Bar Association about misconduct of the Sheriff's Department in the criminal case, the lack of any policy at the District Attorney's Office for handling allegations of police misconduct, and the retaliatory acts he ascribed to his supervisors. Two days later, the office dismissed Ceballos's grievance, a result he attributes in part to his bar association speech.

Ceballos's action against petitioners under 42 U.S.C. § 1983 claims that the individuals retaliated against him for exercising his First Amendment rights in submitting the memorandum, discussing the matter with Najera and Sundstedt, testifying truthfully at the hearing, and speaking at the bar meeting.[15] As I **\*\*1973** mentioned, the Court of Appeals **\*444** saw no need to address the protection afforded to Ceballos's statements other than the disposition memorandum, which it thought was protected under the *Pickering* test. Upon remand, it will be open to the Court of Appeals to consider the application of *Pickering* to any retaliation shown for other statements; not all of those statements would have been made pursuant to official duties in any obvious sense, and the claim relating to truthful testimony in court must surely be analyzed independently to protect the integrity of the judicial process.

Justice BREYER, dissenting.

Garcetti v. Ceballos, 547 U.S. 410 (2006)
126 S.Ct. 1951, 87 Empl. Prac. Dec. P 42,353, 164 L.Ed.2d 689, 74 USLW 4257...

This case asks whether the First Amendment protects public employees when they engage in speech that both (1) involves matters of public concern and (2) takes place in the ordinary course of performing the duties of a government job. I write separately to explain why I cannot fully accept either the Court's or Justice SOUTER's answer to the question presented.

I

I begin with what I believe is common ground:

(1) Because virtually all human interaction takes place through speech, the First Amendment cannot offer all speech the same degree of protection. Rather, judges must apply different protective presumptions in different contexts, scrutinizing government's speech-related restrictions differently **\*445** depending upon the general category of activity. Compare, *e.g., Burson v. Freeman,* 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (plurality opinion) (political speech), with *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (commercial speech), and *Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (government speech).

(2) Where the speech of government employees is at issue, the First Amendment offers protection only where the offer of protection itself will not unduly interfere with legitimate governmental interests, such as the interest in efficient administration. That is because the government, like any employer, must have adequate authority to direct the activities of its employees. That is also because efficient administration of legislatively authorized programs reflects the constitutional need effectively to implement the public's democratically determined will.

(3) Consequently, where a government employee speaks "as an employee upon matters only of personal interest," the First Amendment does not offer protection. *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Where the employee speaks "as a citizen ... upon matters of public concern," the First Amendment offers protection but only where the speech survives a screening test. *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). That test, called, in legal

shorthand, "*Pickering* balancing," requires a judge to "balance ... the interests" of the employee "in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Ibid.* See also *Connick, supra,* at 142, 103 S.Ct. 1684.

**\*\*1974** (4) Our prior cases do not decide what screening test a judge should apply in the circumstances before us, namely, when the government employee both speaks upon a matter of public concern and does so in the course of his ordinary duties as a government employee.

**\*446** II

The majority answers the question by holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Ante,* at 1960. In a word, the majority says, "never." That word, in my view, is too absolute.

Like the majority, I understand the need to "affor[d] government employers sufficient discretion to manage their operations." *Ibid.* And I agree that the Constitution does not seek to "displac[e] ... managerial discretion by judicial supervision." *Ante,* at 1961. Nonetheless, there may well be circumstances with special demand for constitutional protection of the speech at issue, where governmental justifications may be limited, and where administrable standards seem readily available-- to the point where the majority's fears of department management by lawsuit are misplaced. In such an instance, I believe that courts should apply the *Pickering* standard, even though the government employee speaks upon matters of public concern in the course of his ordinary duties.

This is such a case. The respondent, a government lawyer, complained of retaliation, in part, on the basis of speech contained in his disposition memorandum that he says fell within the scope of his obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The facts present two special circumstances that together justify First Amendment review.

Case 2:18-cv-13761-SFC-APP ECF No. 34 filed 03/04/19 PageID.569 Page 105 of 118

Garcetti v. Ceballos, 547 U.S. 410 (2006)

126 S.Ct. 1951, 87 Empl. Prac. Dec. P 42,353, 164 L.Ed.2d 689, 74 USLW 4257...

First, the speech at issue is professional speech—the speech of a lawyer. Such speech is subject to independent regulation by canons of the profession. Those canons provide an obligation to speak in certain instances. And where that is so, the government's own interest in forbidding that speech is diminished. Cf. *Legal Services Corporation v. Velazquez,* 531 U.S. 533, 544, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001) ("Restricting LSC [Legal Services Corporation] attorneys in advising their clients and **447 in presenting arguments and analyses to the courts distorts the legal system by altering the traditional role of the attorneys"). See also *Polk County v. Dodson,* 454 U.S. 312, 321, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) ("[A] public defender is not amenable to administrative direction in the same sense as other employees of the State"). See generally Post, Subsidized Speech, 106 Yale L.J. 151, 172 (1996) ("[P]rofessionals must always qualify their loyalty and commitment to the vertical hierarchy of an organization by their horizontal commitment to general professional norms and standards"). The objective specificity and public availability of the profession's canons also help to diminish the risk that the courts will improperly interfere with the government's necessary authority to manage its work.

Second, the Constitution itself here imposes speech obligations upon the government's professional employee. A prosecutor has a constitutional obligation to learn of, to preserve, and to communicate with the defense about exculpatory and impeachment evidence in the government's possession. *Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *Brady, supra.* So, for example, might a prison doctor have a similar constitutionally related professional obligation **1975 to communicate with superiors about seriously unsafe or unsanitary conditions in the cellblock. Cf. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). There may well be other examples.

Where professional and special constitutional obligations are both present, the need to protect the employee's speech is augmented, the need for broad government authority to control that speech is likely diminished, and administrable standards are quite likely available. Hence, I would find that the Constitution mandates special protection of employee speech in such circumstances. Thus I would apply the *Pickering* balancing test here.

III

While I agree with much of Justice SOUTER's analysis, I believe that the constitutional standard he enunciates fails *448 to give sufficient weight to the serious managerial and administrative concerns that the majority describes. The standard would instruct courts to apply *Pickering* balancing in all cases, but says that the government should prevail unless the employee (1) "speaks on a matter of unusual importance," and (2) "satisfies high standards of responsibility in the way he does it." *Ante,* at 1967 (dissenting opinion). Justice SOUTER adds that "only comment on official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety can weigh out in an employee's favor." *Ibid.*

There are, however, far too many issues of public concern, even if defined as "matters of unusual importance," for the screen to screen out very much. Government administration typically involves matters of public concern. Why else would government be involved? And "public issues," indeed, matters of "unusual importance," are often daily bread-and-butter concerns for the police, the intelligence agencies, the military, and many whose jobs involve protecting the public's health, safety, and the environment. This aspect of Justice SOUTER's "adjustment" of "the basic *Pickering* balancing scheme," *ibid.,* is similar to the Court's present insistence that speech be of "legitimate news interest" when the employee speaks only as a private citizen, see *San Diego v. Roe,* 543 U.S. 77, 83–84, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) *(per curiam).* It gives no extra weight to the government's augmented need to direct speech that is an ordinary part of the employee's job-related duties.

Moreover, the speech of vast numbers of public employees deals with wrongdoing, health, safety, and honesty: for example, police officers, firefighters, environmental protection agents, building inspectors, hospital workers, bank regulators, and so on. Indeed, this categorization could encompass speech by an employee performing almost any public function, except perhaps setting electricity rates. Nor do these *449 categories bear any obvious relation to the constitutional importance of protecting the job-related speech at issue.

Garcetti v. Ceballos, 547 U.S. 410 (2006)

126 S.Ct. 1951, 87 Empl. Prac. Dec. P 42,353, 164 L.Ed.2d 689, 74 USLW 4257...

The underlying problem with this breadth of coverage is that the standard (despite predictions that the government is likely to *prevail* in the balance unless the speech concerns "official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety," *ante*, at 1967 (SOUTER, J., dissenting)), does not avoid the judicial need to *undertake the balance* in the first place. And this form of judicial activity—the ability of a dissatisfied employee to file a complaint, engage in discovery, and insist that the court undertake a balancing of interests—itself may interfere unreasonably with both the managerial function (the ability of the employer to control the way in which an employee performs his **1976** basic job) and with the use of other grievance-resolution mechanisms, such as arbitration, civil service review boards, and whistle-blower remedies, for which employees and employers may have bargained or which legislatures may have enacted.

At the same time, the list of categories substantially overlaps areas where the law already provides nonconstitutional protection through whistle-blower statutes and the like. See *ante*, at 1962 (majority opinion); *ante*, at 1970 – 1971 (SOUTER, J., dissenting). That overlap diminishes the need for a constitutional forum and also means that adoption of the test would authorize Federal Constitution-based legal actions that threaten to upset the legislatively struck (or administratively struck) balance that those statutes (or administrative procedures) embody.

## IV

I conclude that the First Amendment sometimes does authorize judicial actions based upon a government employee's speech that both (1) involves a matter of public concern and also (2) takes place in the course of ordinary job-related duties. **\*450** But it does so only in the presence of augmented need for constitutional protection and diminished risk of undue judicial interference with governmental management of the public's affairs. In my view, these conditions are met in this case and *Pickering* balancing is consequently appropriate.

With respect, I dissent.

### All Citations

547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689, 87 Empl. Prac. Dec. P 42,353, 74 USLW 4257, 152 Lab.Cas. P 60,203, 24 IER Cases 737, 06 Cal. Daily Op. Serv. 4453, 2006 Daily Journal D.A.R. 6495, 19 Fla. L. Weekly Fed. S 203

---

Footnotes

\*  The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

\*  See, e.g., *Branton v. Dallas*, 272 F.3d 730 (C.A.5 2001) (police internal investigator demoted by police chief after bringing the false testimony of a fellow officer to the attention of a city official); *Miller v. Jones*, 444 F.3d 929, 936 (C.A.7 2006) (police officer demoted after opposing the police chief's attempt to "us[e] his official position to coerce a financially independent organization into a potentially ruinous merger"); *Delgado v. Jones*, 282 F.3d 511 (C.A.7 2002) (police officer sanctioned for reporting criminal activity that implicated a local political figure who was a good friend of the police chief); *Herts v. Smith*, 345 F.3d 581 (C.A.8 2003) (school district official's contract was not renewed after she gave frank testimony about the district's desegregation efforts); *Kincade v. Blue Springs*, 64 F.3d 389 (C.A.8 1995) (engineer fired after reporting to his supervisors that contractors were failing to complete dam-related projects and that the resulting dam might be structurally unstable); *Fox v. District of Columbia*, 83 F.3d 1491, 1494 (C.A.D.C.1996) (D.C. Lottery Board security officer fired after informing the police about a theft made possible by "rather drastic managerial ineptitude").

1  It seems stranger still in light of the majority's concession of some First Amendment protection when a public employee repeats statements made pursuant to his duties but in a separate, public forum or in a letter to a newspaper. *Ante*, at 1961.

2  I do not say the value of speech "pursuant to ... duties" will always be greater, because I am pessimistic enough to expect that one response to the Court's holding will be moves by government employers to expand stated job descriptions to include more official duties and so exclude even some currently protectable speech from First Amendment purview. Now that the government can freely penalize the school personnel officer for criticizing the principal because speech on the subject falls within the personnel officer's job responsibilities, the government may well try to limit the English teacher's options by the simple expedient of defining teachers' job responsibilities expansively, investing them with a

Garcetti v. Ceballos, 547 U.S. 410 (2006)
126 S.Ct. 1951, 87 Empl. Prac. Dec. P 42,353, 164 L.Ed.2d 689, 74 USLW 4257...

general obligation to ensure sound administration of the school. Hence today's rule presents the regrettable prospect that protection under *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), may be diminished by expansive statements of employment duties.

The majority's response, that the enquiry to determine duties is a "practical one," *ante,* at 1961, does not alleviate this concern. It sets out a standard that will not discourage government employers from setting duties expansively, but will engender litigation to decide which stated duties were actual and which were merely formal.

3 R. Frost, Two Tramps in Mud Time, Collected Poems, Prose, & Plays 251, 252 (R. Poirier & M. Richardson eds.1995).

4 Not to put too fine a point on it, the Human Resources Division of the Los Angeles County District Attorney's Office, Ceballos's employer, is telling anyone who will listen that its work "provides the personal satisfaction and fulfillment that comes with knowing you are contributing essential services to the citizens of Los Angeles County." Career Opportunities, http://da.co.la.ca.us/hr/default.htm (all Internet materials as visited May 25, 2006, and available in Clerk of Court's case file).

The United States expresses the same interest in identifying the individual ideals of a citizen with its employees' obligations to the Government. See Brief as *Amicus Curiae* 25 (stating that public employees are motivated to perform their duties "to serve the public"). Right now, for example, the U.S. Food and Drug Administration is appealing to physicians, scientists, and statisticians to work in the Center for Drug Evaluation and Research, with the message that they "can give back to [their] community, state, and country by making a difference in the lives of Americans everywhere." Career Opportunities at CDER: You Can Make a Difference, http://www.fda.gov/cder/career/default.htm. Indeed, the Congress of the United States, by concurrent resolution, has previously expressly endorsed respect for a citizen's obligations as the prime responsibility of Government employees: "Any person in Government Service should: ... [p]ut loyalty to the highest moral principles and to country above loyalty to persons, party, or Government department," and shall "[e]xpose corruption wherever discovered," Code of Ethics for Government Service, H. Con. Res. 175, 85th Cong., 2d Sess., 72 Stat. B12. Display of this Code in Government buildings was once required by law, 94 Stat. 855; this obligation has been repealed, Office of Government Ethics Authorization Act of 1996, Pub.L. 104–179, § 4, 110 Stat. 1566.

5 As I also said, a public employer is entitled (and obliged) to impose high standards of honesty, accuracy, and judgment on employees who speak in doing their work. These criteria are not, however, likely to discourage meritless litigation or provide a handle for summary judgment. The employee who has spoken out, for example, is unlikely to blame himself for prior bad judgment before he sues for retaliation.

6 According to the majority's logic, the litigation it encourages would have the unfortunate result of "demand[ing] permanent judicial intervention in the conduct of governmental operations," *ante,* at 1961.

7 Even though this Court has recognized that 42 U.S.C. § 1983 "does not authorize a suit for every alleged violation of federal law," *Livadas v. Bradshaw,* 512 U.S. 107, 132, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994), the rule is that " § 1983 remains a generally and presumptively available remedy for claimed violations of federal law," *id.,* at 133, 114 S.Ct. 2068. Individual enforcement under § 1983 is rendered unavailable for alleged violations of federal law when the underlying statutory provision is part of a federal statutory scheme clearly incompatible with individual enforcement under § 1983. See *Rancho Palos Verdes v. Abrams,* 544 U.S. 113, 119–120, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005).

8 Del.Code Ann., Tit. 29, § 5115 (2003); Fla. Stat. § 112.3187 (2003); Haw.Rev.Stat. § 378–61 (1993); Ky.Rev.Stat. Ann. § 61.101 (West 2005); Mass. Gen. Laws, ch. 149, § 185 (West 2004); Nev.Rev.Stat. § 281.611 (2003); N.H.Rev.Stat. Ann. § 275–E:1 (Supp.2005); Ohio Rev.Code Ann. § 4113.51 (Lexis 2001); Tenn.Code Ann. § 50–1–304 (2005).

9 Ala.Code § 36–26A–1 *et seq.* (2001); Colo.Rev.Stat. § 24–50.5–101 *et seq.* (2004); Iowa Code § 70A.28 *et seq.* (2005); Kan. Stat. Ann. § 75–2973 (2003 Cum.Supp.); Mo.Rev.Stat. § 105.055 (2004 Cum.Supp.); N.C. Gen.Stat. Ann. § 126–84 (Lexis 2003); Okla. Stat., Tit. 74, § 840–2.5 *et seq.* (West Supp.2005); Wash. Rev.Code § 42.40.010 (2004); Wyo. Stat. Ann. § 9–11–102 (2003).

10 Idaho Code § 6–2104(1)(a) (Lexis 2004); Me.Rev.Stat. Ann., Tit. 26, § 833(2) (1988); Mass. Gen. Laws, ch. 149, § 185(c)(1) (West 2004); N.H.Rev.Stat. Ann. § 275–E:2(II) (1999); N.J. Stat. Ann. § 34:19–4 (West 2000); N.Y. Civ. Serv. Law Ann. § 75–b(2)(b) (West 1999); Wyo. Stat. Ann. § 9–11–103(b) (2003).

11 Kan. Stat. Ann. § 75–2973(d)(2) (2003 Cum.Supp.); Ky.Rev.Stat. Ann. § 61.102(1) (West 2005); Mo.Rev.Stat. § 105.055(2) (2004 Cum.Supp.); Okla. Stat., Tit. 74, § 840–2.5(B)(4) (West 2005 Supp.); Ore.Rev.Stat. § 659A.203(1)(c) (2003).

12 See n. 4, *supra.*

Garcetti v. Ceballos, 547 U.S. 410 (2006)
126 S.Ct. 1951, 87 Empl. Prac. Dec. P 42,353, 164 L.Ed.2d 689, 74 USLW 4257...

13    This case comes to the Court on the motions of petitioners for summary judgment, and as such, "[t]he evidence of [Ceballos] is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

14    Sundstedt demoted Ceballos to a trial deputy; his only murder case was reassigned to a junior colleague with no experience in homicide matters, and no new murder cases were assigned to him; then-District Attorney Gil Garcetti, relying in part on Sundstedt's recommendation, denied Ceballos a promotion; finally, Sundstedt and Najera transferred him to the office's El Monte Branch, requiring longer commuting. Before transferring Ceballos, Najera offered him a choice between transferring and remaining at the Pomona Branch prosecuting misdemeanors instead of felonies. When Ceballos refused to choose, Najera transferred him.

15    The county petitioners' position on these claims is difficult to follow or, at least, puzzling. In their motion for summary judgment, they denied that any of their actions was responsive to Ceballos's criticism of the sheriff's affidavit. *E.g.,* App. 159–160, 170–172 (maintaining that Ceballos was transferred to the El Monte Branch because of the decreased workload in the Pomona Branch and because he was next in a rotation to go there to serve as a "filing deputy"); *id.,* at 160, 172– 173 (contending that Ceballos's murder case was reassigned to a junior colleague to give that attorney murder trial experience before he was transferred to the Juvenile Division of the District Attorney's Office); *id.,* at 161–162, 173–174 (arguing that Ceballos was denied a promotion by Garcetti despite Sundstedt's stellar review of Ceballos, when Garcetti was unaware of the matter in *People v. Cuskey,* the criminal case for which Ceballos wrote the pertinent disposition memorandum). Their reply to Ceballos's opposition to summary judgment however, shows that petitioners argued for a *Pickering* assessment (for want of a holding that Ceballos was categorically disentitled to any First Amendment protection) giving great weight in their favor to workplace disharmony and distrust caused by Ceballos's actions. *E.g.,* App. 477–478.

**End of Document**    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 7

856 F.3d 456
United States Court of Appeals, Sixth Circuit.

Mark W. MAYHEW, Plaintiff-Appellant,
v.
TOWN OF SMYRNA, TENNESSEE;
Harry Gill, Defendants-Appellees.

No. 16-5103
|
Argued: January 25, 2017
|
Decided and Filed: May 11, 2017

**Synopsis**
**Background:** Former employee of town's wastewater-treatment plant brought action against town and its town manager, alleging that he was terminated in retaliation for engaging in activity protected by the First Amendment. The United States District Court for the Middle District of Tennessee, Aleta A. Trauger, J., 2016 WL 128524, granted summary judgment in favor of town and manager. Employee appealed.

**Holdings:** The Court of Appeals, Griffin, Circuit Judge, held that:

issue of whether employee engaged in protected speech was a question of law;

employee did not engage in protected speech when he reported fellow supervisor's misconduct;

employee adequately pleaded retaliation claim based on complaints about town's hiring practices; and

employee's complaints about town's failure to follow hiring policies addressed a matter of public concern.

Affirmed in part, reversed in part, and remanded.

**\*459** Appeal from the United States District Court for the Middle District of Tennessee at Nashville. No. 3:14-cv-01653—Aleta Arthur Trauger, District Judge.

**Attorneys and Law Firms**

ARGUED: Douglas B. Janney III, Nashville, Tennessee, for Appellant. Robert M. Burns, HOWELL & FISHER, PLLC, Nashville, Tennessee, for Appellees. ON BRIEF: Douglas B. Janney III, Nashville, Tennessee, for Appellant. Robert M. Burns, Brooke McLeod Coplon, HOWELL & FISHER, PLLC, Nashville, Tennessee, for Appellees.

Before: GILMAN, GRIFFIN, and STRANCH, Circuit Judges.

**OPINION**

GRIFFIN, Circuit Judge.

Mark Mayhew alleges the Town of Smyrna, Tennessee, and its city manager, Harry Gill, terminated his employment in retaliation for engaging in two distinct acts protected by the First Amendment: reporting violations of federal and state regulatory requirements at the town's wastewater-treatment plant; and voicing concerns regarding Smyrna's hiring practices. The district court disagreed and entered summary judgment in defendants' favor. We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

I.

Plaintiff was a long-time employee of Smyrna's wastewater-treatment plant. The plant is subject to extensive regulation by the Environmental Protection Agency ("EPA") and the Tennessee Department of Environment and Conservation ("TDEC"), including various water-quality permit and reporting requirements under the Clean Water Act's National Pollutant Discharge Elimination System ("NPDES"). *See generally* 33 U.S.C. § 1342. TDEC administers the plant's NPDES permit, which sets the parameters for the limits on certain agents or chemical compounds that the plant is allowed to discharge into public waterways. The regulatory regime requires the plant to conduct various water and other treatment by-products tests, provide these results to the EPA (by way of an "annual sludge report") and TDEC (by way of a "monthly operating report" ("MOR") and a "monthly discharge monitoring report" ("DMR")),

and report any discharges in violation of its permit's parameters to TDEC.

Mayhew was the plant's lab supervisor, overseeing the collection and analysis of test samples as part of the plant's reporting requirements. His duties included: (1) ensuring lab activities met EPA and TDEC quality-control standards and followed "proper procedures and documentation"; (2) performing all work necessary to maintain the plant's NPDES permit; (3) maintaining records in compliance with applicable regulations; (4) reviewing daily records "to ensure accuracy and completeness"; (5) completing MORs and DMRs; and (6) reviewing and documenting "all OSHA, Federal, State and City regulations, as they impact the wastewater plant laboratory and report[ing] any appropriate *460 situations and accidents immediately to management."

Smyrna also mandated that Mayhew obtain a TDEC "Grade IV" wastewater-treatment certification. This certification required Mayhew to "comply with the laws, rules, permit requirements, or orders of any governmental agency or court which govern the water supply system or the wastewater system he/she operates." TDEC Rule 0400-49-01-.11(2). Under TDEC's certification requirements, Mayhew could have his certification revoked if he failed to "comply with the monitoring, sampling, analysis, or reporting requirements for a water supply system facility or wastewater system facility," failed to "notify" TDEC of conditions that are "violative of a standard of water quality promulgated by any government agency," or prepared "laboratory analysis results for the system that ... [c]ontain inaccurate data and are known or should be known ... to be false." TDEC Rule 0400-49-01-.11(2)(b-d), (4)(c).

As lab supervisor, Mayhew learned that one of the plant's fellow supervisors, chief operator Leland Noble, was engaging in questionable conduct related to the plant's collection, recording, and reporting of its water samples. This conduct included: (1) pressuring Mayhew to either not report certain results or change results to be submitted to the EPA and TDEC; (2) refusing to allow Mayhew to sample on certain days based on plant conditions to avoid bad results, thus "cherry picking" data; (3) changing Mayhew's collected test results; (4) expanding sample sizes to "throw out any bad numbers," but reporting as if the sample size was smaller; and (5) logging incomplete tests as complete.

Mayhew reported his concerns about Noble's actions to then-plant manager Mike Roberts beginning in February 2014. He went to Roberts first because he wanted to "work[ ] within the chain of command." Roberts responded to these concerns by looking into them himself. Noble's conduct "increased in intensity and activity" to almost a "daily basis" from February to June 2014.

Following Roberts's resignation in June 2014 after an investigation by Smyrna officials on an unrelated matter, Mayhew began reporting his concerns to Roberts's supervisors, the assistant director of utilities Mike Parker, utilities operation manager Aubrey Blanks, and director of utilities Mike Strange. Strange and Parker relayed Mayhew's complaints to Smyrna's city manager, defendant Harry Gill. Strange and Parker also conducted follow-up conversations with several employees at the plant who raised various concerns about management (including about Noble) during their initial investigation into Roberts's misconduct. When Mayhew raised his concerns about Noble in these conversations, Strange and Parker responded by telling him that "they would take care of this matter." According to Mayhew, Strange and Parker "ma[de] some progress" in this regard.

But then, Gill promoted Noble to plant manager, and promoted Gill's nephew, Kyle Gill, to chief operator. He did so without advertising the positions to the public, requiring the two to apply, or permitting anyone else to apply, interview, or be considered for the positions. And he did so, according to Mayhew, despite them failing to possess certain qualifications set forth in the respective job descriptions.

Following these promotions in the face of Mayhew's reports about Noble's conduct, Mayhew "felt [he] had no other alternative" but to "document this with [Smyrna Human Resources Director] Jeff Craig" and with Gill. In his words, it was "imperative to escalate my documentation activities that management was alerted to." Accordingly, *461 he emailed Strange and Parker on July 1, 2014, complaining about Noble's and Kyle Gill's lack of qualifications, their hiring outside of "normal hiring protocol," and commenting that he found "it disturbing that the Town Manager would promote someone [ (Noble) ] that [sic] is clearly responsible for the present working conditions of having to work in an environment of possible retaliation which include

hostilities in the workplace, the very same person that [sic] put pressure on [him] to hide violations, of which [he] refused to do." Mayhew characterized Noble's hiring as putting Mayhew "in a precarious position," based on his concern that Noble would attempt to manipulate, retaliate against, or fire him.

Strange forwarded Mayhew's email to Gill, who was "furious," and "offended that [Mayhew] was questioning [his] ethics with respect to who[m he] hired." Gill found the email to be "insubordinate" and "disrespectful," as it "implied that [Mayhew] would be unwilling to work with [Noble]," and directed Strange to suspend Mayhew.

Mayhew, Gill, Strange, Craig, and Smyrna's town attorney, Jeff Peach, met on July 7, 2014. The parties significantly dispute who said what at this meeting, but we view the facts in the light most favorable to Mayhew. Gill "started right off" by telling Mayhew how "upset he was" about the email and that "[w]e will see if you still have a job today." When asked whether Mayhew could work with Noble, Mayhew stated "Yes, I would—I'm able to work with him, and I will do my very best, sir." Gill then accused Mayhew of being insubordinate and "bitter against Leland Noble," to which Mayhew responded: "No, sir. I'm not bitter towards him. This has nothing to do with personal issues. It has to do with what I reported." Gill also told Mayhew that he could "hire any way he sees fit." Gill terminated Mayhew's employment at the end of the meeting. He did so for two reasons: (1) "there wasn't really a full declaration that he was willing to work with [Noble]. He said, I would do my best"; and (2) "his work ethics could be [compromised] if he had to work with [Noble]."

Mayhew commenced this litigation shortly thereafter, alleging defendants violated the First Amendment and Tennessee's Public Protection Act by terminating his employment in retaliation for his reporting activities. Following discovery, the district court granted summary judgment in favor of defendants as to plaintiff's First Amendment retaliation claim and declined to exercise supplemental jurisdiction over his state-law claim. Having refiled his Public Protection Act claim in Tennessee state court, Mayhew appeals only the district court's dismissal of his First Amendment claim.

## II.

We review the district court's grant of summary judgment de novo. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013). Summary judgment is proper when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Although we view the evidence in a light most favorable to the nonmovant, *Rogers*, 737 F.3d at 1030, "the plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III.

### A.

It is long "settled that a state cannot condition public employment on a **\*462** basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). However, because "government offices could not function if every employment decision became a constitutional matter," *id.* at 143, 103 S.Ct. 1684, a public employee's First Amendment rights are narrower than the citizenry at large. *See, e.g., Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). That is, "the First Amendment protects a public employee's right, *in certain circumstances*, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) (emphasis added).

A public employee alleging First Amendment retaliation must satisfy three requirements. *Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 337–38 (6th Cir. 2010). First, the employee must speak on "matters of public concern." *Id.* at 337 (citing *Connick*, 461 U.S. at 143, 103 S.Ct. 1684). Second, the employee must speak as a private citizen and not as an employee pursuant to his official duties. *Id.* at 338 (citing *Garcetti*, 547 U.S. at 421, 126 S.Ct. 1951). Third, the employee must show that his speech interest outweighs "the interest of the State, as an employer, in

promoting the efficiency of the public services it performs through its employees." *Id.* (quoting *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731).

## B.

We begin with a procedural question: whether the Supreme Court's most recent First Amendment public employment case, *Lane v. Franks*, —— U.S. ——, 134 S.Ct. 2369, 189 L.Ed.2d 312 (2014), abrogated *Connick* and our circuit's subsequent case law holding that the question of "whether ... a public employee's speech is protected [i]s one of law, not one of both fact and law." *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 350 (6th Cir. 2010).

In *Connick*, the Supreme Court unequivocally stated that "[t]he inquiry into the protected status of speech is one of law, not fact." 461 U.S. at 148 n.7, 103 S.Ct. 1684. However, the Supreme Court's holding in *Garcetti* "that the question of whether a statement was spoken as a public employee or as a private citizen for First Amendment purposes was 'a practical one,' requiring a fact-specific inquiry into the 'duties an employee actually is expected to perform,' " resulted in a circuit split as to "whether the inquiry into the protected status of speech remains one purely of law as stated in *Connick*, or if instead *Garcetti* has transformed it into a mixed question of fact and law." *Fox*, 605 F.3d at 350 (quoting *Garcetti*, 547 U.S. at 424–25, 126 S.Ct. 1951 and *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 (9th Cir. 2008)).

As we summarized in *Fox*, the Third, Seventh, Eighth, and Ninth Circuits have concluded that "whether the speech in question was spoken as a public employee or a private citizen presents a mixed question of law and fact," while the D.C., Fifth, and Tenth Circuits have stayed true to *Connick*'s holding. *Id.* (citations omitted). We found this circuit split to be "ultimately irrelevant" in *Fox* because "[i]n our post-*Garcetti* opinions we have consistently described the question of whether, in a First Amendment retaliation action, a public employee's speech is protected as one of law, not one of both fact and law." *Id.* at 350. We also noted, given the summary judgment standard, a district court is required to take the plaintiff's factual allegations as true. In *Fox*, however, there were not any genuine issues of material fact regarding the scope of the plaintiff's employment. **\*463** *Id.* at 351 (citing *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Following *Fox*, we have consistently analyzed the protected status of an employee's conduct as solely one of law. *See, e.g., Dixon v. Univ. of Toledo*, 702 F.3d 269, 274 (6th Cir. 2012); *Westmoreland v. Sutherland*, 662 F.3d 714, 718 (6th Cir. 2011); *see also Rorrer v. City of Stow*, 743 F.3d 1025, 1047 (6th Cir. 2014) (relying on *Connick*, among others, for this proposition).

Mayhew argues *Lane* changes this landscape. The issue before the Court in *Lane* was "whether the First Amendment protects a public employee who provides truthful sworn testimony, compelled by subpoena, outside the scope of his ordinary job responsibilities." 134 S.Ct. at 2378. The Eleventh Circuit concluded that, because the employee testified in a public corruption trial about matters "learned of ... in the course of his employment ..., *Garcetti* requires that his testimony be treated as the speech of an employee rather than that of a citizen." *Id.* at 2379. The Supreme Court rejected this broad reading, emphasizing *Garcetti*'s focus on the *scope* of an employee's duties, not *where* an employee learns of the content of his speech:

> But *Garcetti* said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment.... [T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee —rather than citizen—speech. *The critical question under* Garcetti *is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.*

*Id.* (emphasis added). We have subsequently characterized *Lane* as "narrowing" *Garcetti* by reason of the Supreme Court's addition of " 'ordinary' as a modifier to the scope of an employer's job duties, and by *Lane*'s admonishment that speech is not transformed into employee—rather than citizen—speech simply because it concerns information

Mayhew v. Town of Smyrna, Tennessee, 856 F.3d 456 (2017)
41 IER Cases 1830

acquired by virtue of the speaker's public employment." *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015) (brackets, citations, and quotation marks omitted).

Seizing upon *Lane*'s repeated references to "ordinary job responsibilities" and "ordinary job duties," 134 S.Ct. at 2375, 2377–78, 2381, and *Boulton*'s "narrowing" characterization, Mayhew argues "*Lane* necessarily requires fact finding into whether parts of speech are within the scope of an employee's 'ordinary' or usual duties." To this end, he asks that we revisit our determination in *Fox* and follow some of our sister circuits' application of the mixed question of facts and law standard.[1] *See, e.g., Flora v. Cty. of Luzerne*, 776 F.3d 169 (3d Cir. 2015); *Dahlia v. Rodriguez*, 735 F.3d 1060 (9th Cir. 2013) (en banc); *Posey*, 546 F.3d at 1127.

We have consistently applied the question of law standard post-*Lane, see, e.g., Holbrook v. Dumas*, 658 Fed.Appx. 280, 284 n.3 (6th Cir. 2016); *Devlin v. Kalm*, 630 Fed.Appx. 534, 537 (6th Cir. 2015) (per curiam), and see no reason to *464 accept Mayhew's request. *Lane* neither acknowledged *Connick*'s statement that "[t]he inquiry into the protected status of speech is one of law, not fact," 461 U.S. at 148 n.7, 103 S.Ct. 1684, nor referenced the circuit split we identified in *Fox*. Simply, *Lane* did not address the issue and did not overrule *Connick*. It is not our prerogative to set this binding precedent aside until the Supreme Court tells us we must. *See Bosse v. Oklahoma*, —— U.S. ——, 137 S.Ct. 1, 2, 196 L.Ed.2d 1 (2016) (per curiam); *see also Agostini v. Felton*, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (admonishing lower courts against "conclud[ing the Supreme Court's] more recent cases have, by implication, overruled an earlier precedent"). Nor do Mayhew's citations to decisions from our sister circuits support the extension he requests—they either rely upon pre-*Lane* authority for the mixed question of law and fact standard, *see, e.g., Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1260–61 (9th Cir. 2016); *Flora*, 776 F.3d at 175, or were decided before *Lane. See, e.g., Dahlia*, 735 F.3d at 1072; *Posey*, 546 F.3d at 1129. *See also Fox*, 605 F.3d at 350 (collecting authorities).

In sum, the district court did not err by concluding that the determination as to whether Mayhew engaged in protected speech was one of law.

IV.

With this preliminary question resolved, we turn to whether Mayhew's complaints about Noble's misconduct fell outside the scope of his ordinary job responsibilities pursuant to *Lane*, thus constituting speech as a citizen for First Amendment purposes. In construing *Lane*, we have commented that although *Garcetti* carves out an exception to First Amendment protection for speech that "owes its existence to a public employee's professional responsibilities," this exception "must be read narrowly as speech that an employee made in furtherance of the ordinary responsibilities of his employment." *Boulton*, 795 F.3d at 534. Or, in *Lane*'s words, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." 134 S.Ct. at 2379.

Determining whether an employee speaks as a private citizen or as a public employee can be challenging. *See Boulton*, 795 F.3d at 533. The Supreme Court has not "articulate[d] a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Garcetti*, 547 U.S. at 424, 126 S.Ct. 1951. Instead, the "proper inquiry is a practical one." *Id.* To aid in the assessment of a public employee's statement, "we must consider both its content and context." *Fox*, 605 F.3d at 348. In our pre-*Lane* case law, we recognized several non-exhaustive factors to consider, including: the speech's impetus; its setting; its audience; and its general subject matter. *Handy-Clay v. City of Memphis*, 695 F.3d 531, 540 (6th Cir. 2012). We have continued to utilize these "who, where, what, when, why, and how" considerations post-*Lane, see, e.g., Holbrook*, 658 Fed.Appx. at 288; *Stinebaugh v. City of Wapakoneta*, 630 Fed.Appx. 522, 527 (6th Cir. 2015); *Alomari v. Ohio Dep't of Pub. Safety*, 626 Fed.Appx. 558, 567 (6th Cir. 2015), which inform the answer to *Lane*'s "critical question": "whether the speech at issue is itself ordinarily within the scope of an employee's duties." 134 S.Ct. at 2379.

Mayhew's reporting of Noble's misconduct to Roberts and then to those in City Hall falls within his "ordinary job responsibilities." After all, his job was to oversee all water-sample testing required by state and federal regulations, including *465 the plant's recording and reporting requirements. Most notably, he was required

Mayhew v. Town of Smyrna, Tennessee, 856 F.3d 456 (2017)

41 IER Cases 1830

to "review and document all OSHA, Federal, State and City regulations, as they impact the wastewater plant laboratory and *report any appropriate situations and accidents immediately to management.*" (Emphasis added.) And report to management he did.

Mayhew's rebuttal is not persuasive. In his deposition, Mayhew took the position that *any* reporting of illegal activity was outside the scope of his job duties because he had never done so before and his job was to ensure the accuracy of reports, not to submit reports about others' misconduct. Mayhew thus contends his complaints about Noble's conduct were borne out of his civic and "moral responsibility," not his job functions.

This crabbed reading of his admitted job duties does not comport with *Lane*'s instruction that we focus on his "ordinary job responsibilities" and *Garcetti*'s mandate that we look at job duties *practically*. Mayhew's entire function at the plant was to ensure water-testing standards were in compliance with federal and state regulatory mandates. Yes, his job description did not specifically call upon him to report illegal conduct to management. But, in the context of "all OSHA, Federal, State and City regulations," it required him to "report any appropriate situations and accidents immediately to management." Mayhew does not dispute this—he admits he reported up the chain of command and did so because Noble's conduct "interfer[ed] with [his] ability to do [ ]his job." He also acknowledged that his TDEC certification required him to additionally report violations (to TDEC, which he did not).

Nor does *Garcetti*'s caution against parsing job descriptions in order to determine the scope of an employee's professional duties assist Mayhew, 547 U.S. at 424–25, 126 S.Ct. 1951, for job descriptions are not irrelevant. Indeed, we have repeatedly recognized the converse: "ad hoc or de facto duties can fall within the scope of an employee's official responsibilities despite not appearing in any written job description." *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 544 (6th Cir. 2007). It would certainly be an anomaly to altogether ignore the role job descriptions play for purposes of defining an employee's job duties—especially in a case like this, where the employee does not contest any of the formal aspects of the job description requiring the employee to report issues to management. It would also be in discord with our recent reiteration in *Boulton* that

"most jobs carry with them an inherent duty of internal communication." 795 F.3d at 533; *see also Housey v. Macomb Cty.*, 534 Fed.Appx. 316, 322 (6th Cir. 2013) (rejecting the argument that an employee's job duties did not include reporting misconduct when his responsibilities included ensuring compliance with policies, reporting "trouble spots and recommending corrective actions"); *Haynes v. City of Circleville*, 474 F.3d 357, 364 (6th Cir. 2007) (police officer tasked with training police dogs was "carrying out his professional responsibilities" and not speaking as a private citizen when he complained—without any obligation to do so—about the effects of reduced training).

We also do not agree with Mayhew that his reporting outside the plant to others within the city government fell outside his ordinary job responsibilities. This argument runs headlong into our precedent involving escalating reports up the organizational chart: "[W]hen a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job." *Fox*, 605 F.3d at 350 (citation omitted). It **\*466** also asks us to view his job impractically: he was required to report "to management," which is not limited to those at the plant. Mayhew admitted his reports outside the plant went to "upper management," were all within his chain of command, and were about matters that were part of his ordinary job responsibilities. *Handy-Clay*'s distinction between reports in and outside that employee's department—a case Mayhew tells us is on point—is therefore not helpful to him. 695 F.3d at 542.

Allegations of violations of federal and state regulations should be taken seriously, especially when they involve the possibility of risk to the general public. *Lane* highlights the value we place on permitting public employees to comment on matters concerning their employment as they are "uniquely qualified to comment on matters concerning government policies that are of interest to the public at large." 134 S.Ct. at 2380 (quoting *San Diego v. Roe*, 543 U.S. 77, 80, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004)). Our holding that Mayhew did not engage in protected speech when he complained about Noble's misconduct should not be construed as authorizing public employers to terminate employees complaining about illegal conduct. But given plaintiff's explicit job responsibilities to oversee the plant's water-sampling regime and report any issues regarding that regime, the district court correctly granted

summary judgment in favor of defendants as to Mayhew's First Amendment claim to the extent that it was grounded in his reports of Noble's misconduct.

## V.

Mayhew's last issue on appeal is whether the district court erred in concluding he failed to advance a claim that he engaged in protected conduct when he complained about Smyrna promoting Noble and Kyle Gill, irrespective of its typical hiring practices and their qualifications (or lack thereof). We agree with Mayhew that the district court committed reversible error by holding Mayhew's complaint never pled this ground in support of his First Amendment claim, and that even if he did, it failed on the merits.

## A.

The district court first dismissed Mayhew's claim on a procedural ground: "Mayhew did not explicitly argue that these complaints constitute a basis for his claim of First Amendment retaliation that is separate from, and independent of, his reporting of violations at the Plant until he improperly raised this argument in his Sur-Reply." Rather, despite acknowledging "the factual allegations regarding Mayhew's concerns about the promotions are detailed in the Complaint," the district court read Mayhew's First Amendment claim to encompass only his complaints about Noble's conduct:

> The gravamen of the Complaint is that the plaintiff was retaliated against for speaking out about water treatment processing and reporting violations, not about failure to adhere to hiring and promotion policies. This new theory truly tortures the language of the Complaint and the plaintiff's articulation of his theory of the case set out in the Initial Case Management Order and may not be

injected into the case this late in the game.

We do not read Mayhew's complaint so narrowly.

The complaint more than adequately put defendants on notice of a First Amendment claim grounded in Smyrna's hiring practices within the meaning of Federal Rule of Civil Procedure 8. Paragraphs 10-13 detail Mayhew's very specific concerns regarding the manner in which **\*467** Gill promoted Noble and Kyle Gill, including that they did not meet minimum qualifications for their respective promotions, and that Smyrna did not follow its normal job-posting process in awarding these promotions. The next paragraph then sets forth the complaint's central theory: Gill fired Mayhew for sending his July 1, 2014, email. As described in Paragraph 14, that email documents Mayhew's three concerns:

> On July 1, 2014, at 3:43 p.m., Mr. Mayhew sent an email to Mr. Strange and Mr. Parker documenting Defendant Gill's circumvention of "normal hiring protocol" and practice; reiterating that he had reported concerns about Mr. Noble's conduct that "management was alerted to," including Mr. Noble's pressuring him to "hide violations, which Mr. Mayhew refused to do"; and reiterating his fear of "retaliation" for reporting, opposing, and refusing to remain silent about illegal activities.

(Brackets omitted.) Given this factual specificity connecting Mayhew's allegation that Smyrna did not properly follow hiring protocol, to complaining about this in his email, and to being fired for sending his email, the complaint unambiguously provided defendants with notice of a First Amendment claim based on these factual grounds. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (a complaint need only "give the defendant fair notice of what the claim is and the grounds upon which it rests") (citation and ellipsis omitted); *cf. Johnson v. City of Shelby*, —— U.S. ——, 135 S.Ct. 346, 346, 190 L.Ed.2d 309 (2014) (per curiam) (the Federal Rules of Civil Procedure "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted"). The district court erred in concluding to the contrary.

Mayhew v. Town of Smyrna, Tennessee, 856 F.3d 456 (2017)

41 IER Cases 1830

## B.

We review the district court's alternative holding—that "even if the court were to consider Mayhew's statements about the promotions to be a separate basis for Mayhew's claim of retaliation, they are not actionable under the First Amendment"—de novo. *Gillis v. Miller*, 845 F.3d 677, 689 (6th Cir. 2017). The district court concluded Mayhew's email represented a "personal concern regarding his job security" and his "dissatisfaction with Gill's decision to promote Noble," and was therefore best characterized as "an internal employee grievance." It also reasoned that Mayhew's complaints did not address a matter of public concern because he raised them only internally, as opposed to selecting a "mode of communication ... that would 'bring to light actual or potential wrongdoing or breach of public trust.' " (quoting *Connick*, 461 U.S. at 148, 103 S.Ct. 1684). The district court reasoned improperly.

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 134 S.Ct. at 2380 (internal quotation marks and citation omitted). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684. We examine "the *point* of the speech in question," *Boulton*, 795 F.3d at 534 (citation omitted), as "the pertinent question is not *why* the employee spoke, but *what* he said." *Westmoreland*, 662 F.3d at 719 (citation omitted). It is not "necessary for the entire expression to address matters of public concern, as long as some **\*468** portion of the speech does." *Id.* (citing *Connick*, 461 U.S. at 149, 103 S.Ct. 1684).

We have "recognized that the most difficult cases to adjudicate are 'mixed speech' cases, i.e., those in which the speech for which the employee claims First Amendment protection arises in the context of an employment grievance or other personnel dispute, but where the employee claims that some part of the speech also touches upon matters of public concern." *Farhat v. Jopke*, 370 F.3d 580, 590 (6th Cir. 2004). And, following the Supreme Court's lead, we have consistently reiterated

that allegations of public corruption "are exactly the type of statements that demand strong First Amendment protections." *Handy-Clay*, 695 F.3d at 543–44 (collecting cases). This was a tenet of *Lane* as well, where the Court stated "[t]he content of Lane's testimony—corruption in a public program and misuse of state funds—obviously involves a matter of significant public concern." 134 S.Ct. at 2380.

There is no doubting Mayhew's complaints sound like an employee raising a personal grievance about a disliked supervisor and bleak future job prospects. One need look no further, as the district court did, to some of the content of his email:

> I'm going to do the best I can but after this most recent activity of bypassing hiring protocol and who was promoted and in the manner they were promoted, *I don't feel my position with the Town of Smyrna is secure.*

> This latest activity of placing Leland in a position over me has suddenly placed me in a precarious position. *I feel Leland will attempt to get rid of me and replace me with someone he can control and manipulate.* I feel he will hide NPDES violations if he thinks he can get away with it, as evidenced by the last 5 months of activity. I've seen how Leland has done other people in the past. *I feel he will retaliate against me as it is just his nature.* This is why I feel it necessary to document.

(Emphasis added.)

Yet, the email also extensively documents his concerns with the hiring process in general, raising Noble's misconduct (and Smyrna's alleged disregard for these actions) as an example for why Smyrna should have followed its normal hiring procedures:

> It appears the Town of Smyrna has applied unfair and unequal practices in filling the two highest paid positions at the Smyrna Wastewater Treatment Plant on 6/27/14. It appears the Town Manager has bypassed normal hiring procedures to promote his nephew, Kyle Gill, as well as align him for the [plant] Manager position, by not allowing anyone else to apply for these two positions and circumventing normal hiring protocol.

> The final catalyst that ignited this type [of] email being generated, was Leland Noble being placed in position of authority over me as the new [plant] Manager, of

Mayhew v. Town of Smyrna, Tennessee, 856 F.3d 456 (2017)
41 IER Cases 1830

which he didn't have to apply for or meet qualifications. Leland Noble does not meet the qualifications for this new position, as he does not have a college degree. I was disqualified for not having a degree when I applied for the [plant manager] position in 2004. I stated I have no interest in the Manager position this time but these positions should have been posted like every other position ever was, requiring same qualifications. Also, our department started using interview panels last year which obviously was not done this time either. *Bypassing normal hiring protocol, especially after management was alerted to issues with Mr. Noble magnifies this hiring action.* I find it disturbing that the Town Manager **\*469** would promote someone that is clearly responsible for the present working conditions of having to work in an environment of possible retaliation which include hostilities in the workplace, the very same person that put pressure on me to hide violations, of which I refused to do.

(Emphasis added.)

In short, Mayhew may have had personal reasons for saying some of what he said, but his allegation that Smyrna failed to follow its own hiring policies when it allegedly promoted two unqualified individuals—one being the subject of Mayhew's complaints, and the other the decisionmaker's nephew who was complicit in Noble's illegal activities—reflects his "communications were not made *merely* for personal reasons." *Handy-Clay*, 695 F.3d at 544 (emphasis added); *see also Banks v. Wolfe Cty. Bd. of Educ.*, 330 F.3d 888, 895 (6th Cir. 2003) (holding complaints about "favoritism/nepotism in hiring, the lack of posting and interviewing for job vacancies, and the improper certification of staff" were speech on matters of public concern).

Defendants resist this conclusion by arguing Mayhew's statements went solely up the chain of command, and that he did not allege any violations of the law when raising concerns about the hiring practices. It is on this primary basis they distinguish *Banks*, contending (as did the district court) that our statement in *Banks* about reporting nepotism and violations of hiring protocol being matters of public concern are distinguishable because, there, the plaintiff reported out to a state agency about violations of state law. 330 F.3d at 896–97. But we have never drawn such a narrow distinction when examining the public-concern prong because "constitutional protection for speech on matters of public concern is not premised on the communication of that speech to the public." *Handy-Clay*, 695 F.3d at 544 (citation omitted). Nor must courts limit reports of wrongdoing to illegal acts, for a public concern includes "*any* matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146, 103 S.Ct. 1684 (emphasis added).

For these reasons, the district court erred in holding Mayhew's complaints regarding Smyrna's promotions practices did not constitute speech about a public concern.

VI.

Accordingly, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.[2]

**All Citations**

856 F.3d 456, 41 IER Cases 1830

Footnotes

1    Mayhew first raised this argument before the district court in his sur-reply. Ordinarily, we would not address this untimely argument. *See, e.g., Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 275 (6th Cir. 2010). However, because the district court permitted the sur-reply and addressed the merits of Mayhew's argument, and because the parties have fully addressed the merits on appeal, we make an exception to our general rule. *See Salling v. Budget Rent-A-Car Sys., Inc.*, 672 F.3d 442, 444 (6th Cir. 2012).

2    Defendants did not contest below (or on appeal) Mayhew's contention that (a) Noble's misconduct constituted a matter of public concern, and (b) his complaints regarding Smyrna's hiring practices were made in his capacity as a private citizen. Nor did defendants assert that, under the *Pickering* balancing test, their interests would nonetheless trump Mayhew's protected conduct. Having failed to preserve these issues for appellate review, we express no opinion on them.

End of Document        © 2019 Thomson Reuters. No claim to original U.S. Government Works.