UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Mark Higbee,

    Plaintiff,

v.   Case No. 18-13761

Eastern Michigan University, *et. al.*,   Sean F. Cox
United States District Court Judge

    Defendants.
_____/

# OPINION AND ORDER DENYING INDIVIDUAL DEFENDANTS' MOTION TO DISMISS (ECF No. 29)

In September 2016, racist graffiti appeared on the campus of Eastern Michigan University. Students protested, and the University instituted disciplinary action against the protestors. Almost a year later, a former student was arrested for the vandalism. In the arrest's aftermath, Plaintiff—a history professor at the University—posted a message in a public Facebook group, criticizing the University's response to the graffiti and referring to African American administrators as "'HN in C' functionaries." The University interpreted this phrase as a racial slur and suspended Plaintiff, without pay, for one semester. Plaintiff filed a grievance through his union, and an arbitrator reversed his suspension.

On December 4, 2018, Plaintiff filed this lawsuit, alleging two sets of claims. First, Plaintiff brought retaliatory discharge claims under Michigan's Elliott-Larsen Civil Rights Act ("ELCRA") against the University and its Board of Regents ("the Institutional Defendants"). Second, Plaintiff brought First Amendment retaliation claims, under 42 U.S.C. § 1983, against the individual Regents and other administrators who decided to punish him for the post ("the Individual Defendants").

1

On February 14, 2019, the Individual Defendants filed a motion to dismiss the § 1983 claims, arguing that they are entitled to qualified immunity. (ECF No. 28).[1] For the reasons below, the Court will deny the Individual Defendants' motion.

**BACKGROUND**

Plaintiff Mark Higbee is a Professor of American History at Eastern Michigan University. Defs. Stat. of Material Facts ¶ 1. (ECF No. 27, PageID 94). Higbee teaches courses on African American History. *Id*. at ¶ 2.

In September 2016, racist messages were spray-painted on a residence hall at the University. *Id*. at ¶ 13; Ex. 3 (ECF No. 27-4). More racist graffiti appeared the next month. *Id*. Students protested the graffiti by organizing a peaceful sit-in at a University building. *Id*. After the protesters refused to leave the building at closing time, the University disciplined them by issuing formal reprimands and deferred suspensions. *Id*. The University later dropped all disciplinary action against the protesters. *Id*. Pl.'s Counter-Stat. Of Material Facts ¶ 15. (ECF No. 35, PageID 584).

More than a year after the first act of vandalism, an African American former student of the University was arraigned on criminal charges for creating the graffiti. Defs. Stat. of Material Facts. ¶ 16. In the aftermath of the arraignment, Higbee wrote the following post in "EMUTalk," a public Facebook group:

> EMU administrators, a small group of well paid white guys in suits (plus one woman and a few lower level "HN in C" functionaries), lacked the insight to imagine that they could ever, possibly, be remotely seen as responsible for institutional racist practices. And so they continued to act as the aggrieved party, needlessly alienating

---

[1]The Institutional Defendants also filed a motion to dismiss the ELCRA claims. The Court granted that motion in an opinion and order issued on June 17, 2019. *See Higbee v. Eastern Michigan University, et. al.*, 2019 WL 2502733 (E.D. Mich. June 17, 2019) (ECF No. 41).

students who objected to racism. Why EMU officials, earning six figures or more, took this stance can only be explained by a combination of 1. ignorance about what racism is, 2. overconfidence that they are the good guys, 3. a lack of knowledge of EMU specifically and of higher education generally.

Compl. ¶ 26.

On the first page of the Individual Defendants's brief in support of their motion to dismiss, they argue that "HN in C" is commonly understood to mean "Head Ni**ers in Charge." Individual Defs.' Br. 1 (ECF No. 29, PageID 217) (redaction added). In response, Higbee contends that, among scholars of the African American experience, "HN in C" is commonly understood to mean "Head Negro in Charge." Higbee Aff. ¶ 5. (ECF No. 34, PageID 524-525). Higbee asserts that this phrase has a non-offensive, academic definition. Higbee Aff. ¶ 6-7 (ECF No. 35, PageID 611).[2]

On December 13, 2017, the University suspended Higbee, without pay, for one semester and required him to attend and complete a one-on-one training session with a professional consultant. Compl. at ¶ 27. The University also temporarily banned Higbee from campus and from using its email system. *Id*.

As a member of the University's Chapter of the American Association of University Professors, Higbee grieved his suspension and discipline. *Id*. at ¶ 29. On July 23, 2018 arbitrator Barry Goldman reversed the University's sanctions. *Id*. at ¶ 31.

On December 4, 2018, Higbee filed his seventeen-count Complaint. In the first two counts, Higbee alleged state-law claims of retaliatory discharge against the University and the Board of Regents, respectively. In the other fifteen counts, Higbee alleged First Amendment retaliation

---

[2] At the motion-to-dismiss stage, the Court's analysis is limited to the facts in the complaint. However, the Court includes the parties' positions regarding the meaning of "HN in C" to provide context, and to fully summarize the arguments raised in the parties' briefing.

claims, by way of § 1983, against the individual Regents and University administrators who made the decision to suspend him.[3]

On February 14, 2019, the Individual Defendants filed their pending motion to dismiss, arguing that they are entitled to qualified immunity because they did not violate a clearly established First Amendment right by disciplining Higbee for his use of the term "HN in C." Higbee filed a response to this motion. (ECF No. 33). The Individual Defendants filed a reply. (ECF No. 37). The Court heard oral argument on this motion on May 30, 2019.

**ANALYSIS**

**I.    Applicable Standard**

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. The Court must construe the complaint in the light most favorable to the plaintiff and accept its allegations as true. *DirectTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). To survive a motion to dismiss, the complaint must offer sufficient factual allegations that make the asserted claims plausible on their face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Legal conclusions couched as factual allegations will not suffice. *Rondigo, LLC v. Township of Richmond*, 641 F.3d 673, 670 (6th Cir. 2011). Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

---

[3]The Individual Defendants are the President of the University (James Smith); the Vice President (David Turner); the Assistant Vice President (Wade Tornquist); the Assistant Vice President of Academic Affairs (David Woike); the Provost (Rhonda Longworth); the Associate Provost (James Carroll); the Director of Labor and Employee Relations (Joline Davis); and the members of the Board of Regents (Michelle Crumm, Mary Treder Lang, Dennis Beagen, Michael Hawks, Eunice Jeffries, Michael Morris, James Webb, and Alexander Simpson).

4

*Iqbal*, 556 U.S. 662, 678 (2009).

In addition to the allegations in the complaint, the Court may also consider "other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice." *Ashland, Inc. v. Oppenheimer & Co., Inc*., 648 F.3d 461, 467 (6th Cir. 2011).[4]

## II. The Individual Defendants' Motion

In Counts III through XVII, Higbee alleges § 1983 claims against the Individual Defendants for First Amendment retaliation. The Individual Defendants argue that qualified immunity shields them from these claims. "Government officials who perform discretionary functions are entitled to qualified immunity from civil damage suits arising out of the performance of their official duties unless they violate clearly established constitutional rights of which a reasonable person would have known." *Purisch v. Tennessee Technological University*, 76 F.3d 1414, 1423 (6th Cir. 1996) (internal citations omitted). In other words, public officials are eligible for qualified immunity if (1) they did not violate any constitutional guarantees or (2) the guarantee, even if violated, was not "clearly established" at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Both inquiries are "objective," as they turn on what the law is today and whether it was clearly established at the time of the challenged action. *Harlow v. Fitzgerald*, 457 U.S. 800, 818-819 (1982).

"The purpose of a qualified immunity defense is not only protection from civil damages but protection from the rigors of litigation itself, including the potential disruptiveness of discovery."

---

[4]Higbee asks the Court to consider his affidavit and the arbitrator's opinion in making its analysis. Because this is a motion to dismiss, considering these materials—which are not incorporated into the complaint—would be inappropriate. The Court will confine its analysis to the factual allegations in the complaint and the facts that the parties have agreed the Court can consider.

5

*Summers v. Leis*, 368 F.3d 881, 886 (6th Cir. 2004).  Accordingly, "a qualified immunity defense can be raised at various stages of the litigation[,] including at the pleading stage in a motion to dismiss, after discovery in a motion for summary judgment, or as a affirmative defense at trial." *English v. Duke*, 23 F.3d 1086, 1089 (6th Cir. 1994).  However, even though entitlement to qualified immunity "is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Wesley v. Campbell*, 779 F.3d 421, 433-434 (6th Cir. 2015) (internal citations omitted) (collecting cases); *see also Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016) ("[I]t is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity.")

Despite the general appropriateness of deciding qualified immunity issues at summary judgment, the Court has a duty to address any qualified immunity defense that, like here, is properly raised prior to discovery. *Summers*, 368 F.3d at 886.  Thus, the Court must "determine—prior to permitting further discovery—whether Plaintiff's complaint alleged a violation of a constitutional right at all, and if so, whether that right was clearly established at the time of the alleged violation." *Id*.

### A. Higbee has Alleged Plausible Claims for First Amendment Violations

Higbee alleges that the Individual Defendants violated his First Amendment rights by suspending him for the Facebook post.  "'[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern.'" *Mayhew v. Town of Smyrna, Tenn.*, 856 F.3d 456, 462 (6th Cir. 2017) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)).  Although it is "long 'settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression,'"

6

*Connick v. Myers*, 461 U.S. 138, 142 (1983), such protections must be construed in balance with the efficient functioning of government services." *Mayhew*, 856 F.3d at 461-62. Thus, a person's First Amendment rights as a public employee are narrower than those of the citizenry at large. *Id*. (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

To establish a *prima facie* case of First Amendment retaliation under § 1983, Higbee must demonstrate that "(1) he was engaged in a constitutionally protected activity; (2) he was subjected to adverse action or deprived of some benefit; and (3) the protected speech was a 'substantial' or 'motivating factor' in the adverse action." *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004). At this time, the Individual Defendants do not dispute the second or third element. Nor do they presently dispute that Higbee has adequately alleged that each Individual Defendant participated in the decision to discipline him. *See Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) ("Each defendant's liability must be assessed individually on his own actions."). Rather, the Individual Defendants only argue that, as pleaded, Higbee did not engage in constitutionally protected activity.

To show that his speech was constitutionally protected, a public employee must satisfy three requirements. First, the employee must speak on 'matters of public concern.'" *Mayhew*, 856 F.3d at 462 (citing *Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 337 ("*Evans-Marshall II*") (6th Cir. 2010) and *Connick*, 461 U.S. at 143). Second, the employee must speak as a private citizen and not as an employee pursuant to his official duties. *Id.* (citing *Garcetti*, 547 U.S. at 421). Third, the employee must show that his speech interest outweighs "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id*. (quoting *Pickering*, 391 U.S. at 568) ("the *Pickering* balancing test"). The question of whether a public employee's speech is protected is a question of law for the Court to decide. *Id*. at 462-464.

7

### i. Higbee Has Plausibly Alleged that He Spoke on a Matter of Public Concern

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Mayhew*, 856 F.3d at 467 (quoting *Lane v. Franks*, 573 U.S. 228, 240 (2014)). The Court examines "the point of the speech in question," because "the pertinent question is not *why* the employee spoke, but *what* he said." *Id*. (internal citations omitted) (emphasis in original). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement..." *Connick*, 461 U.S. at 147-148. "It is not necessary for the entire expression to address matters of public concern, as long as some portion of the speech does." *Mayhew*, 856 F.3d at 467-468.

In the Facebook post, Higbee criticized the Individual Defendants' response to the racist graffiti and accused it of failing to acknowledge its own "institutional racist practices:"

> EMU administrators, a small group of well paid white guys in suits (plus one woman and a few lower level "HN in C" functionaries), lacked the insight to imagine that they could ever, possibly, be remotely seen as responsible for institutional racist practices. And so they continued to act as the aggrieved party, needlessly alienating students who objected to racism. Why EMU officials, earning six figures or more, took this stance can only be explained by a combination of 1. ignorance about what racism is, 2. overconfidence that they are the good guys, 3. a lack of knowledge of EMU specifically and of higher education generally.

Compl. ¶ 26.

The Supreme Court has described the "right to protest racial discrimination" as "a matter inherently of public concern." *Connick*, 461 U.S. at 148 n.8; *see also Hardy v. Jefferson Community College*, 260 F.3d 671, 689 (6th Cir. 2001) (noting that "race, gender, and power conflicts in our

8

society" are "matters of overwhelmingly public concern."). Here, Higbee appears to be commenting on his perception of the University's ignorance of its own institutional racism, and expressing his opinion that the Individual Defendants have perpetuated racial conflict by "fail[ing] to adequately address racism on campus." Compl. ¶ 44. Thus, based on the pleadings, the post appears to be on a matter of public concern.

The Individual Defendants make two arguments as to why the post is not on a matter of public concern. First, they argue that "HN in C" is commonly understood as a racial slur and that Higbee used that phrase only to insult University administrators. However, when considering the above-quoted text as a whole, it appears that Higbee was making a broad point about the University's reaction to a newsworthy incident. Moreover, even if "HN in C" could be construed as nothing more than a private insult, "[i]t is not necessary for the entire expression to address matters of public concern, as long as some portion of the speech does." *Mayhew*, 856 F.3d at 467-468. At least a portion of Higbee's post addressed a matter of public concern.

Second, the Individual Defendants argue that Higbee's post, as a whole, is a "run-of-the-mill employment dispute" because it is merely an assertion of his employer's incompetence, poor management, and poor decision-making. But even the case that the Individual Defendants cite in support of this argument specifically distinguishes run-of-the-mill employment disputes from cases where an employee speaks about "discrimination of some form." *See Boulton v. Swanson*, 795 F.3d 526, 532 (6th Cir. 2015) ("In contrast, speech addresses a matter of public concern when it alleges...discrimination of some form"). Because Higbee's post touched on his perception of the University's "institutional racist practices," this case is not a run-of-the-mill employment dispute.

Thus, the factual allegations of the complaint support the conclusion that Higbee spoke on

9

a matter of public concern.

### ii. Higbee has Plausibly Alleged that He Spoke as a Private Citizen

"Determining whether an employee speaks as a private citizen or as a public employee can be challenging." *Mayhew*, 856 F.3d at 464. "[T]he proper inquiry is a practical one." *Id.* (citing *Garcetti*, 547 U.S. at 424). In assessing Higbee's post, the Court must consider "both its content and context." *Id.* The Sixth Circuit has recognized several non-exhaustive factors for the Court to consider including: "the speech's impetus; its setting, its audience; and its general subject matter." *Id.* (citing *Handy-Clay v. City of Memphis*, 695 F.3d 531, 540 (6th Cir. 2012)); *see also Holbrook v. Dumas*, 658 Fed.App'x 280, 284 n.3 (6th Cir. 2016). These factors inform the "critical question" of "whether the speech at issue is itself ordinarily within the scope of an employee's duties." *Id.*

Higbee's complaint contains very few factual allegations that the Court can use to determine whether he spoke as a private citizen. However, Higbee has adequately alleged that he is employed as a Professor of American History. Compl. ¶ 23. Presumably, his primary duty is to teach American history to the University's students. Using a public forum to comment on the University's response to recent racial incidents would not appear to be within a history professor's official duties. Thus, based on the Complaint's factual allegations, the Court can draw a reasonable inference that Higbee spoke as a private citizen.

### iii. For the Purposes of this Motion Only, Higbee's Speech Interest Outweighs the University's Efficiency Interest

In addition to determining whether Higbee spoke about a public concern, as a private citizen, the Court must also apply the *Pickering* balancing test to determine whether the University violated his First Amendment rights. *Gillis v. Miller*, 845 F.3d 677 (6th Cir. 2017) (citing *Pickering*, 391 U.S. at 563 (1968)). In the *Pickering* balancing test, the Court weighs "the employee's interest in

'commenting upon matters of public concern'" against "'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000) (quoting *Pickering*, 391 U.S. at 568). In other words, "[t]he *Pickering* balancing test is used to determine if the employee's free speech interests outweigh the efficiency interests of the government as employer." *Gillis*, 845 F.3d at 684. The public agency bears the burden of justifying the disciplinary action under the *Pickering* balancing test. *See Connick*, 461 U.S. at 150.

### a. Higbee's Speech Interest

Because Higbee has plausibly alleged that, in making the Facebook post, he was speaking as a private citizen, on a matter of public concern, his speech rests "on the highest rung of the hierarchy of First Amendment values." *N.A.A.C.P. v. Claibourne Hardware Co.*, 458 U.S. 886, 913 (1982). Thus, as pleaded, Higbee's speech interest is substantial.

### b. The Individual Defendants' Efficiency Interest

In defining the Individual Defendants' efficiency interest, relevant considerations include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

The crux of the Individual Defendants' efficiency-interest argument is that Higbee's post was likely to cause disruption. They argue that Higbee's use of the term "HN in C" to refer to co-workers was likely to interfere with the performance of his duties as a professor, especially given the heightened atmosphere of racial tension on campus after the graffiti. They also argues that it was

reasonable to believe that there would be disharmony between Higbee and his co-workers and administrators, and that Higbee's comment endangered the prospective enrollment of African American students.

At this point in the case—where the claims are being evaluated under the Rule 12(b)(6) standard—there is no evidence that Higbee's speech caused actual disruption. When there is no evidence of actual disruption, the Court must "assess whether the employer could reasonably predict that the employee speech would cause disruption, in light of the manner, time, and place the speech was uttered, as well as the context in which the dispute arose." *Gillis*, 845 F.3d at 687. "Substantial weight is accorded to the government employer's prediction that given speech has the potential for disruptiveness, but its prediction must be reasonable." *Heil v. Santoro*, 147 F.3d 103, 109 (2nd Cir. 1998).

Because the Court is defining the Individual Defendants' efficiency interest through the lens of a motion to dismiss, its inquiry is confined to the factual allegations of the Complaint and those facts that it can judicially notice. Based on that universe of facts, the Court is unable to conclude that the Individual Defendants reasonably predicted that Higbee's post would cause disruption. The parties only note that, roughly a year before Higbee's post, students protested the racist graffiti by "marching through the street to the president's home" and staging a "peaceful sit-in at a student center." Defs.' Stat. Of Mat. Fact ¶ 13-14; (ECF No. 27-4, PageID 114). These year-old protests, which had a different catalyst, provide little insight into whether the Individual Defendants reasonably predicted disruptions after Higbee's post—especially because there is no indication that the past protests actually disrupted the University's work.

Further, at this point, the Court is unable to credit the Individual Defendants's unsupported

representations that they reasonably predicted disharmony between Higbee, his co-workers, and its administrators, or that it reasonably predicted that Higbee's comment would hinder its ability to recruit and retain students. In the academic setting "dissent is expected" and, accordingly, so is at least some disharmony. *See Smith v. College of the Mainland*, 63 F.Supp.3d 712, 718-719 (S.D. Texas) ("the contention that controversy...threatens the workplace is not nearly as compelling in the context of a college as it might be in other employment settings."). Whether the Individual Defendants reasonably predicted that Higbee's post would cause an *unacceptable* level of disharmony remains to be seen. Further, as the parties' dispute shows, the meaning of the phrase "HN in C" is not obvious from the face of the Complaint, which casts doubt on the effect that the term had, or could have had, among Higbee's fellow professors and the student body. *Cf. Anderson v. Evans*, 660 F.2d 153, 159 (6th Cir. 1981) (concluding that a teacher's comment that she "hate[s] all black folks" would have an "obvious" effect a school "whose entire student body was black"). And there is no basis for the Court to conclude that Higbee's employment relationships with the targets of his speech, the Regents and administrators, are "the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." *Pickering*, 391 U.S. at 570. Without further factual development, the Court cannot conclude that the Individual Defendants' predictions of workplace or student disharmony were reasonable.[5]

---

[5]In passing, the Individual Defendants also argue that they disciplined Higbee because the University is "legally obligated to remediate any abusive, hostile, and discriminatory acts by or toward its employees under Title VII and the Eliot-Larsen Act." These arguments are not fully developed and the Court need not put flesh on their bones. *McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997). Because these underdeveloped arguments could implicate significant questions of federal and state law, the Court will not consider them.

Thus, at this stage of the action, the University has not met its burden to show that its efficiency interest outweighs Higbee's speech interest. Higbee has adequately pleaded his claim and the Court concludes that discovery may show a set of facts that entitle him to relief. *See Twombly*, 550 U.S. at 563. Accordingly, he has pleaded plausible claims for First Amendment retaliation.

B. **For the Purposes of this Motion only, Higbee's First Amendment Right was Clearly Established**

Even though Higbee has pleaded plausible First Amendment retaliation claims, the Individual Defendants would be entitled to qualified immunity if the relevant Constitutional guarantee was not "clearly established" at the time of the alleged misconduct. *Pearson*, 555 U.S. at 236.

This part of the Court's inquiry is complicated by the nature of both the *Pickering* balancing test and the instant motion. The Sixth Circuit has recognized that "in many public employee free speech cases it would be unclear to a reasonable official what the outcome of the [*Pickering*] balancing inquiry should be," *Williams v. Com. of Ky.*, 24 F.3d 1526, 1537 (6th Cir. 1994), and has suggested that, in the First Amendment retaliation context, an official should be charged with knowledge of the law only if there is a previously decided case with "clearly analogous facts." *Evans-Marshall v. Board of Educ. of Tipp City Exempted Village School Dist.* ("*Evans I*"), 428 F.3d 223, 233 (6th Cir. 2005).

But the Sixth Circuit has also acknowledged that there are cases where the imprecision of the *Pickering* balancing test makes no difference because "the employee has spoken out on matters of great public concern, and these statements apparently had only minimal effect on the efficiency" of the public employer. *See Williams*, 24 F.3d at 1537; *see also Akridge v. Wilkinson*, 178 Fed.App'x 474, 481 (6th Cir. 2006) (adopting the following test for qualified immunity in a public employer

First Amendment retaliation case: "...if an employer in the position of the defendants at the time of the adverse job action, measured objectively, could have disagreed as to (1) whether and to what extent the speech was a matter of public concern, and (2) where the *Pickering* scale, with all of the parties' competing interests in the balance would ultimately come to rest, then the protection of qualified immunity should be granted."); *Kinney v. Weaver*, 367 F.3d 337, 372 (5th Cir. 2004) ("[i]t is entirely appropriate to deny qualified immunity when the balance of cognizable interests weighs so starkly in the plaintiff's favor"). As of now, the *Pickering* balancing test weighs starkly in Higbee's favor because the University cannot yet substantiate its efficiency interest. Thus, for the purposes of this pre-discovery motion to dismiss, this is a case where objective employers would not have disagreed about where the *Pickering* scale would have come to rest. *Akridge*, 178 Fed.App'x at 481. Accordingly, the Court will deny qualified immunity to the Individual Defendants at this time.

Moreover, *Pickering* itself seems to be clearly analogous to this case (as it currently sits), and appears to put the Individual Defendants on notice that their alleged conduct was impermissible. There, a teacher wrote a letter to the local paper, criticizing the school board's management of previous bond issues and financial allocations. *Pickering*, 391 U.S. at 568. The school board fired the teacher for writing and publishing the letter. The Supreme Court concluded that "the question whether a school system requires additional funds is a matter of legitimate public concern" and that, although the teacher's statements were "critical of his ultimate employer," they were "neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally." *Id*. at 573. The Supreme Court held that the "teacher's exercise of his right to speak on

15

issues on public importance may not furnish the basis for his dismissal from public employment." *Id*. at 571-574.

Here, a professor wrote a post on a public forum, criticizing his university's response to racial tension on campus. Although the post was critical of the professor's employer, there is currently no indication that it impeded, or would impede, the professor's proper performance of his daily duties in the classroom or that it interfered with the regular operation of the University generally. Under those facts, the post clearly may not furnish the basis for discipline.

To the extent that the Individual Defendants argue that Higbee's use of a purported racial slur changes the qualified immunity analysis, the Court notes that the Sixth Circuit examined cases similar to this one in *Dambrot v. Central Michigan University*, 55 F.3d 1177, 1189 (6th Cir. 1995). In *Dambrot*, a university fired its men's basketball coach after he used the term "ni\*\*er" an attempt to motivate his team to play harder. In rejecting the coach's argument that his speech was on a matter of public concern, the Sixth Circuit compared his use of the slur with other instances where university employees used derogatory language:

> Compare with the instant case two cases out of the Second Circuit involving the First Amendment rights of two professors from the City University of New York (CUNY). *See Levin v. Harleston*, 966 F.2d 85 (2d Cir.1992); *Jeffries v. Harleston*, 21 F.3d 1238 (2d Cir.1994), *vacated, remanded*, 513 U.S. 996, 115 S.Ct. 502, 130 L.Ed.2d 411 (1994). In both cases, professors made derogatory remarks about persons of certain racial or ethnic groups and, in both cases, the University took some action which the professor alleged was in retaliation for the exercise of his First Amendment rights. Professor Levin wrote three letters which were published in the New York Times and two journals in which he made denigrating comments about the intelligence of African Americans. The University created a "shadow section" for one of Levin's classes and set up an Ad Hoc Committee to review his fitness to teach. Professor Jeffries made a speech in which he discussed racial bias in the New York public school system and made derogatory comments about Jews. In his case, the University denied Jeffries a three-year term as chairman of the Black Studies department, the post he had held since the department's inception in 1972. In *Levin*, the Second Circuit found Professor Levin's expression of ideas demanded First

> Amendment protection. *Levin*, 966 F.2d at 87. In *Jeffries*, the Second Circuit found the speech in question satisfied the first prong of the *Connick* test, touching a matter of public concern. *Jeffries*, 21 F.3d at 1245. The speech and letters advanced viewpoints, however repugnant, which had as their purpose influencing or informing the public debate. Dambrot's speech did not have such a purpose.

*Id.* at 1189.

In making this comparison, the Sixth Circuit clearly acknowledges that a university professor's speech is not *per se* punishable just because it incorporates racially derogatory remarks. *See also Morris v. Crow*, 117 F.3d 449, 458 n.4 (11th Cir. 1997) (noting that there is no *per se* rule that profanity is or is not protected under *Pickering*). Thus, absent a showing of the Individual Defendants' countervailing efficiency interest, Higbee's post falls within the protection of the First Amendment.

## CONCLUSION

The above analysis is based on the record currently before the Court. Without further factual development, the Court is unable to better define the Individual Defendants' efficiency interests or conclusively determine whether they are entitled to qualified immunity. This problem is well-recognized in the Sixth Circuit. *See Devlin v. Kalm*, 531 Fed.App'x 697, 707 (6th Cir. 2013) (noting that, because courts in the Sixth Circuit frequently deny summary judgment to government employers who fail to produce evidence that would allow the court to strike the *Pickering* balance in their favor, "at the motion-to-dismiss stage—where facts outside the complaint cannot be considered and the plaintiff's allegations must be accepted as true—it will rarely be possible to determine whether a defendant's actions were clearly lawful.")[6]; *Handy-Clay*, 695 F.3d at 545

---

[6]*Devlin* does not suggest that it is "*never* [ ] possible to recognize qualified immunity on a *Pickering* claim at the pleadings stage." *Devlin*, 531 Fed.App'x at 707 (emphasis in original). However, the only case that the Court knows of where qualified immunity was granted before

17

(concluding that, on a motion to dismiss, a government employer could not support its claim that a termination was for a non-retaliatory reason "without some factual discovery.") (internal citations omitted); *Evans-Marshall I*, 428 F.3d 223, 235 (Sutton, J., concurring) ("But just as [the considerations in the *Pickering* balancing test] frequently will make it difficult for a plaintiff to surmount a qualified-immunity defense *after discovery,* so they make it difficult for a defendant to claim qualified immunity on the pleadings *before discovery* and before the parties (much less the courts) know what is being balanced against what.") (emphasis in original); *Perry v. McGinnis*, 209 F.3d 597, 603 (6th Cir. 2000) ("In many cases, due to inadequate factual development, the [*Pickering*] balancing test cannot be performed on a 12(b)(6) motion.").[7]

---

any factual development, *Guercio v. Brody*, 911 F.2d 1179 (6th Cir. 1990), is readily distinguishable from this case. *See Devlin*, 531 Fed.App'x at 707 (noting that, in *Guercio*, the Sixth Circuit relied upon "highly detailed allegations in the plaintiff's complaint" and the "court's awareness of the institutional dynamics" of plaintiff's employers (a federal district court and a federal bankruptcy court)).

[7]The Court also notes that the Individual Defendants do not cite any cases where a court has granted a pre-discovery motion to dismiss in a *Pickering* context. *See Lane*, 573 U.S. at 233 (2014) (affirming in part grant of summary judgment in favor of defendant); *Waters v. Churchill*, 511 U.S. 661, 668 (1994) (remanding case after district court's grant of summary judgment); *Boulton*, 795 F.3d at 530 (affirming grant of summary judgment in favor of defendants "after discovery"); *Evans-Marshall II,* 624 F.3d at 337 (affirming grant of summary judgment in favor of defendants "after discovery"); *Farhat,* 370 F.3d at 587 (affirming grant of summary judgment to defendants); *Brandenburg v. Housing Authority of Irvine*, 253 F.3d 891, 896 (6th Cir. 2001) (affirming grant of summary judgment in favor of defendant); *Dambrot*, 55 F.3d at 1181-82 (affirming grant of summary judgment); *Williams*, 24 F.3d at 1532 (1994) (affirming denial of defendants' motion for summary judgment); *Anderson*, 660 F.2d at 165 (affirming judgment in favor of defendants where the district court had treated motions as cross-motions for summary judgment); *Snipes v. Volusia County*, 704 Fed.App'x at 851 (11th Cir. 2017) (affirming grant of summary judgment in favor of defendant); *Morris*, 117 F.3d at 455 (11th Cir. 1997) (reversing jury verdict in favor of plaintiff); *Geer v. Altiere*, 2018 WL 1535232 at *3 (N.D. Ohio 2018) (granting summary judgment in favor of defendants); *Wright v. Glynn County Bd. of Com'rs*, 932 F.Supp. 1476, 1479 (S.D. Ga. 1996) (granting summary judgment in favor of defendants); *Foreman v. LSU Health Sciences Center*, 907 So.2d 103, 106 (La. Ct. App. 2005) (affirming Civil Service Commission's decision, which was rendered after an evidentiary hearing); *Vinci v.*

The Individual Defendants may well prevail at summary judgment. Discovery could, and likely will, impact the Court's *Pickering* analysis because it will provide insight on the University's efficiency interest (i.e whether Higbee's post caused actual disruption or whether the Individual Defendants had a reasonable prediction of disruption). A different *Pickering* balance, in turn, might change the Court's qualified immunity analysis because it could show that objective employers would have disagreed about where the *Pickering* balance would come to rest in this case. *Akridge*, 178 Fed.App'x at 481. Discovery could also shed light on other important considerations, such as whether Higbee was actually speaking as a private citizen. However, based on the factual allegations contained in Higbee's Complaint and those facts that the Court has judicially noticed, the Court concludes that Higbee has pleaded plausible claims of First Amendment retaliation and that the Individual Defendants are not entitled to qualified immunity at this time.

For these reasons, the Court **DENIES** the Individual Defendants' motion to dismiss. (ECF No. 29).

**IT IS SO ORDERED.**

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: July 1, 2019

---

*Nebraska Dept. of Correctional Services* 571 N.W.2d 53, 57-58 (Neb. 1997) (describing an administrative procedure where testimony was taken).